**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SERVICIOS FUNERARIOS GG, S.A. DE C.V., | |
| Plaintiff, | |
| v. | |
| ADVENT INTERNATIONAL CORPORATION, | |
| Defendant, | |
| and | Civil Action No. 23-cv-10684 |
| ADVENT INTERNATIONAL CORPORATION, | |
| Counterclaim-Plaintiff, | |
| v. | |
| SERVICIOS FUNERARIOS GG, S.A. DE C.V., | |
| Counterclaim-Defendant. | |

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT**

Defendant and Counterclaim-Plaintiff Advent International Corporation ("AIC") submits the following answer, affirmative defenses, and counterclaims to the March 29, 2023 complaint ("Complaint") filed by Plaintiff and Counterclaim-Defendant Servicios Funerarios GG, S.A. de C.V. ("Servicios Funerarios"):[1]

## **INTRODUCTION**

Already having engaged in the flagrant abuse of the Mexican justice system, Servicios Funerarios' Complaint is just the latest step in an escalating scheme designed to coerce AIC into re-trading on an ordinary-course private equity deal that had been heavily diligenced and negotiated.  AIC has not and will not submit to this obvious extortion attempt, and files this answer, affirmative defenses, and counterclaims to vindicate its rights and reputation.

---

[1]  Pursuant to Federal Rule of Civil Procedure 44.1, AIC hereby gives notice that it may rely on the laws of Mexico, without prejudice to asserting that the laws of Massachusetts or of any other jurisdiction apply to any specific claim, counterclaim, or defense referenced herein.

## ANSWER

### INTRODUCTION

1.     Paragraph 1 of the Complaint is a narrative introduction purporting to describe Plaintiff's lawsuit and thus no answer is required.  To the extent that an answer is required, AIC denies the allegations in Paragraph 1 of the Complaint.

### PARTIES, JURISDICTION, AND VENUE

2.     AIC denies the allegations in Paragraph 2 of the Complaint, including because AIC lacks information or knowledge sufficient to form a belief about the allegations that Servicios Funerarios is a corporation organized and doing business under the laws of Mexico and that Servicios Funerarios owns 99.9% of the shares of Grupo Gayosso S.A. de C.V. ("Gayosso").

3.     AIC denies the allegations in Paragraph 3 of the Complaint, except it admits that (i) AIC is a corporation organized under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts; and (ii) AIC manages investment funds.

4.     AIC lacks sufficient information to admit or deny that this is an action between a citizen of a State and a citizen or subject of a foreign state.  The remainder of this paragraph states legal conclusions to which no response is required.

5.     AIC admits that it resides in this district and that venue is proper in this district. AIC denies that a substantial part of the events or omissions giving rise to the claims Servicios Funerarios asserts occurred in this district.

### FACTUAL ALLEGATIONS

6.     AIC denies the allegations in Paragraph 6 of the Complaint, including because it lacks information or knowledge sufficient to form a belief about the allegations that Gayosso is currently the largest funeral services company in Mexico, the number of funeral homes and cemeteries Gayosso currently owns, the number of Mexican states in which Gayosso currently

operates, or the specific types of funeral services Gayosso currently provides, except AIC admits that Gayosso is a funeral services company that was formed in 1875.

7.      Paragraph 7 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 7 of the Complaint, except it admits that (i) on January 24, 2020, TwiBel 1 SPRL, TwiBel 2 SPRL, TwiBel 3 SPRL, TwiBel 4 SPRL, TwiBel 5 SPRL, TwiBel 6 SPRL, TwiBel 7 SPRL (collectively, the "TwiBel Entities"), entered into a Stock Purchase and Sale Agreement with Servicios Funerarios (as amended, the "SPA"); and (ii) the SPA was amended four times: on January 27, 2020; September 30, 2020; December 18, 2020; and January 27, 2021.

8.      AIC denies the allegations in Paragraph 8 of the Complaint, except it admits that (i) at the time the TwiBel Entities entered into the SPA, the TwiBel Entities owned approximately 99.9% of the shares of Gayosso; and (ii) the TwiBel Entities were special-purpose entities.

9.      AIC denies the allegations in Paragraph 9 of the Complaint, except it admits that the TwiBel Entities were respectively owned by seven special-purchase entities incorporated in Luxembourg named Advent Twilight Luxembourg 1 S.à r.l., Advent Twilight Luxembourg 2 S.à r.l., Advent Twilight Luxembourg 3 S.à r.l., Advent Twilight Luxembourg 4 S.à r.l., Advent Twilight Luxembourg 5 S.à r.l., Advent Twilight Luxembourg 6 S.à r.l., and Advent Twilight Luxembourg 7 S.à r.l. (collectively, the "TwiLux Entities").

10.      Paragraph 10 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 10 of the Complaint, except it admits that (i) the purpose of the SPA was the sale and purchase of Gayosso's capital stock and Gayosso's real estate assets; and (ii) the transaction closed in January 2021, with Servicios Funerarios acquiring Gayosso's capital stock.

11.     AIC denies the allegations in Paragraph 11 of the Complaint, except it respectfully refers the Court to the SPA in the original Spanish for its complete contents and denies any characterizations that are inconsistent with its terms.

12.     AIC denies the allegations in Paragraph 12 of the Complaint, except it (i) admits that Gayosso's audited financial statement for the year 2019 and the unaudited financial statement for the year 2020 were among the documents attached to the SPA executed in January 2021; (ii) admits that Gayosso's audited financial statements for the years 2016, 2017, and 2018 and Gayosso's unaudited financial statement for 2019 were attached to versions of the SPA executed before January 2021; and (iii) respectfully refers the Court to the SPA in the original Spanish for its complete contents and denies any characterizations that are inconsistent with its terms.

13.     AIC denies the allegations in Paragraph 13 of the Complaint, except it respectfully refers the Court to the SPA in the original Spanish for its complete contents and denies any characterizations that are inconsistent with its terms.

14.     Paragraph 14 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 14 of the Complaint.

15.     Paragraph 15 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 15 of the Complaint, except it admits that (i) Veronica Stenner placed certain financial statements of Gayosso and other documents concerning Gayosso in a virtual data room; and (ii) Servicios Funerarios accessed and reviewed documents in the virtual data room during negotiations concerning the purchase of Gayosso.

16.     Paragraph 16 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 16 of the Complaint.

17.     AIC denies the allegations in Paragraph 17 of the Complaint, except it admits that investment funds managed by AIC invested in Gayosso in 2007.

18.     AIC denies the allegations in Paragraph 18 of the Complaint, except it admits that in 2017, Gayosso declared a dividend.

19.     Paragraph 19 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 19 of the Complaint, except it admits that the original SPA was executed in January 2020.

20.     Paragraph 20 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 20.

21.     Paragraph 21 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 21.

22.     AIC denies the allegations in Paragraph 22 of the Complaint, including because it lacks information or knowledge sufficient to form a belief about the allegations concerning Gayosso's current business and activities.

23.     Paragraph 23 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 23 of the Complaint, except it admits that (i) pre-need contracts present accounting considerations that are different from those implicated by at-need contracts; (ii) while a pre-need purchaser may pay in full either at the time of contracting or in installments beginning at that time, a funeral service provider would not actually have to provide the contracted-for services until sometime in the future, often years later and sometimes never; and (iii) in pre-need transactions, Gayosso had to determine when it would recognize the revenue it received for the services and goods it had not yet provided.

24.     Paragraph 24 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 24 of the Complaint.

25.     Paragraph 25 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 25 of the Complaint

26.     Paragraph 26 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 26 of the Complaint

27.     Paragraph 27 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 27 of the Complaint

28.     Paragraph 28 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 28 of the Complaint

29.     Paragraph 29 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 29 of the Complaint, except it admits that Gayosso acquired caskets from third-party vendors and from one of its subsidiaries.

30.     Paragraph 30 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 30 of the Complaint.

31.     Paragraph 31 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 31 of the Complaint, except it admits that at the time the SPA was executed, Gayosso had an existing contract, dated January 8, 1982, with the Mexican government agency Instituto de Seguridad y Servicios Sociales de los Trabajadores del Estado.

32.     Paragraph 32 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 32 of the Complaint.

33.     Paragraph 33 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 33 of the Complaint.

34.     Paragraph 34 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 34 of the Complaint, except that AIC is not a named party to the SPA.

35.     AIC denies the allegations in Paragraph 35 of the Complaint.

36.     AIC denies the allegations in Paragraph 36 of the Complaint, except it respectfully refers the Court to the referenced Advent International web page entitled "How We Add Value," located at https://www.adventinternational.com/about/how-we-add-value/, for its complete contents and denies any characterizations that are inconsistent with those contents.

37.     AIC denies the allegations in Paragraph 37 of the Complaint, except that it (i) admits that Enrique Pani Bano served as Chairman of Gayosso's board; and (ii) respectfully refers the Court to the referenced May 2021 Advent International Responsible Investment Policy, located at https://www.adventinternational.com/wp-content/uploads/2021/05/Advent_RI_Policy_Statement_2021.pdf, for its complete contents and denies any characterizations that are inconsistent with those contents.

38.     AIC denies the allegations in Paragraph 38 of the Complaint, except that it respectfully refers the Court to the referenced filing for its complete contents and denies any characterizations that are inconsistent with those contents.

39.     Paragraph 39 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 39 of the Complaint.

40.     AIC denies the allegations in Paragraph 40 of the Complaint.

41.     Paragraph 41 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 41 of the Complaint.

42.     Paragraph 42 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 42 of the Complaint, except it admits that Enrique Pani Bano was the chairman of the Board of Gayosso at the time of the negotiation and execution of the SPA.

43.     Paragraph 43 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 43 of the Complaint, except it admits that (i) Carlos Alfredo Paz Perez is a Senior Director and co-head of Portfolio Support Group, Latin America, for Advent International PE Advisors, S.C.; and (ii) Messrs. Paz and Pani executed the SPA on behalf of Gayosso.

44.     AIC denies the allegations in Paragraph 44 of the Complaint, except it admits that at the time of the negotiation and execution of the SPA, James Westra was based in AIC's Boston office as General Counsel and Managing Partner.

45.     AIC denies the allegations in Paragraph 45 of the Complaint.

46.     Paragraph 46 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 46 of the Complaint.

47.     Paragraph 47 states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in Paragraph 47 of the Complaint

### COUNT I
### (Fraud in the Inducement)

48.     AIC hereby incorporates by reference its responses to Paragraphs 6 through 47 of the Complaint as if fully stated herein.

49.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

50.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

51.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

52.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

53.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

**COUNT II**
**(Violation of Massachusetts General Law Chapter 93A)**

54.     AIC hereby incorporates by reference its responses to Paragraphs 6 through 47 of the Complaint as if fully stated herein.

55.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

56.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

57.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

**COUNT III**
**(Negligent Misrepresentation)**

58.     AIC hereby incorporates by reference its responses to Paragraphs 6 through 47 of the Complaint as if fully stated herein.

59.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

60.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

61.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

## COUNT IV
### (Unjust Enrichment)

62.     AIC hereby incorporates by reference its responses to Paragraphs 6 through 47 of the Complaint as if fully stated herein.

63.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

64.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

65.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

66.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

## COUNT V
### (Unjust Enrichment)

67.     AIC hereby incorporates by reference its responses to Paragraphs 6 through 47 of the Complaint as if fully stated herein.

68.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

69.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

70.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

71.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

72.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

73.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

74.     This paragraph states legal conclusions to which no response is required.  To the extent a response is required, AIC denies the allegations in this paragraph.

## PRAYER FOR RELIEF

AIC denies that Servicios Funerarios is entitled to any relief in this action.

## AFFIRMATIVE DEFENSES

AIC states the following affirmative and other defenses to Plaintiff's claims, without assuming the burden of proof on such defenses that would otherwise rest on Plaintiff:

### First Affirmative Defense

The Complaint fails to state any claims upon which relief can be granted.

### Second Affirmative Defense

Servicios Funerarios' claims are barred by the applicable statutes of limitations.

### Third Affirmative Defense

Servicios Funerarios' claims are barred by the doctrine of laches.

<u>Fourth Affirmative Defense</u>

Servicios Funerarios' claims are barred by the doctrine of unclean hands.

<u>Fifth Affirmative Defense</u>

Any recovery by Servicios Funerarios would constitute unjust enrichment.

<u>Sixth Affirmative Defense</u>

To the extent Servicios Funerarios is entitled to any relief, it is not entitled to any equitable relief because it has an adequate remedy at law.

<u>Seventh Affirmative Defense</u>

Servicios Funerarios' claims are barred or limited by the terms of the SPA, the concurrently executed financial guarantee, or any related contracts or agreements.

<u>Eighth Affirmative Defense</u>

Servicios Funerarios has waived any recovery in connection with the SPA.

<u>Ninth Affirmative Defense</u>

Servicios Funerarios has released its claims in connection with the SPA.

<u>Tenth Affirmative Defense</u>

Servicios Funerarios' claims are barred because it has not pled that it relied on any statement AIC made.

<u>Eleventh Affirmative Defense</u>

Servicios Funerarios' claims are barred because it has not pled that it relied on any false or misleading representations or omissions.

<u>Twelfth Affirmative Defense</u>

Servicios Funerarios' claims are barred because it has not pled that AIC is legally responsible for any of the individuals or entities that were involved with or parties to the transaction, through agency theory, piercing the corporate veil or any other theory.

<u>Thirteenth Affirmative Defense</u>

Servicios Funerarios' claims are barred by Servicios Funerarios' failure to take all reasonable steps to prevent, mitigate, minimize, or avoid any damage or losses alleged.

<u>Fourteenth Affirmative Defense</u>

Servicios Funerarios' claims are barred to the extent that Servicios Funerarios destroyed evidence, lost evidence, allowed evidence to be lost, suppressed evidence, or failed to preserve evidence.

<u>Additional Affirmative Defenses</u>

AIC reserves the right to assert additional affirmative defenses based upon further investigation and discovery.

## COUNTERCLAIMS

1.      Defendant and Counterclaim-Plaintiff AIC brings these counterclaims in response to Counterclaim-Defendant Servicios Funerarios' flagrant abuse of the Mexican criminal justice system to target the reputations, liberty, and livelihoods of a leading Massachusetts-based private investment firm and its senior professionals and affiliates.

2.      This case involves calculated extortion arising out of a plain-vanilla private equity transaction.  Servicios Funerarios' campaign of abuse has included obtaining patently baseless arrest warrants, Interpol "Red Notices," and *ex parte* embargos of unrelated assets all in the hopes of pressuring AIC's affiliates into paying ransom.

3.      AIC is a global private investment firm based in Boston with $92 billion of assets under management as of December 31, 2022.

4.      In January 2021, Servicios Funerarios acquired Gayosso, a private Mexican funeral services company, in a USD 201 million transaction from entities owned by certain private equity fund programs managed by AIC (the "Sellers" or, as defined above, "TwiBel Entities").

5.      The Sellers had relied on Carlos Peña Vazquez ("Carlos Peña") as one of their negotiators in the Gayosso transaction.  At the time, Carlos Peña was an experienced and trusted member of the investment team at Advent International PE Advisors, S.C. ("Advent Mexico"), an affiliate of AIC based in Mexico City.  Carlos Peña had worked for Advent Mexico for more than a decade and received millions of dollars in salary and incentive compensation.

6.      From start to finish, the sale process involved more than a year and a half of back-and-forth.  The transaction closed after a seventeen-month due diligence and information-sharing period, during which Servicios Funerarios and its sophisticated legal, financial, and accounting advisors had virtually unfettered access to Gayosso's financial, operations, and accounting information, as well as its management team.

7.     Put simply, Gayosso gave Servicios Funerarios everything it needed to diligence the deal—and then some.  Not once during this seventeen-month period did Servicios Funerarios claim that Gayosso's accounting practices ran afoul of applicable standards.

8.     But almost immediately after the sale closed, troubling signs of Servicios Funerarios' extortion scheme began to emerge.

9.     Shortly after the January 2021 closing, Carlos Peña abruptly informed colleagues at Advent Mexico that he was joining Gayosso—now owned by Servicios Funerarios—as its CEO.

10.     Then, in November 2021, with Carlos Peña installed as Gayosso's CEO, Servicios Funerarios sent a demand letter alleging that the Sellers had fraudulently induced Servicios Funerarios to enter into the Gayosso transaction by presenting an inaccurate picture of Gayosso's accounting and financial health—despite the fact that Servicios Funerarios and its accounting advisors pored over Gayosso's financial statements and accounting practices for months.  The letter was sent to the Sellers and to various fund entities managed by AIC that had executed a guarantee agreement (the "Guarantee") in favor of Servicios Funerarios in the event of a money judgment against the Sellers arising out of a breach of the parties' SPA.

11.     Servicios Funerarios demanded that the Sellers immediately return the purchase price for the Gayosso transaction and pay hundreds of millions of dollars in putative damages as calculated by Servicios Funerarios.  The letter threatened that if the Sellers did not capitulate to its demands, Servicios Funerarios would bring civil and criminal actions against AIC's affiliates, and the amounts would "only increase."

12.     The allegations in Servicios Funerarios' letter were completely manufactured.  At the same time that it claimed the Sellers fraudulently induced it to enter into the SPA through false representations, Servicios Funerarios continued to employ the Sellers' negotiator Carlos Peña as

Gayosso's CEO, and retained the same CFO who was responsible for Gayosso's financial accounting for years prior to the sale.

13.     The Sellers immediately saw the letter for what it was: an extortion attempt.  So they refused to "pay up."

14.     Making good on its threat, Servicios Funerarios then filed a sham civil lawsuit in Mexico against AIC, Advent Mexico, and the Sellers, seeking to reverse the transaction and collect hundreds of millions of dollars in fictitious damages.

15.     To try to gain additional improper leverage, Servicios Funerarios' civil complaint also requested an "emergency" embargo freezing hundreds of millions of dollars in assets unrelated to the Gayosso transaction.  The targeted assets were held by completely different AIC-managed funds, with different investors, than the funds that had invested in Gayosso.

16.     Like its demand letter, the Mexican civil complaint falsely alleged that the Sellers willfully deceived Servicios Funerarios into purchasing Gayosso by employing accounting practices that presented an inaccurate picture of Gayosso's finances.

17.     The Mexican civil complaint's allegations are false and its claims legally frivolous. Servicios Funerarios had virtually unfettered access to Gayosso's books and management throughout the seventeen-month period leading up to closing the deal and, aided by a team of sophisticated advisors, gained an intimate working knowledge of Gayosso's business model and accounting practices.

18.     Servicios Funerarios also had an unusually direct and knowledgeable source of information in diligence.  Servicios Funerarios' lead negotiator was Pablo Peña Vazquez ("Pablo Peña").  And Pablo Peña's brother was Carlos Peña—who in addition to negotiating the transaction on behalf of the Sellers, had managed the Gayosso investment for the Sellers before the sale and

served on the management and finance committees of Gayosso's board of directors.  To give just one example of the close information-sharing between the Peña brothers that occurred throughout the sale process, Carlos Peña immediately forwarded correspondence sent to Gayosso's board of directors directly to Pablo Peña even before sharing or discussing it with other representatives of the Sellers.

19.     It was plain to AIC that Servicios Funerarios intended the Mexican civil lawsuit as a vehicle for extortion rather than an effort to advance legitimate legal claims.  AIC refused to submit, and Servicios Funerarios made no headway on its civil lawsuit.  The requested asset embargo was denied by the civil court, and the denial was confirmed by a second Mexican court.

20.     So Servicios Funerarios sought to escalate what is, at most, an ordinary business dispute, by applying additional pressure through abuse of the Mexican criminal justice system.

21.     To do so, Servicios Funerarios and the Peña brothers added a key new member to their scheme: a Mexican law firm notorious for regularly abusing its close connections to prosecutors, judges, and other Mexican officials to weaponize criminal process against their clients' adversaries in civil litigation.

22.     Servicios Funerarios' criminal counsel's abuse of the Mexican justice system for purposes of extortion on behalf of its clients has been widely reported in the press, including that it was the subject of an investigation by Mexico's Attorney General.

23.     Following the tested playbook, Servicios Funerarios caused a prosecutor in Mexico City to launch a criminal investigation against several current and former employees of AIC, Advent Mexico, and Gayosso (the "Targeted Employees"), including AIC's then-general counsel, who was also one of its managing partners based in Boston.

24.     Servicios Funerarios then caused the prosecutor to seek, and successfully obtain, extraordinary relief from a Mexico City criminal judge.  This included arrest warrants against the Targeted Employees—before they had been so much as charged with a crime—and the same embargo that had just been denied by the Mexican civil court, on hundreds of millions of dollars in assets wholly unrelated to the Gayosso transaction.

25.     One of the targeted assets in particular, a Mexican pharmaceutical business called Grupo Farmacéutico Somar, S.A.P.I de C.V. ("Somar"), was the subject of a pending transaction between affiliates of an AIC-managed fund (as sellers) and Procaps Group, S.A., a Nasdaq-listed global pharmaceutical company (as buyer).  On information and belief, Servicios Funerarios knew this and sought to exploit the pending transaction as leverage in its own unrelated litigation involving Gayosso.

26.     The relief was requested and granted at two short *ex parte* criminal hearings held within hours of each other and just days before the Somar transaction was set to close.

27.     The orders granting Servicios Funerarios' requested relief were clearly in violation of Mexican law.

28.     Under Mexican law, issuing an arrest warrant before an initial charging hearing at which the person being investigated is present, informed of their rights, provided a description of the allegations against them, and given an opportunity to answer them is an extraordinary measure. It is reserved for exceptional circumstances and requires the prosecutor to make an evidentiary showing that the only way for the accused person to appear at the charging hearing is through an arrest warrant and not by any other means—typically because the accused has repeatedly failed to appear in the face of other process, such as a subpoena.  The only exception to this rule is for particularly serious crimes, such as murder, rape, and human trafficking.

29.    Here, no exceptional circumstances exist.  The Targeted Employees are attorneys and prominent senior executives.  The criminal investigation concerns baseless allegations of fraud in connection with an ordinary business transaction.  The prosecutor never attempted to secure the Targeted Employees' appearance at an initial charging hearing before seeking the arrest warrants. And the only evidence that the prosecutor presented to support the assertion that doing so would have been futile is that certain of the accused individuals had multiple homes, including some outside of the jurisdiction.  Mexican law does not permit the issuance of an arrest warrant on such a patently insufficient basis.

30.    Similarly, to obtain a criminal asset embargo against an entity, as here, Mexican law imposes the basic minimum requirement that the entity be subject to a criminal investigation. None of the AIC-affiliated entities that owned the embargoed assets is the subject of any criminal investigation related to the Gayosso transaction.  Indeed, it is undisputed that none of them was in any way involved in the Gayosso transaction.  The criminal court that issued the embargo confirmed this fact while perversely denying reconsideration of the embargo order.

31.    The entire asset embargo hearing that resulted in the freezing of hundreds of millions of dollars in assets unrelated to the Gayosso transaction lasted just over nine minutes. Neither AIC nor any of its affiliates received notice of the hearing or an opportunity to be heard. No mention was made by the prosecutor of the Guarantee, which was negotiated to address the precise harm alleged in the criminal complaint; of the existence of a civil complaint that had sought the same asset embargo; or of the civil court's prior rejection of it.

32.    The prosecutor's and judge's failure to adhere to the most basic principles of Mexican criminal law reflects the lack of basis for the requests, the extortionate nature of the

scheme, and Servicios Funerarios' counsel's improper reach in the Mexican criminal justice system.

33.     But even this abuse of the Mexican criminal justice system was not enough for Servicios Funerarios and its fellow conspirators.

34.     With the arrest warrants in hand, Servicios Funerarios improperly requested issuance of Interpol "Red Notices" for the Targeted Employees—international requests that law enforcement agencies throughout the world detain those individuals pending extradition and likely imprisonment in Mexico.

35.     These abuses of the Mexican and international institutions of justice have caused grievous harm to AIC.

36.     Since the illegitimately obtained embargo prohibited an AIC-managed fund from transferring large segments of its Latin American assets, Servicios Funerarios' actions directly resulted, as intended, in the termination of the significant pending Somar transaction, causing AIC direct economic harm, undermining its reputation as a consistent and reliable business partner, and exposing it and its affiliates to claims from the Somar transaction counterparty.

37.     The illegitimately obtained embargo has also prohibited AIC-managed funds from exercising their rights to transfer shares in other investments.

38.     Subject to arrest warrants and unable to travel without fear of detention and, in some cases, extradition for crimes they did not commit, the Targeted Employees' freedom of movement and emotional well-being were compromised, harming them and drawing their attention away from other business matters at AIC and its affiliates.

39.     Servicios Funerarios, along with its co-conspirators Pablo Peña, Carlos Peña, and its criminal counsel, intended each of these ill effects and more—all to coerce AIC and its affiliates to cede to its extortionate demands.

40.     AIC seeks damages from Servicios Funerarios to redress the severe and ongoing harm it has caused to AIC and to hold them accountable for their tortious conduct.

## JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over AIC's counterclaims under 28 U.S.C. § 1332, because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and, on information and belief, this action is between a citizen of a State and a citizen of a foreign state that is not domiciled in Massachusetts.

42.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and/or 28 U.S.C. § 1391(b)(3).

## PARTIES AND RELEVANT PLAYERS

### I.      Counterclaim-Plaintiff Advent International Corporation

### A.      Advent International Corporation

43.     Counterclaim-Plaintiff AIC is a global private equity investment fund manager incorporated in Delaware and headquartered in Boston, Massachusetts.

44.     AIC, through its managed funds, specializes in making targeted investments in companies with operational and strategic potential and partnering with their management teams to create sustainable value through revenue and earnings growth.

45.     AIC pursues a geographically diversified investment strategy.  Through its managed funds, it has over $92 billion in assets under management worldwide.  Over $7 billion of the capital investments of these managed funds are in Latin America, including substantial assets in Mexico.

46.    Funds managed by AIC indirectly owned a controlling interest of substantially all of Gayosso's capital stock between 2007 and 2021, until Gayosso's sale to Servicios Funerarios.

47.    Other, unrelated funds managed by AIC indirectly owned controlling interests in assets frozen by embargos issued as a result of Servicios Funerarios' abuses of the Mexican justice system.  For example, AIC-managed funds own more than 92% of the shares in Somar.

48.    The AIC-managed funds affected by the asset embargos did not own, directly or indirectly, the Sellers' interest in Gayosso.

49.    As a result of Servicios Funerarios' tortious conduct, including the commencement and escalation of meritless civil and criminal proceedings in Mexican and United States courts, AIC has been injured in multiple independent ways including, but not limited to, financial loss, reputational loss, and the inability of its managed funds to complete pending and future transactions critical to its global investment strategy.

II.    **Counterclaim-Defendant Servicios Funerarios and Its Advisors**

50.    Counterclaim-Defendant Servicios Funerarios is a Mexico-based company that, according to its corporate registration and documentation filed with the Mexican Federal Commission on Economic Competition, was formed in 2019 as an acquisition vehicle in connection with the Gayosso transaction.

51.    In January 2021, Servicios Funerarios acquired Gayosso from the Sellers and took control of its operations.

52.    In addition to being the Plaintiff in the instant action, Servicios Funerarios is currently the plaintiff in a meritless civil litigation proceeding in Mexico, which arises from and seeks to unwind the Gayosso transaction.  The civil litigation is a pretext for Servicios Funerarios'

actual objective: to extract hundreds of millions of dollars from AIC and its affiliates by any means necessary.

53.     In an attempt to gain leverage in that litigation, Servicios Funerarios has engaged, and conspired to engage, in a multifaceted scheme to extort AIC through flagrant abuses of Mexican and international institutions of justice.

54.     Servicios Funerarios has furthered its scheme by engaging Mexican criminal counsel notorious in Mexico for leveraging its close connections to public officials to obtain favorable outcomes for itself and its clients, including by engaging in illegitimate conduct.

55.     Servicios Funerarios' counsel's abuses of the Mexican criminal justice system are widely documented in the Mexican press.

56.     Upon information and belief, these abuses have also attracted the scrutiny of Mexican authorities.  The press has reported that Servicios Funerarios' criminal counsel has been the subject of an investigation by Mexico's Attorney General.

57.     Aware of its counsel's reputation and playbook, Servicios Funerarios engaged them to intimidate and coerce AIC and its affiliates into acquiescing to its extortionate demands by any means necessary.

58.     The influence wielded by Servicios Funerarios' counsel has been instrumental in Servicios Funerarios' leverage of Mexican and international institutions of justice to threaten (and cause) personal and financial injury to AIC and its affiliates.

III.    **Related Parties**

    **A.    Gayosso**

59.     Gayosso is a private funeral services company based in Mexico that was founded in 1875.

60.     Funds in the LAPEF III and LAPEF IV private equity fund programs, which are managed by AIC, indirectly acquired a controlling interest of substantially all of Gayosso's capital stock 2007, which they held until they sold their interests to Servicios Funerarios in 2021.

61.     During the period between 2007 and 2021, Gayosso owned real estate assets including cemeteries, funeral homes, and crematoria in Mexico.

62.     Gayosso's operating business had two main segments: "at-need" funeral services, in which a client purchased funeral services upon a death, and "pre-need" services, in which Gayosso entered into future funeral services contracts that, in return for an upfront payment, required it to deliver the contracted services upon the death of the client or the client's assignee, which might occur decades in the future.

63.     In connection with the Gayosso transaction, and in order to finance the acquisition, Servicios Funerarios spun off Gayosso's real estate assets to Fibra Uno, a Mexican real estate investment trust controlled by the influential El-Mann family based in Mexico.

**B.     Carlos Peña**

64.     Carlos Peña is a former member of the investment team at Advent Mexico who, following Gayosso's acquisition by Servicios Funerarios, left Advent Mexico to become the CEO of Gayosso.

65.     While at Advent Mexico, Carlos Peña received millions of dollars in salary and bonuses.  He also received substantial allocations of carried interest in certain funds managed by AIC that were made available to him as a senior employee in good standing.

66.     Carlos Peña served as one of the Sellers' negotiators with Servicios Funerarios in connection with the sale of Gayosso.  At the time, Carlos Peña was also a member of Gayosso's board of directors and of that board's management and finance committees.

67.     Following the conclusion of the transaction, Carlos Peña left Advent Mexico to become the CEO of the asset he had just sold and to work under Servicios Funerarios, his former counterparty.

68.     Carlos Peña has now conspired with Servicios Funerarios and his brother, Pablo Peña, to extort AIC and its affiliates by causing them personal and financial harm.

69.     Though all civil and criminal complaints that Servicios Funerarios has caused to be filed against AIC and its affiliates are wholly without merit, Carlos Peña's specialized and proprietary knowledge of AIC's business and the Gayosso transaction has given him and Servicios Funerarios special leverage in their coordinated campaign to coerce AIC to abandon its rights in the pending civil litigation and submit to Servicios Funerarios' extortion demands.

**C.      Pablo Peña**

70.     Pablo Peña is an investment banker based in Mexico who approached Advent Mexico in 2019 as a representative of potential buyers with an interest in purchasing Gayosso.

71.     Pablo Peña was already familiar with Gayosso by the time he approached Advent Mexico in 2019.  In 2016, Pablo Peña had provided advisory services in a potential sale of Gayosso to another buyer.

72.     In 2019, Pablo Peña approached Advent Mexico initially as a representative of the El-Mann family, the primary owners of the entity that ultimately purchased Gayosso's real estate assets.  As negotiations advanced, Pablo Peña formed Servicios Funerarios as the acquisition entity.

73.     Throughout the negotiation and sale process, Pablo Peña served as Servicios Funerarios' principal and chief negotiator and subsequently orchestrated a scheme, together with

Carlos Peña, to extort AIC for manufactured deficiencies in its representations during the sales process.

74.     On information and belief, Pablo Peña has continued to participate in the conspiracy along with Servicios Funerarios and its counsel, as well as his brother Carlos Peña, to extort and cause harm to AIC and its affiliates.

     **D.     The Individual Victims Of Servicios Funerarios' Abuse Of The Mexican Criminal Justice System**

75.     As a result of a meritless criminal complaint that Servicios Funerarios caused to be filed in a Mexican court, six individuals with some involvement in the Gayosso transaction are the subject of baseless arrest warrants in Mexico.

76.     As a result of equally baseless requests to Interpol to issue Red Notices for the Targeted Employees, each was threatened with an international request to law enforcement in all Interpol member states to locate and provisionally arrest him pending extradition to Mexico for likely imprisonment.

77.     Each of the Targeted Employees is being targeted not because he committed any wrongdoing, but because Servicios Funerarios and its co-conspirators believe that putting the Targeted Employees' liberty at risk will advance Servicios Funerarios' scheme to extort AIC and its affiliates.

78.     James Westra served as the general counsel of AIC for eleven years, retiring at the end of 2022.  From 2014 until his retirement, Mr. Westra was also a managing partner of AIC.  Mr. Westra lives in Massachusetts, and worked at AIC's Boston headquarters prior to his retirement.

79.     While Mr. Westra remains the subject of an unlawfully obtained arrest warrant in Mexico, as of the date of this pleading, the Mexican prosecutor's office has withdrawn the request

for a Red Notice as to Mr. Westra because, on information and belief, it understood that Interpol would have been unwilling to issue a Red Notice based on the insufficient information the Mexican prosecutor's office provided—which was nothing aside from Mr. Westra's name.

80.     Enrique Pani Bano is a former senior executive at Advent Mexico who worked on the Gayosso transaction.  Mr. Pani is a Mexican national who currently resides in New York in connection with his new employment.

81.     Carlos Alfredo Paz Pérez is a current employee of Advent Mexico.  Mr. Paz is a Mexican national who is based in Mexico.

82.     Carlos Lukac was the CEO of Gayosso from 2013 until he was replaced by Carlos Peña following the sale of Gayosso to Servicios Funerarios.  Upon information and belief, Mr. Lukac is a Mexican national who currently resides in the United States.

83.     Alejandro Sosa Hernández was the COO of Gayosso from 2015 until June 2021, a few months after the company was acquired by Servicios Funerarios.  Upon information and belief, Mr. Sosa is a Mexican national who is based in Mexico.

84.     In addition to the Targeted Employees, Mario Arregoytia García, a former partner at Ernst & Young who led audits for Gayosso prior to the sale, is also subject to an arrest warrant in Mexico.  Upon information and belief, Mr. Arregoytia is a Mexican national who is based in Mexico.

**FACTUAL ALLEGATIONS**

I.     **The Gayosso Transaction**

        A.     **Servicios Funerarios Approaches Gayosso And Engages In Due Diligence**

85.     Between 2007 and 2021, ten private equity funds managed by AIC, constituting the Advent Latin American Private Equity Fund III Program ("LAPEF III") and nine private equity funds managed by AIC, constituting the Advent Latin American Private Equity Fund IV Program

("LAPEF IV," and, together with LAPEF III, the "Selling Funds"), owned a controlling stake of substantially all of the outstanding stock of Gayosso.  The Selling Funds' investment was held by seven special purpose vehicles, TwiBel 1 SPRL, TwiBel 2 SPRL, TwiBel 3 SPRL, TwiBel 4 SPRL, TwiBel 5 SPRL, TwiBel 6 SPRL, and TwiBel 7 SPRL—*i.e.*, the "TwiBel Entities" or "Sellers."

86.     Employees of Advent Mexico, including Carlos Peña, sat on Gayosso's board and provided advice to Gayosso's management team, but Gayosso's day-to-day operations were carried out by Gayosso's own experienced management team.

87.     Gayosso management, in particular, was responsible for the company's accounting and financial reporting.  The company's CFO, Octavio Trejo, was ultimately responsible for setting Gayosso's accounting policies and procedures and ensuring the accuracy of its financial statements.

88.     In 2018, Advent Mexico began to explore a potential sale of the Gayosso investment on behalf of the Sellers, and after attracting various indications of interest, entered into a letter of intent and exclusivity agreement with a prospective buyer and began exchanging draft purchase agreements.  The potential deal was based on an enterprise valuation for Gayosso of MXP 4.8 billion (approximately USD 244 million at the time), including real estate and debt.

89.     The exclusivity period with the prospective buyer expired on February 15, 2019 without signing a deal.

90.     Around the same time, Pablo Peña, Carlos Peña's brother and the principal at an investment advisory firm called Consultoria XFN, S.C. (generally known as "Execution Finance" or "ExeFin") approached Advent Mexico as an advisor for additional prospective buyers for Gayosso.

91.     Pablo Peña was already very familiar with Gayosso and its operations.  In 2016, he had tried to broker a potential sale of the company to a different prospective buyer.  Several years earlier, he had also advised Gayosso in connection with a public debt offering.  Both engagements had given Pablo Peña an in-depth look at Gayosso's operations and accounting.

92.     In 2019, Pablo Peña returned as a prospective buyer (or buyer's representative) himself.

93.     As part of his efforts to negotiate a sale of Gayosso, Pablo Peña refamiliarized himself with Gayosso's business and operations.

94.     Within a few months, Pablo Peña extended a proposal to acquire Gayosso as a representative of the El-Mann family.  As noted above, the El-Manns are a wealthy and influential Mexican family who own and operate Fibra Uno—the entity that would ultimately purchase Gayosso's real estate assets and thereby assist in financing Servicios Funerarios' acquisition of the Sellers' shares in Gayosso.

95.     Pablo Peña's proposal was based on an enterprise valuation of MXP 4.9 billion (approximately USD 247 million at the time), including real estate and debt, in line with the offer made by the earlier prospective buyer.

96.     The Sellers decided to engage with the offer from the El-Mann family, and Pablo Peña became the Sellers' negotiating counterparty.

97.     On June 3, 2019, Pablo Peña and Advent Mexico entered into a non-binding term sheet for Pablo Peña to "further explore and analyze the potential acquisition of" Gayosso.  Pablo Peña signed the term sheet as the "Legal Representative" of Grupo E S.A. de C.V. ("Grupo E"). Grupo E is an entity founded and operated by members of the El-Mann family.

98.     Shortly after the term sheet was signed, Pablo Peña formed Servicios Funerarios as an acquisition vehicle for Gayosso, and it became the officially designated buyer.  Until Pablo Peña formed Servicios Funerarios, he signed all transaction-related documents as the legal representative of either Grupo E or his own company ExeFin.

99.     Between July 2019 and January 2020, Pablo Peña and his attorneys exchanged drafts of the SPA with certain members of the deal team at Advent Mexico and their attorneys.

100.     Concurrently, Servicios Funerarios also engaged in months of intensive due diligence with the assistance of sophisticated legal, accounting, and financial advisors with relevant experience.  These included professionals at Ernst & Young, the same firm that provided audit services to Gayosso, which Gayosso enabled by signing a conflict waiver.

101.     Through this process, Servicios Funerarios developed an intimate familiarity with Gayosso's financial accounting.

102.     Servicios Funerarios and its advisors were provided access to a virtual data room that contained voluminous and highly detailed information on Gayosso's assets and liabilities, financial performance, accounting, third-party contracts, and operations.  Among these documents was a detailed analysis of the impact of the adoption of the International Financial Reporting Standards ("IFRS") on Gayosso's revenue recognition policies.  The records from the virtual data room confirm that Servicios Funerarios viewed this analysis during the due diligence process.

103.     In addition to documents provided by Gayosso and the Sellers in the data room, Servicios Funerarios had unfettered access to Gayosso's management.  Over the course of the diligence period, Gayosso's then-CEO Carlos Lukac repeatedly offered to provide Pablo Peña any information he requested, and Gayosso provided Pablo Peña a weekly update with information concerning Gayosso's financial performance.

104. Moreover, Servicios Funerarios' advisors at Ernst & Young, along with Pablo Peña's staff at ExeFin, engaged in numerous meetings with Gayosso's CFO and financial staff to understand its accounting practices, including its revenue recognition policies and compliance with IFRS accounting standards. Throughout this process, Servicios Funerarios' advisors requested and received additional accounting documentation directly from Gayosso's CFO.

105. On January 24, 2020, following more than seven months of due diligence, the Sellers entered into an SPA to sell their shares in Gayosso to Servicios Funerarios for a total enterprise value of MXP 4.15 billion (approximately USD 209 million at the time), including real estate and debt.

106. Servicios Funerarios expressly represented in the SPA that it "has conducted and continues to conduct in good faith an audit process (due diligence) of the legal, contractual, environmental, labor, accounting, operational, fiscal, and financial affairs and details of the Company and . . . acknowledge[s] that it has been given appropriate access to the personnel, facilities, books, records, and other Company documents and information for this purpose."

107. Servicios Funerarios in fact conducted additional due diligence after the SPA was signed and prior to closing. Before the transaction closed, in total, Servicios Funerarios engaged in seventeen months of intensive due diligence with virtually unfettered access to Gayosso's management and the material records of Gayosso's business.

108. By the time it entered into the SPA, and certainly by the time the parties closed on the transaction, Servicios Funerarios had a complete and accurate understanding of Gayosso's accounting practices and financial position.

109. Servicios Funerarios never raised any concerns that Gayosso's accounting was false or fraudulent prior to closing.

### B.    The Peña Brothers' Role In The Gayosso Transaction

110.    Carlos Peña was one of the Sellers' principal negotiators in the Gayosso transaction. He had especially deep knowledge of Gayosso's business operations.  Throughout the sale process with Servicios Funerarios, Carlos Peña served as a member of Gayosso's board of directors, including as a member of the board's management and finance committees.

111.    In these roles, Carlos Peña attended committee meetings with Gayosso's executive staff at least once a week, and routinely met with Gayosso's CFO, Mr. Trejo.

112.    As a result, Carlos Peña was intimately familiar with Gayosso's financial accounting, including its revenue and expense-recognition policies, cost accounting, and cashflow.

113.    Among other aspects of the transaction, Carlos Peña was involved in the negotiation of the SPA and actively managed the Sellers' response to Servicios Funerarios' due diligence requests following the execution of the SPA.

114.    Servicios Funerarios was represented in the negotiations and during the due diligence process by Pablo Peña.

115.    Servicios Funerarios' due diligence was facilitated by the fraternal connection. Carlos Peña personally led "working sessions" with his counterparty and brother, Pablo Peña, to explain Gayosso's financial modeling and projections.  Carlos Peña also forwarded correspondence sent to Gayosso's board of directors directly to his brother even before passing it on to other members of the Advent Mexico team.  In this way, Servicios Funerarios was given unusually direct, real-time access to Gayosso's financial performance and even the internal deliberative materials of its board.

116.    For example, on October 27, 2020, Carlos Peña received a confidential analysis prepared by KPMG for AIC concerning the Mexican tax implications of the sale of Gayosso for

the Sellers.  Without consulting with anyone, Carlos Peña almost immediately forwarded the analysis—as well as the entire email chain of internal strategic discussion between KPMG, AIC, and Advent Mexico personnel—to his brother.

117.    During the transaction, Carlos Peña also worked with the Sellers' Mexican outside counsel as well as AIC's internal legal counsel based in Boston.  Counsel relied on Carlos Peña, as one of the Sellers' negotiators, to provide accurate information and an honest assessment of the parties' negotiating positions.

118.    During the course of considering the transaction and negotiating the SPA, Carlos Peña reported to AIC's Latin American Investment Advisory Committee.  That committee evaluated the business case for the transaction and contributed to the exit memorandum presented to AIC's Investment Committee, which authorized the deal team's continuing efforts in the transaction.

119.    Presentations to these committees are made in summary form, and as is customary, the committees did not review the full documentation of the deal.

120.    Like AIC's counsel, the Latin American Investment Advisory Committee and AIC's Investment Committee relied on information Carlos Peña provided to the deal team regarding the negotiations and his assessment of the transaction.

121.    When it became clear that the lead potential acquirer of Gayosso was Carlos Peña's brother, there were obvious concerns among certain members of the deal team at Advent Mexico about having two siblings involved in negotiating a transaction on opposite sides.  But due to his preexisting knowledge of Gayosso developed over his tenure at Advent Mexico, as well as his experience negotiating share purchase agreements, Carlos Peña was particularly qualified to participate in the negotiations for the Sellers.

122.    The deal team relied on the implicit and explicit representations of a longtime and trusted executive that he would abide by his fiduciary duties to act solely for the benefit of Advent Mexico and its affiliates.

123.    In negotiating the SPA, Carlos Peña worked alongside Mr. Pani and Mr. Paz, two other employees at Advent Mexico with responsibility for the Sellers' investment in Gayosso.

124.    When the time came to execute the SPA, each of Carlos Peña, Mr. Pani, and Mr. Paz had authority to sign the SPA on behalf of Gayosso.  Upon learning this, Carlos Peña directed that Messrs. Pani and Paz, and not he, should sign the SPA.

125.    Notably, the fact that Messrs. Pani and Paz signed the SPA was the sole basis for the Mexican criminal court's issuing arrest warrants against them, while the criminal complaint did not so much as mention Carlos Peña.

### C.    The SPA's Damages Cap

126.    The SPA provided that the Sellers would indemnify Servicios Funerarios "exclusively from the Losses suffered by the Purchaser for the purchase of the Shares" "arising from, or related to, or in any other way with respect to (i) any breach of their respective obligations assumed [in the SPA], and (ii) the lack of veracity in the statements of the Sellers and [Gayosso] in this Contract."  SPA § 9(a).

127.    The SPA further provided that Servicios Funerarios "acknowledge[s] that the compensation derived from [Section 9 of the SPA] will be their only recourse against the Sellers to claim payment of the Losses arising from the Transaction object of this Contract."  *Id.*

128.    The SPA further provided that Servicios Funerarios would not be entitled to compensation for an amount equal to or less than MXN 60 million (approximately USD 3.3

million), and that the Sellers would not be liable for any losses in excess of MXN 300 million (approximately USD 16.6 million).

129.    The SPA separately capped the Sellers' indemnification for losses in the event of a lack of veracity of certain "Fundamental" declarations at MXN 4.076 billion (approximately USD 224.9 million).

130.    Section 1 of the SPA enumerated specific representations and warranties made by the Sellers or by Gayosso that Servicios Funerarios and the Sellers deemed to be "Fundamental."

131.    Section 5.1 of the SPA contains declarations made by the Sellers.  None of the declarations in Section 5.1 concern Gayosso's financial statements or Gayosso's financial condition.

132.    Section 5.2 of the SPA contains declarations made by Gayosso.  Section 5.2 contains certain representations concerning Gayosso's financial statements or financial condition. None of the declarations concerning Gayosso's financial statements or financial condition are "Fundamental" declarations as defined in the SPA.

**D.    The Selling Funds' Guarantee**

133.    Concurrent with the closing of the SPA, Servicios Funerarios and the Selling Funds executed a Guarantee in favor of Servicios Funerarios.  The Guarantee envisions that the Sellers themselves may wind up following the close of the transaction, and protects Servicios Funerarios' financial interests in the event it needs to enforce the indemnity provisions in the SPA against the Sellers.

134.    Pursuant to the Guarantee, the Selling Funds agreed to pay Servicios Funerarios the amount of any money damages that the Sellers would be obligated to pay under the SPA, up to the higher (*i.e.*, MXN 4.076 billion) indemnity cap set by the SPA.

135.    The Guarantee expressly provides that the Selling Funds' obligations would survive the bankruptcy or dissolution of the Sellers.

136.    The Guarantee also contains a non-recourse provision that provides, *inter alia*, that:

> (a) . . . [Servicios Funerarios] acknowledges, covenants and agrees that all claims, obligations, liabilities, causes of action, or proceedings (in each case, whether at law or in equity, and whether sounding in contract, tort, statute or otherwise) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Guarantee . . . (each of such above-described legal, equitable or other theories or sources of liability, a "Claim") may be made or asserted only against (and are expressly limited to) the Guarantors . . . . No Person who is not such a Guarantor (including, without limitation, (i) any past, present or future director, officer, employee, incorporator, member, partner, manager, direct or indirect equityholder, management company, Affiliate (other than Vendor or any assignee of Vendor or of a Guarantor under the Agreement or hereunder), agent, attorney, or representative of, and any financial advisor or lender to (all above-described Persons in this subclause (i), each a "Related Party") to a Guarantor or any Affiliate of a Guarantor, and (ii) any Related Party of such Guarantor's Related Parties (the persons in subclauses (i) and (ii), collectively "Non-Parties")) shall have any liability or obligation in respect of any Claims.

> (b) . . . [Servicios Funerarios] hereby waives, releases and disclaims any and all Claims against all Non-Parties, including, without limitation, any Claims to avoid or disregard the entity form of any Guarantor or otherwise seek to impose any liability arising out of, relating to or in connection with a Claim on any Non-Parties, whether a Claim granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise, and (ii) the Guaranteed Party disclaims any reliance upon any Non-Parties with respect to the performance of this Guarantee or any representation or warranty made in, in connection with, or as an inducement to this Guarantee. This Section 9 shall survive the termination of this Guarantee.

Guarantee §§ 9(a)–(b).

137.    AIC is not a "Guarantor" under the Guarantee—only the Selling Funds are.

138.    The Guarantee provides that the Guarantee and all claims arising under it "shall be governed by the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that

would cause the application of the laws of any jurisdiction other than the State of Delaware." Guarantee § 10.

139.    The Guarantee further provides that "[e]ach of the parties hereto (for itself and on behalf of its successors and permitted assigns and any Person claiming by, through or on behalf of any of them) irrevocably agrees that any permitted Claim shall be brought exclusively in the state and federal courts located in the City, County and State of Delaware." *Id.*

### E.    The Gayosso Transaction Closes And Peña Resigns

140.    The SPA was amended four times between its execution on January 24, 2020 and closing.

141.    The fourth and final amendment to the SPA was executed on January 27, 2021, and reflected an amended share value of MXN 4.076 billion (approximately USD 201 million at the time) less indebtedness and working capital.

142.    The final enterprise value reflected a reduction from the original agreed-upon enterprise value, and was negotiated at Servicios Funerarios' insistence after it perceived an adverse effect on Gayosso's financial health caused by the COVID-19 pandemic.

143.    The transaction closed on January 28, 2021.  The Sellers' net proceeds in the transaction were approximately USD 50 million.

144.    A little less than half of the deal was funded by a loan from HSBC to Servicios Funerarios, and the balance from the spin-off of Gayosso's real estate assets in a sale-and-leaseback transaction to the El-Mann controlled Mexican real estate investment trust, Fibra Uno, which occurred contemporaneously with and was reflected in the SPA.  Each of these financing arrangements was negotiated by Servicios Funerarios.

145.    Specifically, the SPA set the purchase price of Gayosso's real estate assets by Fibra Uno at MXN 2.192 billion (approximately USD 108 million at the time).

146.    Almost immediately following the closing of the transaction, Carlos Peña resigned from Advent Mexico to become CEO of Gayosso, an entity now owned by Servicios Funerarios, the contractual counterparty with whom AIC and its affiliates had trusted Carlos Peña to negotiate on their behalf.

## II.     Servicios Funerarios Commences Civil Litigation Against AIC

147.    In November 2021, Servicios Funerarios sent the Sellers and the Selling Funds a letter, addressed to AIC's headquarters in Massachusetts, accusing the Sellers of fraud and demanding that the Sellers immediately return to Servicios Funerarios the purchase price for the Gayosso transaction and pay additional putative damages as calculated by Servicios Funerarios (the "Demand Letter").

148.    The Demand Letter demanded additional damages in the amount of over MXN 2.395 billion (approximately USD 116 million at the time).

149.    Servicios Funerarios called these damages "minimum amounts" and threatened that they "may only increase" in a future "judicial proceeding."

150.    The Demand Letter directed the Sellers to communicate with Servicios Funerarios' civil counsel in connection with the Gayosso transaction, but informed the Sellers that it was also represented by a criminal law firm notorious for abusing the Mexican justice system to create leverage against parties opposite its clients in civil proceedings.  Servicios Funerarios' inclusion of its criminal counsel was an unmistakable threat.

151.    The Demand Letter was a transparent extortion attempt, and the Sellers refused Servicios Funerarios' demand.

152.    On March 24, 2022, Servicios Funerarios filed a commercial claim against AIC, Advent Mexico, and the Sellers in the Federal Court in Matters of Asset Forfeiture.

153.    Servicios Funerarios falsely alleged that Gayosso's financial reporting failed to comply with accounting policies and standards, including by understating the costs of its long-term contractual obligations and failing to provision for capital expenditures.

154.    Servicios Funerarios was fully aware of Gayosso's business model and accounting practices at the time it negotiated and executed the SPA, but nonetheless alleged that Gayosso's accounting misled Servicios Funerarios about Gayosso's financial health.

155.    In an attempt to evade the SPA's indemnity cap, the complaint also falsely alleged that the SPA is void because the Sellers intended to deceive Servicios Funerarios into purchasing Gayosso.

156.    Servicios Funerarios' claims are meritless and pretextual.

157.    The accounting practices Servicios Funerarios challenged comply fully with all applicable accounting rules and procedures, and Gayosso has applied those policies consistently for more than twelve years.

158.    Prior to its purchase by Servicios Funerarios, Gayosso had been subject to regular annual audits by large and well-respected accounting firms for over a decade.

159.    Prior to the sale, such audits uniformly resulted in clean opinions validating Gayosso's accounting under local and international accounting principles including Mexican GAAP and IFRS.

160.    Moreover, Servicios Funerarios conducted over a full year of due diligence prior to purchasing Gayosso, during which time it had virtually unfettered access to Gayosso's financial records, the assistance of legal, financial, and accounting advisors, and a lead negotiator with

detailed knowledge of Gayosso's financial position and business model. The voluminous information Sellers and Gayosso shared with Servicios Funerarios through this diligence process was more than sufficient to fully apprise Servicios Funerarios of Gayosso's accounting practices and financial condition.

161. Servicios Funerarios' conduct outside of the litigation is also entirely inconsistent with its allegations of fraud.

162. Carlos Peña, who was a highly engaged member of Gayosso's board of directors and who negotiated the Gayosso transaction on behalf of the Sellers, would necessarily have been a central actor in perpetrating any alleged fraud against Servicios Funerarios. But Servicios Funerarios hired Carlos Peña as Gayosso's CEO immediately after the transaction closed. Carlos Peña then served as Gayosso's CEO until May 2022, long after Servicios Funerarios began advancing its baseless allegations of fraud. On information and belief, Carlos Peña remains at Gayosso in an executive role today.

163. Servicios Funerarios has also retained as Gayosso's CFO Mr. Trejo, who also served as CFO throughout the period during which Servicios Funerarios alleges Gayosso systemically misrepresented its financial condition through fraudulent accounting practices. Servicios Funerarios and their advisors interfaced directly with Mr. Trejo consistently throughout the diligence process, and received regular reports and information concerning Gayosso's accounting practices and financial condition from him directly. Servicios Funerarios' decision to retain the person at Gayosso responsible for managing and reporting its financial condition, and who represented its accuracy and integrity to Servicios Funerarios during the extensive due diligence process preceding its purchase of Gayosso, is irreconcilable with its allegations that those same representations were fraudulent.

164.     Neither Carlos Peña nor Mr. Trejo is so much as mentioned in Servicios Funerarios'
Complaint filed in this Court or its civil or criminal complaints in Mexico.

165.     Nonetheless, on the basis of their frivolous allegations, Servicios Funerarios seeks
damages in the Mexican civil litigation of approximately MXP 2.713 billion (approximately USD
150 million), as well as an order declaring that the SPA is null and void and requiring an unwinding
of the sale.

166.     Despite attempting to nullify the SPA, Servicios Funerarios also seeks an order
holding the Sellers, AIC, and Advent Mexico jointly bound to Servicios Funerarios' credit contract
to HSBC and leasing contract with the Mexican real estate investment trust, its primary sources of
funding for the Gayosso transaction.

167.     In effect, Servicios Funerarios seeks to force a sale of Gayosso to AIC and affiliated
entities for at least double the price it paid for Gayosso's operations, while also putting AIC on the
hook for Servicios Funerarios' own financial obligations.

168.     Servicios Funerarios' Mexican civil complaint also seeks to pierce the corporate
veil to hold AIC, which is not a contractual counterparty, liable for any damages due to it from the
Sellers.  The complaint's purported justifications for holding AIC liable are conclusory and plainly
pretextual—alleging, for example, that "[AIC] uses different special legal vehicles, probably to
avoid its rights and obligations, and from this it can be presumed that it abuses its legal entity and
acts in bad faith."

169.     The Mexican civil complaint's veil piercing request is spurious.  Veil piercing
would not be appropriate under the law of any jurisdiction because there was no misuse of the
corporate form to perpetuate fraud or otherwise deprive Servicios Funerarios of access to a remedy

for contractual violations.  To the contrary, Servicios Funerarios' financial interests are protected by a heavily negotiated Guarantee executed by the Selling Funds—the actual owners of the Sellers.

170.    Servicios Funerarios' sole purpose in requesting to pierce the corporate veil is to gain improper leverage against the target of its extortion scheme.

171.    In addition to damages and veil-piercing, Servicios Funerarios asked the Mexican civil court for an additional extraordinary remedy: an embargo freezing all accounts and assets belonging to AIC, Advent Mexico, the Sellers, and AIC-managed funds with investments in Latin America.

172.    Servicios Funerarios claimed that it was necessary to freeze assets belonging to AIC and its affiliates to ensure that Servicios Funerarios could be compensated for any damages awarded in the lawsuit.  Servicios Funerarios failed to mention the Guarantee or Servicios Funerarios' contractual right to enforce the Guarantee against the Selling Funds in the United States.

173.    Servicios Funerarios knew that it was legally protected in its ability to recover losses under the SPA by a heavily negotiated Guarantee.  Its sole purpose in requesting to freeze all assets belonging to AIC and its affiliates was to gain improper leverage against AIC in its frivolous lawsuit and extortion scheme.

174.    Even though the Mexican civil court was unaware of the Guarantee, it denied all of Servicios Funerarios' requests to embargo accounts and assets belonging to AIC and its affiliates. This denial was confirmed upon review by a second Mexican court.

175.    While AIC has not yet been served in the Mexican civil proceeding, it rejects Servicios Funerarios' unfounded allegations and intends to vigorously defend itself.

III.   **Servicios Funerarios Commences Criminal Proceedings**

A.   **Servicios Funerarios And Its Counsel Bring Baseless Criminal Charges**

176.   In June 2022, unsatisfied with the Mexican civil court's denial of its request to freeze assets owned by AIC-managed funds, and seeking to ratchet up the pressure on AIC to agree to its extortion demands, Servicios Funerarios instructed its counsel to file a criminal complaint with a prosecutor in Mexico City responsible for investigating alleged financial crimes.

177.   Servicios Funerarios' criminal complaint was based on the same meritless accusations it had levied in the pending Mexican civil proceeding.

178.   As in the meritless Mexican civil proceeding—and despite the fact that Servicios Funerarios had complete access to Gayosso's financial records during a due diligence process facilitated by its future CEO Carlos Peña—Servicios Funerarios' criminal complaint alleged that AIC modified Gayosso's financial statements to induce it to enter into the Gayosso transaction.

179.   Shortly thereafter, a Mexico City prosecutor initiated a criminal investigation into the allegations in Servicios Funerarios' criminal complaint (the "Criminal Proceeding").

180.   The Mexico City prosecutor then sought—and successfully obtained—extraordinary relief from a Mexico City criminal judge, including arrest warrants against the Targeted Employees prior to an initial charging hearing and the same embargo that had just been denied by the Mexican civil court, on hundreds of millions of dollars in assets wholly unrelated to the Gayosso transaction.

181.   On information and belief, Servicios Funerarios and its counsel influenced the prosecutor's and criminal court's actions by use of illegitimate means.

### B.      The Mexican Criminal Court Issues an Asset Embargo

182.     On October 7, 2022, the judge in the Criminal Proceeding issued an order enjoining the transfer of certain assets held by funds managed by AIC—again, without prior notice to AIC or an opportunity for AIC or any of its affiliates to be heard.

183.     The Mexican criminal court did so despite the fact that neither AIC nor the owners of the embargoed assets was the subject of any criminal proceeding, much less the criminal investigation on which the prosecutor's request was premised.  This is a basic requirement for issuance of a criminal embargo under Mexican law.

184.     The entire asset embargo hearing lasted roughly nine minutes.

185.     The embargoed assets included AIC-managed funds' indirectly held shares in Somar, a pharmaceutical company that AIC announced it had entered into an agreement to sell in May 2022.  It also included shares that other AIC-managed fund programs indirectly held in Banca Mifel SA ("Mifel"), a Mexican bank presently bidding for Citigroup's Mexican retail arm Banamex; pension fund InverCap Holdings SA ("Invercap"); and agrochemical company Viakem S.A. de C.V. ("Viakem").

186.     Servicios Funerarios had previously asked that the Mexican civil court embargo each of these groups of assets, and the Mexican civil court had denied those requests.  But the prosecutor did not mention this critical fact to the judge at the hearing, nor even the existence of a civil complaint that had sought the same relief.  The prosecutor likewise did not mention the existence of the Guarantee that the parties had negotiated to address the precise harm that Servicios Funerarios was alleging in its criminal complaint.

187.     The asset embargo affected hundreds of millions of dollars of assets managed by AIC and owned by AIC-managed funds.  It encompasses assets wholly unrelated to Gayosso or

the Mexican civil litigation.  Among other things, the investors in the AIC-managed funds that hold the embargoed assets do not comprise the same group of investors as those invested in the Selling Funds.

188.    Such a broad asset embargo is an extreme and rarely imposed measure that, under Mexican law, is not warranted under the circumstances presented by this case.

189.    Servicios Funerarios and its counsel's targeting of the embargoed assets is a blatant attempt to disrupt the Latin American business of AIC-managed funds and strong-arm AIC and its affiliates into capitulating to Servicios Funerarios' extortion demands.

190.    AIC and its affiliates were not made aware of the asset embargo until October 12, 2022, five days after it issued.

191.    By its terms, the asset embargo was initially set to expire on December 6, 2022.

192.    On December 6, 2022, however, the judge, at the prosecutor's request, extended the embargo until January 6, 2023.  The judge did so on a day when no other hearings were held because judicial employees were on strike.

193.    On information and belief, Servicios Funerarios and its counsel influenced the prosecutor's request for and the judge's imposition and extension of the asset embargo by use of illegitimate means.

194.    After the embargo expired on January 6, 2023, Servicios Funerarios quickly sought to illegitimately encumber the assets through other means.  On January 11, 2023, a Mexican criminal court from the same jurisdiction issued a six-month lien on those assets (including Somar) up to USD 300 million, subject to confirmation by the minister of the Mexican financial agency that the relevant AIC-affiliated entities own the assets subject to the lien.

195.    Neither AIC nor any of its affiliates has been formally notified of this court order or served with it.  They learned of its issuance only through media inquiries.  On information and belief, this illegitimate order likewise was obtained through Servicios Funerarios and its counsel's improper influence and abuse of the Mexican criminal justice system.

### C.    The Court Issues Baseless Arrest Warrants for AIC Affiliates

196.    On October 7, 2022, the same day as he ordered the asset embargo and just one hour after the prosecutor requested a private hearing, the judge in the Criminal Proceeding also issued arrest warrants for six individuals.   These individuals include two former Gayosso executives, Gayosso's former auditor at Ernst & Young, and three current and former employees of AIC or Advent Mexico—including Mr. Westra, a Massachusetts resident.

197.    Notably, the prosecutor did not request, and the judge did not issue, an arrest warrant for Carlos Peña, despite his centrality to the Gayosso transaction and his role negotiating the transaction on behalf of the Sellers.

198.    Nor was an arrest warrant requested for Mr. Trejo, who, as Gayosso's CFO during the sale process and the years leading up to the transaction, was responsible for the company's accounting policies and financial reporting.

199.    The arrest warrants that were issued have no basis in any wrongdoing, criminal or otherwise, and are not supported by probable cause.

200.    For example, the Mexican criminal court issued Mr. Westra's arrest warrant on the basis that Mr. Westra was "hired to verify [Gayosso's] financial situation," an indisputably false allegation never even asserted by the prosecutor.

201.    The judge in the Mexican criminal court, who typically grants hearings with defendants' counsel as a matter of course, has refused all of defense counsel's attempts to be heard in connection with the baseless arrest warrants.

202.    On top of all that, the arrest warrants were issued without holding an initial charging hearing at which the Targeted Employees were present, informed of their rights, provided a description of the allegations against them, and given an opportunity to answer them. This, too, was a basic violation of Mexican law, which requires an evidentiary showing that the accused will refuse to appear for arrest warrants to be issued prior to a charging hearing. This showing can only be made in exceptional circumstances, such as where the accused has repeatedly failed to appear in response to other process, like a subpoena, or when the alleged crime is extremely serious, like murder, rape, or human trafficking.

203.    Here, the prosecutor did not even attempt to cause the Targeted Employees to appear at an initial charging hearing through a subpoena or other process. He presented no evidence indicating that the accused would be unwilling to do so. Indeed, the only information the prosecutor offered to justify the extraordinary issuance of the arrest warrants is that certain of the accused owned multiple homes, including outside of Mexico City. Mexican law does not permit the issuance of arrest warrants on such a baldly insufficient basis.

204.    Each of the arrest warrants remains pending as of the date of this filing.

205.    On information and belief, Servicios Funerarios presented the prosecutor with false and misleading information, including by omitting Carlos Peña and Mr. Trejo's role and knowledge of the transaction, in its request for arrest warrants. As a direct and intended result of Servicios Funerarios' actions, the prosecutor provided false and misleading information to the judge in connection with the requests for arrest warrants.

206.    On information and belief, Servicios Funerarios and its counsel influenced the judge's issuance of arrest warrants by use of illegitimate means.

207.    The Mexican media has publicized these arrest warrants and baseless proceedings against AIC, its affiliates, and its executives, resulting in substantial reputational harm to AIC, its affiliates, and the Targeted Employees.  On information and belief, Servicios Funerarios and its agents have publicized these proceedings to Mexican media outlets to heighten settlement pressure on AIC and its affiliates.

### D.    Interpol Issues Baseless Red Notices for AIC Affiliates

208.    In addition to causing a Mexican criminal court to issue baseless and abusive arrest warrants against the Targeted Employees, Servicios Funerarios through its Mexican counsel caused the Mexican authorities to request that Interpol issue "Red Notices" for the same individuals, thereby extending the reach of the arrest warrants beyond Mexico City's jurisdiction.

209.    As described by Interpol, a "Red Notice is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action."

210.    The U.S. Department of Justice describes the Interpol Red Notice as "the closest instrument to an international arrest warrant in use today."

211.    Interpol's public documentation explains that a Red Notice contains "[i]nformation related to the crime they are wanted for, which can typically be murder, rape, child abuse or armed robbery," underscoring that Red Notices are intended to be issued only for the most severe crimes.

212.    Interpol issued Red Notices for each of the Targeted Employees except for Mr. Westra.  Each of these Red Notices remains pending.

213.    The Mexican authorities ultimately withdrew their request to issue a Red Notice for Mr. Westra.  On information and belief, it was evident that Interpol could not grant a Red Notice on the plainly inadequate basis Servicios Funerarios had fabricated.

214.    On information and belief, Servicios Funerarios and its counsel caused the issuance of the Interpol Red Notices by use of illegitimate means.

## IV.    <u>Servicios Funerarios Repeats Its Frivolous Allegations In This Court</u>

215.    Despite Servicios Funerarios' unrelenting abuses of the Mexican and International systems of justice, AIC and its affiliates have refused to accede to its baseless and extortionate demands.

216.    Frustrated with its inability to gain headway in its campaign to extract hundreds of millions of dollars from AIC and its affiliates through civil and criminal proceedings in Mexico, Servicios Funerarios has now turned to the United States federal courts for additional leverage.

217.    On March 29, 2023, Servicios Funerarios filed its complaint in this action (the "Massachusetts Complaint").  Its complaint rests substantially on the same unfounded allegations as its meritless civil and criminal filings in Mexico.

218.    Once again, Servicios Funerarios attempts to transform what is at most a garden-variety dispute concerning the accuracy of representations and warranties in a heavily negotiated contract—for which the SPA provides a remedy and the Guarantee provides assurances of payment in the event of liability—into a claim of fraud.

219.    The Massachusetts Complaint is riddled with inaccuracies, material omissions, and outright lies, including (among many others) the following:

   a.   The Complaint falsely alleges that AIC "captured" a buyer in the form of Servicios Funerarios.  ECF No. 1 ("Compl.") ¶ 19.  In fact, it was Pablo Peña—who had previously participated in the potential sale of Gayosso to another buyer—who approached Advent Mexico and emerged from among other bidders with an offer

to purchase Gayosso from the Sellers in his capacity as representative of the entity that would become Servicios Funerarios.

b.  The Complaint alleges that only Messrs. Pani and Paz led the negotiations to sell Gayosso to Servicios Funerarios. Compl. ¶ 43. The Complaint entirely omits the role of Pablo Peña's brother, Carlos Peña, as one of Sellers' principal negotiators in the sale of Gayosso, as well as Servicios Funerarios' decision to retain Carlos Peña as Gayosso's CEO despite alleging that Sellers defrauded it during the same negotiations.

c.  The Complaint alleges that AIC directed Gayosso to engage in deceptive accounting practices to present a fraudulent picture of Gayosso's financial condition. In fact, Gayosso's management directed the company's accounting practices. To the best of AIC and its affiliates' knowledge, these practices always complied with applicable laws and standards and remained generally consistent for over a decade. Gayosso's financial reporting also consistently received clean audit opinions from Big Four auditors. And Servicios Funerarios was well aware of Gayosso's accounting practices.

d.  The Complaint falsely alleges that the Sellers warranted in the SPA that they would not be dissolved. Compl. ¶ 13(k). In fact, the section of the SPA Servicios Funerarios references warranted that *Gayosso* had no intent to dissolve. It was evident to Servicios Funerarios that the Sellers could dissolve following the sale, which is why the SPA envisioned (and the parties to the SPA executed) a financial Guarantee under which the Selling Funds agreed to cover the Sellers' indemnification obligations up to the full value of the transaction in the event the Sellers dissolved.

e.  Similarly, the Complaint repeatedly alleges that AIC dissolved "the Twibel and Twilux entities . . . only after sending the hundreds of millions of dollars of sale proceeds upstream to [AIC] and its Funds while leaving Servicios Funerarios with a company in the red," Compl. ¶ 20, omitting that the Selling Funds provided Servicios Funerarios with an ironclad Guarantee entitling Servicios Funerarios to recovery for compensable losses directly from the Selling Funds even in the event that the Sellers dissolved.

## V. Servicios Funerarios' Abuse of the Mexican Justice System, International Institutions, And This Court Has Harmed AIC

220.  Servicios Funerarios' manipulation of the Mexican civil and criminal justice systems, as well as this Court, to manufacture leverage in a putative contract dispute has caused significant and lasting harm to AIC.

A. **Interference With Pending Somar Transaction**

221.    On May 16, 2022, investment vehicles owned by AIC-managed funds entered into an agreement to sell Somar and other portfolio companies active in the Mexican pharmaceutical sector to Procaps.

222.    The transaction with Procaps was set to close on October 14, 2022.

223.    Servicios Funerarios caused a prosecutor to seek and ultimately obtain the asset embargo on October 7, 2022—just one week before closing the Somar transaction.  The embargo prohibited any transfer of Somar's capital stock, preventing the timely consummation of the transaction and disrupting the hard-won deal with Procaps.

224.    Because there had been no opportunity to object to the embargo, AIC and its affiliates only learned of the embargo five days after it was issued, on October 12, 2022.  At the very last minute, the sellers in the Somar transaction were forced to inform Procaps that they could not complete the transaction on schedule.

225.    As a result of the delay in finalizing the transaction, AIC-managed funds were forced to bear new transaction costs.

226.    By law, the Mexican criminal judge could set the asset embargo for a maximum of 60 days.  The court set the embargo for the maximum time, with an expiration date of December 6, 2022.

227.    The sales and purchase agreement with Procaps (the "Somar Agreement") provided that the transaction must be completed no later than December 31, 2022.

228.    But on December 6, 2022, a date when no other court hearings were held, the same Mexican criminal judge extended the embargo until January 6, 2023, five days beyond the long-stop date in the Somar Agreement.

229.    The renewed asset embargo prohibited AIC-managed funds from transferring their shares in Somar by the December 31, 2022 long-stop date.

230.    On January 1, 2023, Procaps provided the Somar seller entities with a formal notice terminating the Somar Agreement and reserving the right to claim damages.

231.    Procaps issued a press release on January 3, 2023, announcing that it had terminated the Somar Agreement because "a court in Mexico City issued an Embargo Precautorio affecting certain shares of capital stock of Grupo Somar in connection with a pending dispute that involves an investment by a fund managed by Advent International but that is otherwise unrelated to the sellers, Grupo Somar, the Company, or the acquisition" and "[t]he time required for resolution of the Embargo remains uncertain."

232.    The collapse of the Somar transaction prevented AIC and its managed funds from realizing the profits that would have flowed from the Somar transaction had it been completed.

233.    Procaps further announced that it "cannot provide any assurances regarding whether an acquisition of Grupo Somar by [Procaps] will occur in the future."

234.    The Somar seller entities' inability to complete the transaction with Procaps also undermines confidence among other potential counterparties that AIC affiliates can reliably complete purchase and sale agreements in which they have entered, limiting their competitive position to solicit and complete future transactions.

235.    The purchase and sale of controlling shares in companies owned by AIC-managed funds is the heart of AIC's business, and any reduction in confidence in AIC or its funds as potential contractual counterparties has a deleterious effect on AIC's ability to operate and its managed funds' abilities to remain profitable.

B.      **Reputational Harm**

236.    AIC has suffered serious and foreseeable harm to its reputation as a result of the baseless accusations that Servicios Funerarios has levied.

237.    AIC's reputation has suffered further harm as a result of the meritless Mexican criminal complaint that Servicios Funerarios and its counsel have caused to be filed, the issuance of arrest warrants against the Targeted Employees, and the order embargoing assets owned by AIC's managed funds.

238.    The inability to complete the Somar transaction on the agreed-upon terms has further damaged AIC's reputation and credibility, threatening its core operating model of advising its managed funds in the strategic acquisition, improvement, and sale of businesses.

239.    Among other events affecting AIC's reputation, AIC has been subject to negative media coverage as well as requests from third parties in multiple global markets to explain Servicios Funerarios' manufactured claims, the arrest warrants issued against the Targeted Employees, and AIC's inability to complete the Somar transaction.

240.    Servicios Funerarios' filing of a further frivolous complaint in Massachusetts has further undermined AIC's hard-won reputation.

241.    The Massachusetts Complaint is the first court filing concerning this matter to be filed in English or in the United States, broadcasting Servicios Funerarios' recklessly false and misleading allegations to a broader global audience.

242.    Since the filing of Servicios Funerarios' Massachusetts Complaint, AIC has been the subject of numerous articles in the press repeating and disseminating Servicios Funerarios' baseless claims.

243.    These examples are non-exhaustive, and AIC has suffered and continues to suffer reputational harm as an intended result of Servicios Funerarios' tortious and extortionary conduct.

**CAUSES OF ACTION**

**COUNT I**
**Abuse of Process**

244.    AIC incorporates by reference and re-alleges Paragraphs 1 through 243 as though fully set forth herein.

245.    Servicios Funerarios intentionally made an improper use of the legal process by causing, or conspiring to cause, the filing of frivolous complaints in civil and criminal courts in Mexico City, and the issuance of baseless arrest warrants against the Targeted Employees.

246.    Servicios Funerarios further made an improper use of the legal process by causing, or conspiring to cause, the imposition of an injunction that deprives AIC and its managed funds of the freedom to manage and control their valuable assets and prevents them from completing negotiated business transactions.

247.    Servicios Funerarios further made an improper use of the legal process by causing, or conspiring to cause, Mexican authorities to request and/or Interpol to issue equally baseless Red Notices against the Targeted Employees.

248.    Servicios Funerarios further made an improper use of the legal process by filing the instant action against AIC in this Court.

249.    Servicios Funerarios took each of these actions based on false allegations and arguments, and for the ulterior and illegitimate purpose of damaging AIC's business and reputation in order to gain leverage in pending civil litigation and to coerce AIC to abandon its rights and defenses in that litigation.

250.    As a result of Servicios Funerarios' wrongful and illegal conduct, AIC has suffered and continues to suffer significant damages, including but not limited to financial loss, damage to reputation, and loss of business opportunities.

## COUNT II
## Tortious Interference with Advantageous Relations

251.    AIC incorporates by reference and re-alleges Paragraphs 1 through 243 as though fully set forth herein.

252.    Servicios Funerarios intentionally caused, or intentionally conspired to cause, through improper means and with improper motive, a Mexican court to enjoin AIC-managed funds from transferring shares in Somar.

253.    Further, the baseless civil and criminal complaints that Servicios Funerarios intentionally caused to be filed, or intentionally conspired to cause to be filed, against AIC and its affiliates have harmed AIC's reputation and raised uncertainty about its managed funds' ability to close the Somar transaction.

254.    Servicios Funerarios intended the civil and criminal proceedings to interfere with AIC's ability to dispose of its managed funds' assets, including pursuant to the publicly announced agreement to sell their shares in Somar to Procaps.

255.    Servicios Funerarios interfered with the Somar transaction with the improper motive to coerce AIC and its affiliates to abandon their rights and defenses in pending civil litigation, and to encumber AIC's and its affiliates' resources to prevent it from vigorously pursuing those rights and defenses.

256.    Servicios Funerarios interfered with the Somar transaction using the improper means of filing or causing to be filed meritless civil and criminal complaints in a blatant abuse of the Mexican justice system.

257.    On information and belief, Servicios Funerarios has also enlisted the aid of Mexican authorities with the use of illegitimate means.

258.    Servicios Funerarios' interference with the Somar transaction has harmed AIC in myriad ways, including by preventing that transaction from closing at the agreed-upon date and thus depriving AIC and its managed funds from realizing the profits that would have flowed from the Somar transaction had it been completed; by causing Procaps to formally terminate the Somar Agreement; by threatening to cause Procaps to abandon the transaction altogether; and by imposing transaction and other costs on funds managed by AIC, thereby substantially reducing the potential return on the investment in Somar.

**COUNT III**
**Civil Conspiracy**

259.    AIC incorporates by reference and re-alleges Paragraphs 1 through 243 as though fully set forth herein.

260.    Servicios Funerarios, its Mexican criminal counsel, and the Peña brothers (the "Conspirators") had a common design and agreement to cause AIC and its affiliates to abandon their rights and defenses in meritless civil litigation brought by Servicios Funerarios, and to encumber their resources to prevent them from vigorously pursuing those rights and defenses.

261.    In furtherance of that objective and agreement, Servicios Funerarios committed multiple tortious acts, including abuse of process and tortious interference with advantageous relations as set forth above, as well as violations of Massachusetts General Law Chapter 93A and *fraude procesal* and illicit conduct under Mexican law as set forth below.

262.    Among other tortious acts, Servicios Funerarios and the other Conspirators intentionally abused the Mexican justice system to illegitimately secure an asset embargo that

would prevent AIC and its affiliates from pursuing and completing transactions critical to AIC's global investment strategy, including the Somar transaction.

263.    Servicios Funerarios and the other Conspirators further abused the Mexican justice system to illegitimately cause a prosecutor to request, and a court to grant, baseless arrest warrants for the Targeted Employees.  They also caused the Mexican government to request baseless Red Notices for the Targeted Employees.

264.    By combining Servicios Funerarios' resources, connections, and litigation position as AIC's affiliates' contractual counterparty, with Carlos Peña's proprietary knowledge of AIC's business strategy, and Servicios Funerarios' criminal counsel's ability to abuse the Mexican criminal justice system, Servicios Funerarios exerted greater coercive pressure than it could have exerted independently.

**COUNT IV**
**Violation of Massachusetts General Law Chapter 93A**

265.    AIC incorporates by reference and re-alleges Paragraphs 1 through 243 as though fully set forth herein.

266.    Servicios Funerarios engages in the conduct of trade or commerce.  As part of that conduct, and in an attempt to extract further value from AIC and its affiliates in connection with the Gayosso transaction, Servicios Funerarios engaged in unfair and deceptive trade practices.  For example, Servicios Funerarios commenced criminal proceedings in Mexico in an attempt to recover what is no more than a (purported) civil debt.  Servicios Funerarios also engaged in extortionate and coercive tactics to resolve its dispute, seeking, and ultimately obtaining, orders freezing AIC affiliates' assets.  In an attempt to mislead the Mexican courts, Servicios Funerarios omitted from its applications that it was secured by the Guarantee.  All this was done in an effort to disrupt AIC's and its affiliates' business operations, and to extort AIC and its affiliates to

57

provide greater compensation than Servicios Funerarios could be entitled to under the Guarantee and other applicable contracts.  Servicios Funerarios also lacked any good faith basis for its allegations of fraud and breach of warranty underlying the Mexican litigation.

267.    Servicios Funerarios' unfair practices took place primarily and substantially within the Commonwealth of Massachusetts because all of its conduct was directed at coercing the actions of AIC or AIC-managed funds managed from Massachusetts, and causing AIC and its AIC-managed funds financial injury.

268.    AIC, which engages in trade or commerce, suffered a loss of money and property as a result of Servicios Funerarios' conduct, including, among other things, the loss of valuable business transactions; legal and other costs associated with the failure of the Somar transaction; and costs associated with reputational harm.

### COUNT V
### Declaratory Judgment of AIC's Non-Liability for Fraud

269.    AIC incorporates by reference and re-alleges Paragraphs 1 through 243 as though fully set forth herein.

270.    Servicios Funerarios falsely claims that AIC fraudulently induced it to enter into the SPA, and has brought or caused to be brought multiple lawsuits on that basis, including in this Court.

271.    An actual, present, and justiciable controversy has arisen between AIC and Servicios Funerarios concerning AIC's liability to Servicios Funerarios for fraud in connection with the sale of Gayosso.

272.    Servicios Funerarios' claims are baseless, including because (i) AIC has not made or caused to be made any false representation to Servicios Funerarios; (ii) AIC has not made or caused to be made any representation to Servicios Funerarios with knowledge of its falsity or with

intent to deceive Servicios Funerarios; (iii) Servicios Funerarios has not reasonably relied on any statement made by AIC; and (iv) Servicios Funerarios has not been harmed.

273.    AIC is entitled to declaratory judgment from this Court that it is not liable to Servicios Funerarios for fraud.

## COUNT VI
### (In the Alternative)
### *Fraude Procesal* Under Mexican Law

274.    AIC incorporates by reference and re-alleges Paragraphs 1 through 243 as though fully set forth herein.

275.    Article 310 of the Mexico City Penal Code makes it a crime for a party to obtain an undue benefit for itself or another by presenting misleading information to a judicial authority. This crime is referred to as *Fraude Procesal*.

276.    Under Article 1910 of the Federal Civil Code and under Article 1910 of the Mexico City Civil Code, a party is liable for any damages that it caused to another party for illicit acts and acts against good custom.  Under Article 1910, the commission of a crime is considered an illicit act.

277.    Servicios Funerarios has acted illegally by directing the presentation of false and misleading information to a Mexican prosecutor in order to obtain leverage against AIC.

278.    Servicios Funerarios has acted illegally by directing the presentation of false and misleading information to a Mexican criminal judge in order to obtain leverage against AIC.

279.    Servicios Funerarios has also acted illegally by directing the presentation of false and misleading information to a Mexican civil judge, and by continuing to mislead judicial authorities in (unsuccessfully) seeking to have a second civil court evaluate its request for an embargo, in order to obtain leverage against AIC.

280.     Servicios Funerarios has obtained an undue benefit through this conduct by securing arrest warrants against the Targeted Employees.

281.     Servicios Funerarios has also obtained an undue benefit through this conduct by obtaining an embargo on AIC's managed funds' shares in Somar, Mifel, Viakem, and Invercap.

282.     As a result of Servicios Funerarios' wrongful and illegal conduct, AIC has suffered and continues to suffer significant injury, including but not limited to financial loss, damage to reputation, and loss of business opportunities.

## COUNT VII
### (In the Alternative)
### Illicit Conduct Under Mexican Law

283.     AIC incorporates by reference and re-alleges Paragraphs 1 through 243 as though fully set forth herein.

284.     Under Article 1910 of the Federal Civil Code and under Article 1910 of the Mexico City Civil Code, a party is liable for any damages that it caused to another party for illicit acts and acts against good custom.

285.     Servicios Funerarios has engaged in illicit acts by intentionally injuring AIC by causing, or conspiring to cause, the filing of a frivolous complaint in federal civil court in Mexico City.

286.     Servicios Funerarios has further engaged in illicit acts by intentionally injuring AIC by causing, or conspiring to cause, a prosecutor in Mexico City to open criminal proceedings and pursue arrest warrants and Red Notices against individuals employed by AIC or associated with AIC.

287.     Servicios Funerarios has further engaged in illicit acts by intentionally injuring AIC by causing, or conspiring to cause, a prosecutor in Mexico City to seek and obtain asset embargos and liens encumbering valuable assets owned by AIC-managed funds, leading to (among other

things) the loss of a valuable transaction and numerous legal, financing, and other costs in connection with that loss.

288.    Servicios Funerarios further engaged in illicit acts by intentionally injuring AIC by filing the instant action against AIC in this Court.

289.    Servicios Funerarios did so without any excuse or justification, based on fabricated evidence, false and misleading allegations and arguments, and abuses of the Mexican justice system.

290.    Servicios Funerarios has used, or conspired to use, the above-mentioned civil and criminal proceedings not to prosecute crimes and pursue their rights as victims of civil or criminal offenses, but rather to cause harm to AIC's financial positions and reputation to extort and threaten AIC to abandon its rights and defenses in civil litigation and to pay Servicios Funerarios a substantial settlement.

291.    As a result of Servicios Funerarios' wrongful and illicit conduct, AIC has suffered and continues to suffer significant injury, including but not limited to financial loss, damage to reputation, and loss of business opportunities.

## PRAYER FOR RELIEF

Wherefore, AIC respectfully requests that the Court enter judgment in its favor and grant the following relief:

(a)    Award AIC compensatory and punitive damages in an amount to be determined at trial;

(b)    Award AIC treble damages pursuant to Mass. Gen. L. Ch. 93A;

(c)    Award AIC, in the alternative, moral damages under Mexican law pursuant to Article 1916 of the Mexico City Civil Code;

(d)    Award AIC its costs and reasonable attorneys' fees;

    (e)        Issue a declaratory judgment that AIC is not liable to Servicios

                 Funerarios for fraud; and

    (f)        Grant such other and further relief as may be just and proper.


Dated: April 24, 2023                   Respectfully submitted,

_/s/ Andrew J. Rossman_             _/s/ Peter L. Welsh_

Andrew J. Rossman*              Peter L. Welsh (No. 643261)
Nicholas A. S. Hoy*              Daniel V. Ward (No. 667158)
QUINN EMANUEL URQUHART &     ROPES & GRAY LLP
SULLIVAN, LLP                 Prudential Tower
51 Madison Avenue, 22nd Floor     800 Boylston Street
New York, New York 10010        Boston, MA 02199
(212) 849-7000                  (617) 951-7050
andrewrossman@quinnemanuel.com  Peter.Welsh@ropesgray.com
nicholashoy@quinnemanuel.com     Daniel.Ward@ropesgray.com


Gabriel F. Soledad*
QUINN EMANUEL URQUHART &     _Counsel for Defendant and Counterclaim-_
SULLIVAN, LLP                 _Plaintiff AIC_
1300 I Street NW
Washington, D.C. 20005
(202) 538-8000
gabrielsoledad@quinnemanuel.com


Joseph H. Margolies*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400
josephmargolies@quinnemanuel.com


*_pro hac vice application forthcoming_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of April, 2023, I served a copy of the foregoing *Defendant and Counterclaim-Plaintiff's Answer, Affirmative Defenses, and Counterclaims to Plaintiff's Complaint* via ECF to all counsel of record.

<u>/s/ *Peter L. Welsh*</u>

Peter L. Welsh
*Counsel for Defendant and Counterclaim-Plaintiff AIC*