# EXHIBIT J

# HERNÁN GÓMEZ BRUERA

# BETRAYAL IN PALACE

## The business of justice in Q4T

Grijalbo

# Table of Contents

Betrayal in Palace

Warning

Presentation

FIRST PART. The character

     1. The Justice Business in Mexico

     2. In the name of the father

     3. The relationship with AMLO and the left

     4. Estate and Real Estate Businesses

     5. Business from Power

     6. Morena as a franchise

     7. Litigation as a gold mine

SECOND PART. Judicial business

     8. The modus operandi of the Scherer network

     9. Juan Collado: "liberty for freedom"

     10. Alonso Ancira and Altos Hornos de México

     11. Extortion to Miguel German

     12. Banco Santander and the millionaire inheritance of Garza Sada

     13. Black Gold – Personal Revenge

     14. Blue Cross: the jewel of the crown

     15. Aleatica and Bicentennial Viaduct

Note for reflection

Notes

About this book

About the author

Credits

# Betrayal in Palace

The business of justice in Q4T

HERNÁN GÓMEZ BRUERA

Grijalbo

To and those responsible for not repeating this story.

# Warning

The content, information, narratives and documentation of this book are derived from a collection of 80 testimonies from high- and mid-ranking officials of various public institutions, as well as from litigants who claim to know the character referred to here or their way of working. Therefore, all of the author's observations are based exclusively on factual premises narrated to him, as well as on the records of litigation and business put in view of the journalist. They are not, at any time, personal guesses or elucubrations. The premises on which the observations of the author are based are the result of the investigation, and in no way should it be understood as your purpose to affect the consideration of the subject in question, or as a personal desire to damage the reputation of the subject in question. This work is solely and exclusively the result of a documented inquiry and with solid sources that allow us to formulate the indications that were disclosed to us, in order to provide substantial information to nourish public judgment and provide a historical version, by informants whose identity, at your request and in the exercise of professional secrecy, has been kept under reserve.

[*Part 1 removed for brevity*]

# SECOND PART

## Judicial business

8

## The modus operandi of the Scherer network

The alleged network of judicial businesses created by Julio Scherer Ibarra during the AMLO government has featured four large law firms (see figure 1). At least in three of these the link was publicly recognized by the former legal adviser himself. In fact, in the resume that he himself submitted to the Secretariat of Public Function when taking on the position he admitted having been a partner of the Araujo office, Gonzalez, Peimbert, Robledo and Carrancá Legal Consultants, S.C. (AGPRyC); Rivera Gaxiola, Kalloi, Fernandez, From the Castle, Quevedo, Lagos and Machuca Abogados (which we will identify here as Rivera Gaxiola and partners); as well as Ferráez, Benet, Segovia and Igartúa, SC (FBSI).1 There are, however, an additional fourth dispatch, whose relationship has not been recognized by Scherer, despite being the one who played the most important role within the former counselor's judicial business scheme: the law firm García González y Barradas (GGyB).1 25

Scherer has never clarified the type of relationship he has with all of these lawyers, nor whether he has been formally a partner of them.2 Liaisons, however, can be easily traced, as even several of the former counselor's family members are associated with, work for, or have worked for these firms.2 24

The actions of the lawyers who make up the Scherer network are not always easy to track, because they sometimes disguise their intrusion through lesser-known litigants, who are formally listed in the files, because they disguise their participation in certain litigations in which they consist of addresses other than those of their main offices.3 3 24



CJEF
FEDERAL EXECUTIVE LEGAL COUNCEL

[logo:] UNITED MEXICAN STATES

LEGAL COUNSEL OF THE FEDERAL EXECUTIVE
Administration and Finance Unit
Directorate of Human Development and Organization

JULY SCHERER IBARRA

No. EMPLOYEE: **729**

SCHOOLING:
BACHELOR OF LAW

WORK EXPERIENCE:

| DEPENDENCY | POSITION | FIELD OF EXPERIENCE |
|---|---|---|
| CONASUPO OF VERACRUZ. | CEO | ADMINISTRATION |
| SUGAR INGENUITY ORCALCO. | CEO | ADMINISTRATION |
| NUTRIMEX. | CEO | ADMINISTRATION |
| CLEMEX. | CEO | ADMINISTRATION |
| INDUSTRIAL GROUP NKS. | CEO | ADMINISTRATION |
| COLLECTIVE TRANSPORT SYSTEM ROUTE 100. | CEO | ADMINISTRATION |
| NATIONAL WAREHOUSES S.A. | CEO | ADMINISTRATION |
| SCORPION SUGAR CONSORTIUM. | CEO | ADMINISTRATION |
| NATIONAL WAREHOUSES S.A. | CEO | ADMINISTRATION |
| SECRETARIAT OF AGRARIAN REFORM. | CONSULTANT TO THE SECRETARY OF AGRARIAN REFORM | PUBLIC ADMINISTRATION |
| INSTITUTIONAL GAME CHANGER. | ASSISTANT SECRETARY AT PRI | ADMINISTRATION |
| SECRETARY OF LABOR AND SOCIAL WELFARE. | ASSISTANT SECRETARY OF LABOR AND SOCIAL SECURITY | PUBLIC ADMINISTRATION |
| OCEAN GARDEN PRODUCTS, INC. | PRESIDENT | |
| C.V. GASTELUMS A BUFFET | PARTNER | NATIONAL LAW AND LEGISLATION |
| ARAUJO, LYING DOWN, RATCHET, AND GIVE ME LAWYERS. | PARTNER | NATIONAL LAW AND LEGISLATION |
| RIVERA GAXYOLA, RATCHET, AND KALLOI, S.C. | PARTNER | NATIONAL LAW AND LEGISLATION |
| FERRAEZ, BENET, SEGOVIA & IGARTUA, S.C. | PARTNER | NATIONAL LAW AND LEGISLATION |

Note: Summary version of the curriculum that is located in the file in the safekeeping of the Directorate of Human Development and Organization, does not include the current position, which you can verify on the National Transparency Platform,
http://www.plataformadetransparencia.org.mx/http://www.plataformadetransparencia.org.mx/

Offices with which Julio Scherer Ibarra had an employment relationship.

Araujo, Gonzalez, Peimbert, Robledo and Carrancá (AGPRyC) is a firm originally founded in 1992 by Juan Araujo Riva Palacio, his main brain, and Victor Carrancá de la Mora, former Assistant Attorney General of Justice of Mexico City and former attorney of Puebla, as well as the cousin of today's Minister of the Supreme Court, Juan Luis Gonzalez

Alcántara Carrancá. In 1997, Agustín Acosta was added, famous for having been the attorney for Florence Cassez.4 Today they make up this firm, in addition to Araujo himself, César Omar González Hernández, principal liaison with Julio Scherer, José María Peimbert Calvo, Alejandro Robledo Carretero and Daniel Carrancá de la Mora, son of Victor.4_22

AGPRyC is primarily engaged in criminal matters and is known for defending Florence Cassez, René Bejarano, Alfonso Ramírez Cuevas, a character close to Scherer, and even Guillermo Zayas, prosecuted in the New's Divine case when he was chief of the capital police, during the government of Marcelo Ebrard. Araujo, in particular, has been mentioned in the press for his controversial role in the case of controversial Lord Ferrari.5 5_22

Among various litigants, it has come to the attention of how these Scherer partners, according to various sources, quickly took on an immense mansion—practically a mansion—at Francisco Sosa Street, in Coyoacán, whose value today amounts to about $8.5 million. That site, in addition to being used as one of the offices of the office, is now home to the so-called Mexican Institute of Justice.

Different versions of this property circulate: some point out that Araujo and González took one of their clients into bad faith, and others say that they acted through the Attorney General's Office of Justice of Mexico City to order it to be seized, offer a legal solution and finally acquire the property at the time it had lost its value in the market, precisely as a result of the seizure that these lawyers pro.

What is clear, and can be verified in real folio No. 9513829, relating to this property, is that since the end of 2019 the property was mortgaged in unusual circumstances in the name of Vertical CDMX, S. A. de C. V. to guarantee a credit in favor of Unifin Credit. It should be noted that Vertical CDMX, incorporated just in 2018, is the property of an Araujo partner called Augusto Pi Suñer Azcuaga, whose registered address, by the way, is a shared workspace (or coworking). The first thing that catches the eye, as Paulo Díez Gargari points out, is that a company apparently controlled by Araujo has established a mortgage on a real property owned by him to guarantee the payment of a credit to a third party. The second is that the interest rate is 45% per year, a value far higher than the market. This transaction was not entered into in terms of the market. In fact, it is common that when a person guarantees an obligation of another through a property owned by them, it is actually because it is one belonging to another, not the one held as owner. Some believe that the true owner of this palace could be Julio Scherer Ibarra, although there are no major test items.



Figure 2
FORMER COUNSELOR JULIO SCHERER IBARRA'S NETWORK OF ATTORNEYS

SOURCE: Adapted from Paulo Díez Gargari

Of all the firms that make up the alleged network of the former adviser, none has been so mentioned in the media: AGPRyC took the case of Juan Collado (chapter 9), Alonso Ancira (chapter 10) and played a part in the topic Cruz Azul (chapter 14). In the first one we talked about an extortion complaint and the attempt to force the lawyer to sell his company, Caja Libertad, at a price well below its market value, to a businessman close to Schererer who we have already talked about: Julio Villarreal. In the second case, the thing is similar, although Ancira did not finally report it. Coincidentally, here also Scherer's same businessman friend intended to be favored with the purchase of a significant part of Altos Hornos de México.

According to reserved sources, this office would also have led the case of Emilio Zebadúa, accused of the diversion of approximately 5 billion pesos through the Master Scam, although the members of this office expressly denied having been involved when I asked one of them. Sources with indirect knowledge of the case ensure that, to give it an opportunity criterion, the former senior officer of the Secretariat of Social Development (Sedesol) was obliged to deliver to this office about 100 million pesos in money and real estate. The critical moment took place in April 2021 when Cesar Gonzalez achieved that the third district judge based in Tapachula, Chiapas, Oswaldo Alejandro López Arellanos, obtained a suspension that prevented him from acting against him for the investigation of

the Master Scam. According to attorneys who had contact with him, González came to presume the ease with which he was able to bribe this judge with 5 million pesos.

In contrast to what happened to Rosario Robles, it draws attention that, since then, the Zebadúa case has not advanced, nor is it known what the true implications of its statements have been. In fact, although Sedesol's former senior official—whose statement was written in its entirety by Araujo—given names, surnames and details of the main ones involved in the Master Scam, the fact is that practically none of them had any information in their process from these confessions. The criterion of opportunity offered to Zebadúa, in addition, was never really met and has even been legally questioned. As is known, in order for such an instrument to be granted, the beneficiary must report or give information about a crime of greater severity than the one committed by it. Zebadua was actually accused of a crime similar to Rosario Robles, who faced a very different process than his.

Although the former board member has publicly recognized being a partner in this firm, Araujo claims that over the years they only litigated "some cases" together. Another source within this same firm, with whom I spoke off the record, asserts that they have barely litigated together in three matters. Why will Scherer and its partners offer different versions of the type of partnership they have had?

As I disclosed in Aristegui Noticias, at the time, according to a source of intelligence to which I had access, the espionage to which the prosecutor Alejandro Gertz Manero was subject on February 25, 2021, when a call was shown between him and the sub-prosecutor Juan Ramos, could have been carried out in Damas 94, San José Insurgentes, in Mexico City, from an alternate office used by the office of Araujo and González. As can be seen through a simple Google search, there was also a private security and research company in the United States called Thomas Dale & Associates, led by Thomas Elfmont,6 a former LA police chief.6 21 The firm draws attention because in 2011 it was accused in courts in that country of having contracted an espionage service to intervene in a cell phone in San Bernardino, California, as stated in various news releases.7 7 21

What we see then is that in the same offices where a US security company appears domiciled, that at least once would have committed acts of espionage (even a second Swiss capital security company named Glarus, S. A. de C. V.), AGPRyC has an alternate venue luck.8 The office is located right on the corner of Women 94 and Mercaderes 39, where there are two different houses interconnected, which have been used by Araujo and its partners as their registered office.9 Will it be a mere coincidence that two security companies—one accused of espionage—have operated at an Araujo and partner address?8 219 19 Will it be that from there the Attorney General of the Republic could have been spied on? Some information should have been held by the President of the Republic when he declared in a morning room on March 7, referring to espionage against the prosecutor: "That's law firms, corrupt politician groups, spies."

The second office of the Scherer network is Ferráez, Benet, Segovia and Igartúa, S.C. (FBSI), founded in 2010 to pursue real estate issues. Its partners are José Andrés Ferráez Quintanilla, Enrique Benet Gregg, Mauricio Segovia Barrios and Alejandro Igartúa Scherer, nephew of the former adviser. Scherer himself acknowledged having been a partner of this firm between 2014 and 2018.10 10 16

Without a doubt, this is the firm closest to Scherer and its interests, as it is primarily dedicated to managing paperwork and sponsoring litigation related to Mexico City's real estate development. As explained in chapter 4, during the government of Michelangelo Mancera, this firm served the director and his to capture the Secretariat of Urban Development and Housing (Seduvi), through privileged access that has allowed him to obtain permits to build developments that, in many cases, exceed the number of floors permitted by law.

In contravention of the highest laborer to separate the economic power from the political power, two of the most important appointments made by the former director within his closest work team arose from charts linked to the real estate businesses of the FBSI firm: Raúl Mario Segovia Barrios, who served as assistant director of Constitutional and Contentious Control, and Mario Iván Verguer Cazadero, who appointed general director of Constitutional and Contentious Control.

The former counselor's link to this firm is impossible to disguise. Scherer himself made public, on October 13, 2021, in an interview for Aristegui Noticias, that during the time he held the position of General Counsel of the Federal Executive, he remained a partner of this firm.11 Surely to disguise the obvious relationship he had with whom he was now in charge of the Legal Department, from February 8, 2019, a few weeks after Scherer assumed his new position, FBSI adopted a new corporate name:11 15 Regulation & Compliance.

The director favored this firm so that the National Banking and Securities Commission (CNBV) granted it three contracts, between 2019 and 2021, for a total amount of 89.7 million pesos.12 Most likely, Julio secured these contracts for its partners, in a clear conflict of interest, through Sandro García Rojas Castillo, a friend and operator of his who arrived at the Vice Presidency of Supervision of Preventive Processes of the CNBV.12 15

Due to insufficient staff, sources with knowledge of financial matters explained to me, the CNBV usually hires an external firm to review the work of all the money laundering audits of hot flashes, exchange centers and money transmitters in the country. As can be read in one of the contracts (CNBV/037/20), the firm was in charge of preparing the "study of audit reports regarding the prevention of operations in resources of illegal origin and financing of terrorism of exchange centers, money transmitters and unregulated multipurpose financial companies."13 13 14

We are faced with a typical example of capturing the State for the benefit of an individual, because having obtained these contracts, in addition to being bagged a good amount, Scherer and its partners were in a privileged position, not only to audit

themselves, but also to their potential competitors. That way they were able to punish financial institutions that at some point were a roadblock.

The firm Rivera Gaxiola, Kálloi, Fernández, Del Castillo, Quevedo, Lagos and Machuca, founded in 2002, consists of Alonso Rivera Gaxiola, Béla Kálloi Romero, Ramón Fernández Vigil, Alejandro del Castillo Ramírez, Pedro Iván Quevedo Ramos, as well as Julio's nephew, Rodrigo Lagos Scherer, a young ITAM graduate who joined the firm in 2017. Carlos Mauricio Suárez Tavernier, a son of Julio Scherer Ibarra's partner, also works or worked in this office.

This firm specializes in matters of commercial, civil and administrative litigation, and is responsible for conducting commercial tenders and resolving conflicts between shareholders. In 2016 Julio turned to Rivera Gaxiola to represent Lopez Obrador in the litigation he initiated against The Wall Street Journal for a published note on undeclared properties. The attorney would have been one of Scherer's main operators in the Judiciary of Mexico City, and even in the Federal Judiciary, where it has been said that he has a close relationship with Carlos Alpízar, Secretary General of the Council of Federal Judiciary and today an official in the Secretary of Governor's Office (Segob).

At the start of the administration of Lopez Obrador, the rumor that Rivera Gaxiola could be included in the Senate terna to become a minister of the Supreme Court was strongly circulated. Scherer Ibarra appeared to intervene in favor of him recalling the positive role he played in the Wall Street Journal complaint.14 14  12

Rivera Gaxiola's office would have been involved in an alleged case of extortion or influence peddling to Miguel Alemán Magnani, on the Interjet topic, which I talk about in chapter 11, and it would have operated behind the scenes in favor of sisters Maria del Carmen, Gabriela and Viviana Garza Sada, in a legal dispute over an inheritance against Banco Santander, where they were able to reverse a judgment and take a stratospheric sum out of the bank, thanks to the favors that the Scherer network was able to obtain in the federal Judiciary (chapter 12).

García González y Barradas, S.C. (GGyB)15 is a firm founded in February 2014 by Roberto García González and Guillermo Barradas (best known in the world as "the Chinese" and "Memo"), in addition to Ricardo Contreras, Sharon Hernández and Victor Palacios as junior partners.15 11 Barradas and Scherer, in particular, have a long-standing personal relationship, solidified from their home neighbourhood. In addition, Valentina Scherer, daughter of Hugo Scherer, cousin of July, has worked in this office.

In the past, very controversial cases were carried out at this firm, such as that of former governor Javier Duarte, with whom Barradas appears to have had a very close relationship,

in addition to the fact that, according to information published in the press, he helped him formulate a "contingency plan" and obtain safety houses in three countries so that he could take refuge from justice.16 16 11

While AGPRyC has been the most questioned in the media so far, the role GGyB appears to have played in the Scherer network is far more unsettling. Unlike the Araujo firm, which has had more of its own life, if the other took off in recent years, it is thanks to its proximity to the former legal adviser.

Probably here were the cases of most interest to Scherer, such as the Cruz Azul cooperative (chapter 14), the gold mine of the litigation in Mexico, and that of the investors of the company Oro Negro who sued Gonzalo Gil White—son of the secretary of Finance at Fox's time, with whom Scherer sought an obvious personal revenge (chapter 13). In addition, the dispatch of Chino and Memo was involved in cases such as General León Trauwitz, former assistant director of Pemex during the government of Enrique Peña Nieto, Arrested for protecting huachicoleros in the dispute between the University of the Americas Puebla (UDLAP) and the Mary Street Jenkins Foundation; as well as those of the biller Víctor Manuel Álvarez Puga, outsourcer Raul Beyruti and, tangentially, according to some sources, in the case of Rosario Robles, although there are versions found on the latter.

This firm also brought the case of entrepreneurs André and Max El-Mann Arazi, who, together with their partners Rafael and Teófilo Zaga Tawil, shareholders of Telra Realty, were accused of an irregular contract signed in 2014 with the Infonavit. García González and Barradas would have charged the El-Manns about 200 million pesos in exchange for a repair agreement by which they returned another 2 billion equivalent to a part of the repair. Very different was by the way the luck of the Zaga Tawil, who refused to be part of the game. For resisting the terms of the plan, on December 25, 2020, the Deputy Attorney General's Office Specialized in Organized Crime Investigation (SEIDO) released an apprehension order against Rafael, Teofilo and Elías Zaga, Rafael's son.

An important character close to this office is Jorge Arturo Galván Jiménez, who, in addition to being the cousin of Scherer's ex-wife, some consider central to the network. It appears that he has been involved for a long time in several of the former counselor's affairs, acting as one of his arms in both local justice in Mexico City and federally. In 2004 Galván was the lawyer who appeared in the defense of Carlos Imaz, where Araujo and Scherer were involved. As explained in chapter 14, Galván would have had a relevant interest in the Cruz Azul case.

Some sources point out that this character was involved in the Rosario Robles case, in which the Barradas office had a relevant participation during the stage prior to the release of the former secretary. One of the testimonies states that, seeing that the successive judicial rulings did not favor it, Robles decided to go to Julio Scherer Ibarra, presumably through Galván. It appears that, through its conduit, the firm would have collected some millions of dollars to make it easier for the former owner of the Sedesol. As you know, on

August 19, 2022, Judge Ganther Alejandro Villar Ceballos allowed Robles to face his process in liberty. On the subject, however, there is still much to investigate, and those involved have been reluctant to give their version. Rosario Robles herself refused to discuss the matter.

## THE SCHEME

The scheme through which the Scherer network worked seems to have operated as follows: when someone was going to see the then counselor to solve any legal problem, he recommended that one of his associated offices take the cases to justice or take care of lobbying and making arrangements before the authorities. Those interested in obtaining favors or "solving their problems" were quoted in the offices of those firms, where they were basically informed of the price to fix things, as explained by attorney Díez Gargari.17 In some cases, such as that of Miguel Alemán (chapter 11), written quotes were submitted requesting exorbitant sums that can only suggest that a commission or form of bribe was implied.17 11

According to testimonies, the former legal counsel took the majority of dividends reported from this network of judicial businesses. As the head of the group and the main anchorage in power, Scherer took between 70 and 80%, while the offices had between 20 and 30%. Obviously, very important amounts were also going to give to the judges. According to calculations prepared in flight by a litigant who has known Scherer and his group of lawyers for about three decades, this network was bagged at least about 2 billion pesos during the time that the board member's management lasted. All of these numbers, however, require much more in-depth research in order to be elucidated.

In some cases, the issues entered Scherer's orbit directly through his office, which was commonly reached by troubled characters to ask for favors or seek management, or through network lawyers. In others, however, Scherer and its partners were looking for potential million-dollar cases and appropriated them. This is indicated by an investigation by Juan Pablo Becerra Acosta, published as a column in El Universal, where he explains how the firms linked to Scherer would have pressured wealthy clients to fire their lawyers and hire the directors' partners.18 The modus operandi was the same, according to the sources consulted by this journalist.18 11 One of the entrepreneurs you spoke with describes this way of blackmail: "I was warned that if I stayed with my lawyers, I would lose the case. That there was no alternative. We're talking about million-dollar issues, not a few pesos. And that if I hired them, Scherer's friends or partners, they assured me that, thanks to their power and influences, my case would be resolved favorably and expeditiously."

In that sense, explains Becerra Acosta, "what they sold, through fear, was the Scherer brand, the power of Scherer, charging much more money than other firms, and taking in between those firms, which perhaps had been close to the previous regimes."19[19 9]

Cases such as that of Juan Collado or Alonso Ancira, which are discussed in the following chapters, have been defined as extortion practices, understood, according to Article 390 of the Criminal Code, as forcing another person to "give, do, stop doing or tolerate something, obtaining profit for himself or for another by causing someone property damage." In fact, in the world of litigation, it is unclear how far a crime of this kind can be set up, one of my sources explained. "Thinking that powerful characters like Ancira, Collado or others can be easy subjects of extortion is probably naive," he said perhaps rightly.

Therefore, without ruling out the possibility that extortion practices actually took place, we may be faced with the existence of a set of judicial businesses based mainly on influence trafficking, where some characters—several of whom did commit illicit acts—returned to figures of proven efficiency and proximity to power to resolve their affairs. Since they were finally defrauded or deceived by the person who offered them privileged treatment, they ended up reporting the person who failed to comply with them.

Julio Scherer's modus operandi appears to have consisted of extracting income from a combination of strategies. In several cases, the network certainly met its customers by giving them favorable rulings, usually in exchange for large sums of money. This happened with the André and Moisés El-Mann brothers, involved in a fraud of the Infonavit; or with the Jesús Gabriel brothers, William Jorge and Paul Karam Kassab, owners of Hydrosine, a gas station accused of buying huachicol, who in 2019 had their accounts frozen and in February 2020 had been issued an arrest warrant.20 According to versions of litigants consulted, Julio Scherer would also have offered protection to these characters in exchange for some properties in Polanco.20[20 9] In the circle of elite offices, it also ensures that the former adviser interceded through Rafael Guerra, the president of the Superior Court of Justice of Mexico City, so that attorney Ulrich Richter, his friend, could beat Google a claim for identity theft for the exorbitant amount of $250 million (about 5 billion Mexican pesos) for moral and punitive damages.

In other cases, however, Scherer and his clients did not comply. In its overwhelming ambition, the director would charge large sums for procedures that he committed to carry out before the Judiciary or the prosecutors, without ever delivering results or even trying to carry out what was promised. Several sources narrate experiences in that regard. One points out that the king of outsourcing, Raúl Beyruti, Gónzales and Barradas would have been charged $20 million in exchange for protection; however, in the end an arrest warrant was issued against him. Julio also does not appear to have complied with Victor Manuel Alvarez Puga, the country's largest biller, and his wife. Some sources claim that during the campaign Álvarez Puga gave Julio 100 million pesos, although, as always, it is not known whether these resources were fully reported, in exchange for obtaining the protection of

the future government. From what was seen, when he was in trouble he went to the counselor to ask him to help him navigate the action of justice, claiming the payment he had made to him. It appears that the official replied that the money he had given him at the time covered the fact that he would give him the sting, so that he could flee the country before an apprehension order was issued. In order to continue helping him, the former adviser would have sent his partners, the Chino and Memo, who charged him a sum on properties, including a house in the Tres Vidas de Acapulco fractionation (which apparently had to be returned later).21 If what the director achieved was to delay the criminal action against him.21_9

This, however, did not work for him. another testimony, Scherer also did not do well for former governor Cabeza de Vaca, who was promised to help him avoid his federal eviction in exchange for a million and a half dollars: he put Aguilar Zínser as an attorney and did not consume the task, which led the former governor to change his defense. The same thing seems to have happened with Alonso Ancira, whom Juan Araujo and César Gonzalez promised that he would not go to prison when returning to Mexico to face criminal proceedings against him, as I explained in chapter 10.

Sometimes, when clients investigated, they learned that the then-counselor had done nothing about what he had done. That's why Julio Scherer Ibarra probably cannot walk the streets freely without his escorts today, despite having formed—paradoxically—part of a government that made the decision to substantially limit the safety of public officials. On the subject, a businessman very close to Q4T reflected: "Jlio Scherer's problem is that he didn't understand that political power is ephemeral, but economic power isn't. Julio fucked those who had money and power before this government and who will continue to have it when it is over. He wanted to become a millionaire extorting the wealthy and that will never be forgiven."

Another pattern found in Scherer's judicial business is to place its attorney partners—either through persuasion, or pressure—on two opposing sides of legal disputes, ensuring all possibilities to earn and receive commissions from both parties, including promising or suggesting the ability to influence results. One case that clearly illustrates it is the ripple legal lawsuit that they held, as of October 2018, Roberto Javier Henaine Buenrostro, son of the textile businessman and former owner of the Puebla soccer club, Ricardo Henaine Mezher, and his former husband, Raquel Juan Marcos, from a considerably wealthy family, for the custody of his four-year-old girl.

According to the testimonials collected, the story happened more or less like this: Roberto and Raquel were separated by an infidelity of the former. On one occasion she took the little girl on a trip out of the country where she was receiving cancer treatment. When several days had passed, the father began to doubt about his daughter's whereabouts, which he did not return home the day his mother had promised, and only received long days on the return date. Henaine, who decided to place an Amber Alert to locate the girl,

finally learned that her wife was looking to take her from custody and that she intended to accuse him of sexually abusing the girl. Those who know the case claim that it was frail and that the allegations likely came from a woman who felt clear.

Represented by attorneys Víctor Oléa and Celestino Alonso, the child's mother then filed a series of complaints against her ex-husband. One was initially formulated, accompanied by a video of the child, in which she pointed out that her father touched her when she bathed her and explained it by saying how she had "cleaned her poop." Shortly, however, the mother filed another complaint in which the version changed. Now he said that he had carried out the action was not his father, but his grandfather, as he would have told his psychologist. But later the girl's version was changed again: it had not been her father or grandfather, but her four-year-old cousin who would have put a teaspoon on her. Given these facts, Henaine's attorney for the criminal party, Diego Ruiz, filed an indictment against Raquel Juan Marcos for false statements.

Prior to the time the hearing was to be held, however, families decided to suspend the session to try to reach a settlement and avoid trial. They were already in the foyer of reaching a fairly satisfactory agreement for the mother, with which Roberto could basically only see his daughter a few times a year and always with the custody of Raquel. However, the arrangement was suspended surprisingly for reasons that were not fully understandable at the time. What happened? Well, Raquel, seeking revenge rather than justice, came to Julio Scherer through his brother-in-law, one of the Blue Marine owners who knew the former counselor. The recommendation Julio then made to Raquel was the same as he made to others who were going to ask for favors: to change attorneys. This was how the mother of the girl replaced the office of Victor Oléa with that of Guillermo Barradas, which would charge her a higher amount, but guaranteed the result she expected. As they prepared for the new connection, the day the hearing was scheduled something unusual happened: the agent of the public ministry did not arrive. Following the same logic of Raquel, at three weeks, Ricardo Henaine, Roberto's father and who was in charge of the negotiations, also went to see Julio Scherer, who appeared to have arrived through David Gómez Arnau, partner and financial officer of the former adviser. Once again, the latter's recommendation was to change lawyers and hire nothing more than the office of Juan Araujo and César González.

You don't know how Henaine ultimately ultimately lost the girl, though it's known that the lawyers charged her $3 million to take her case. Operating within the Attorney General's Office of Justice of Mexico City, Barradas and hers were able to file a charge against the child's father for gender violence, forcing her to agree to sign an agreement waiving custody of the child, without being able to approach her until she reaches the age of majority. The father had no choice but to agree to the agreement, since, if he did not, he would have been prescribed preventive prison, as such has been the practice in Mexico City in cases of this type.

Anyone who looks at the case from the outside should be drawn to the attention that, in a matter of weeks' difference, two very close offices to Julio Scherer – that of Barradas and that of Araujo – have suddenly come to resolve a matter that was about to be resolved through the conciliation. As some of the parties involved presume, things ended up being resolved, with some calls that arrived at the Prosecutor's Office, in favor of who possibly paid the highest sum to the two offices that are members of the Scherer network. Unable to know if the girl's custody ended up deciding in favor of one of the parties as a result of an auction or if the dice were already loaded from the beginning to fall on one side.

## PROSECUTORS AND OFFICIALS AT THE SERVICE OF SCHERER

Julio Scherer's network would not have managed to operate had he not had strategic support within the Office of the Attorney General of the Republic and the Office of the Attorney General of Justice of Mexico City, where the director recommended some profiles and even made others available to resolve his issues quickly. In particular, Scherer showed a clear interest in the areas of financial crimes within the prosecutors' offices, as they deal with the offenses committed by the holders of large fortunes, where in general the lawsuits involving significant sums of money are filed and the previous inquiries that are worth enormous fortunes take place. For this, Scherer did not necessarily have to pass through the owners of the dependencies, Alejandro Gertz Manero and Ernestina Godoy; it is even unclear whether or not these officials had knowledge of the director's modus operandi or whether they consented at any time.

It is widely commented that within the Office of the Attorney General of the Republic, Scherer had the collaboration of his close friend, Alfredo Higuera Bernal, the head of the Sub-Attorney General's Office Specialized in Organised Crime Investigation (SEIDO), whom the lawyers linked to the former adviser would permanently resort to make arrangements on his behalf, without it being necessary to reach the Attorney General. An elite attorney commented that several SEIDO holders agreed on matters with Julio Scherer at their Virrey de Mendoza public-private offices. That same and other more sources also point out that a character that would have allowed the former adviser to operate at his own expense was responsible for the money laundering area, Mauro Anselmo Jiménez Cruz, former owner of the Unit Specialized in Operations Research with Resources of Illicit Origin, Falsification or Alteration of Currency. With the knowledge of Higuera Bernal, Scherer would have assisted this official in cases such as Black Gold, Blue Cross and Cowhead, in which the former counselor had a personal interest. In the latter of those cases, Jiménez Cruz took personal responsibility for expediting things to chase Billy Alvarez and his partners, removing them from the direction of the cooperative and issuing apprehension orders to admit them to the

High Plaintiff criminal, a maximum security jail that receives high-hazard subjects, as explained in chapter 14.

According to some sources within the Office of the Attorney General of the Republic, then counselor personally recommended Attorney Alejandro Gertz Manero, to lead the Tax and Financial Crime Analysis Unit of that agency, to Jose Oscar Valdez Ramirez, close to Scherer and pal with his notary general, Guillermo Alberto Rubio Díaz, who, since March 5, 2019, served as an advisor to the Legal Department, as indicated by a Counterline report.22 Apparently, the counselor, that then had a good relationship with Attorney Gertz Manero, was particularly insistent on this appointment until that one ended up giving up, and signed it on September 15.22 9 Two weeks later, however, before Valdez could formally take possession, something unusual happened: on October 2, his driver, José Antonio Ramírez Beltrán, was arrested on a road in the State of Mexico while driving a car in which he transported 3 million,950 thousand pesos in cash. When they found it, the driver stated to the authorities that this money was not his own, but the property of his boss, who had given it to him hours before with the order to take him home in Toluca. Both the money and the vehicle – both owned by the Scherer referee – were insured, and the driver, stopped and linked to the process.

José Óscar Valdez finally never took possession (it appears that the Prosecutor's Office never formally delivered his appointment), and even later learned that "the Sultan," as identified by this perφφsonage, spearheaded an extortion network that charged millions of dollars to entrepreneurs to resolve nonexistent investigations, as can be read in the Counterline report.23 That was how the FGR opened a criminal case for the crime of transactions with resources of illicit origin, extortion, usurpation of functions and organized crime.23 9 According to the inquiries made known by Counterline, this doctor in law and ex-counselor of the Legal Department (thing that I could never verify, since there is no record that he had worked there) informed his victims that they had various investigations for the crime of money laundering and that could help them avoid the exercise of criminal action in exchange for high sums. According to one of the complainants, Valdez Ramírez himself had told him to have the ability to resolve an investigation folder against him, which ultimately turned out to be apocryphal. For this, however, he demanded the payment of 15 million pesos, according to the aforementioned publication.2424 7

Oscar Valdez's relationship with Scherer Ibarra is unclear and deserves further investigation. According to the publication, to extort, Valdez hid in an alleged friendship with him, but also with Santiago Nieto. In any case, the sources of the Office of the Attorney General consulted ensure that this person had already extorted before his appointment in the FGR and that he had indeed been recommended by the former director, perhaps with knowledge of the illegal activities he carried out. Valdez seemed to have all the intention to reach the Tax and Financial Crimes area of the Prosecutor's Office, where it has traditionally been operated with extortive practices.

As already mentioned, the former adviser also established a typology important in the Attorney General's Office of Justice of Mexico City, with another official who, although we don't know if you recommended, certainly seems to have been available to you: the head of the Prosecutor's Office for Strategic Investigation of Financial Crimes, Édgar Pineda Ramíŝćrez, in whose office several research folders appealing to Scherer fell, as in the cases of Black Gold and Blue Cross (chapters 13 and 14), and in all of them the institution's actions tended to be very favorable to the interests of the then legal counsel. In that office Scherer's affairs were generally assigned to a specific public ministry agent: Andrés Maximino Pérez Hicks, holder of the C-6 Research Unit. The channel to address these issues was the office of García González and Barradas, although within it it was well known that the person who drove the issues was the then legal counsel, which forced their officials to give them speed and privileged treatment.

But there were other characters within the capital prosecutor's office through which Scherer would have managed to advance his affairs: one of them is Rodrigo de la Riva Robles, general coordinator of Strategic Research, one of the most important areas of the Prosecutor's Office, who would later leave as an officer of the Secretariat of Citizen Security. This subject came to his position thanks to his proximity to Rosa Icela Rodríguez, of whom he was private secretary at the Secretariat of Social Development of Mexico City between 2012 and 2015. Within the Prosecutor's Office, as sources of the agency itself acknowledge, De la Riva dealt with Scherer's matters with particular attention, to the extent that more than one litigant who went to him to raise any matter received the same response: that he simply could not deal with "July's" matters.

Another official who was especially functional in Scherer's interests was Facundo Santillán Julián, general coordinator of Strategic Research (today holder of the Transparency Unit of the Secretariat of Security), recommended, not surprisingly, by the presiding magistrate of the Superior Court of Justice of Mexico City, Rafael Guerra. The case of Junquera, attorney for Cruz Azul, fell on the court of Santillán, among others, and it was through its successor, Octavio Cevallos, with whom the reparation agreement was negotiated, with which it ended up canceling the arrest order, as we will see later.

Outside the prosecutors' offices, there is another federal financial officer who also appears to have played a relevant role in Scherer's affairs: Santiago Nieto Castillo. The relationship of the former holder of the Financial Intelligence Unit (FIU) with the former adviser is unclear: while inside the government some believe that he had a stubborn relationship with the former counselor and that he resisted some of his requests, Others claim—especially litigants consulted—that he played a key role in Scherer's network of extortion and influence peddling and that he was complicit in some of the actions promoted by Scherer, especially through the Judicialization Desk, where one and the other drove their personal agendas. Without Nieto's participation, these sources affirm, it would be difficult

to explain what happened in cases such as Cruz Azul, Álvarez Puga, Beyruti, Juan Collado or Jenkins.

As is known, the UIF cannot order the freezing of accounts without a court order or by request of a foreign authority or international body. To appear to have the second, the press has realized how Santiago Nieto used a clearly illegal mechanism to freeze various accounts, falsifying requests from institutions in the United States, such as the DEA, the Department of Justice, the FBI, the embassy of this country and the FinCEN (the equivalent of the UIF). In reality, what the former holder of the UIF did was draw on a simple addition of the United States embassy in Mexico, Joseph González, who, without having authorization or express powers, signed on behalf of the aforementioned institutions, even using its stamps and logos. For that reason, in January 2022, a group of Cruz Azul co-operatives reported both Nieto and Gonzalez to the United States Department of Justice.25 There are two other complaints filed in that country by Oro Negro and Cabeza de Vaca, which are being investigated.25 7



SOURCE: Preparation of its own, based on the testimony of the sources and/or information of judgments.
Highlights are those judges who learned more than one case of interest to the former legal counsel.

Some believe that due to these and other irregularities Santiago Nieto was forced to submit his resignation, which occurred on November 8, 2021, nine weeks after Scherer. His departure from the UIF, in this sense, was not as much due to the scandal generated by his wedding in Antigua, Guatemala, as the fact that the president was seeking a pretext to get

rid of an official who had lost confidence for his performance in cases such as those mentioned here. Otherwise, it is unclear to what extent there could be a complicity relationship between the former UIF holder and the former legal adviser. This book is not intended to draw conclusions about this. Some testimonials point to Nieto having a tight relationship with Scherer and opposing some of his applications, although others point out that he was part of some of his businesses. In this regard, a well-known litigant recounted: "I was present once Scherer called Santiago Nieto on the phone to ask for a case and heard when he assured him: 'Yours is already fixed.'"

I tried to talk to Santiago Niego repeatedly. After insisting, we agreed that I would send you a written questionnaire. Oddly, he replied in several WhatsApp messages, with brief responses, somewhat evasive and little contributed to clarifying my doubts about his relationship with Julio Scherer Ibarra.


## SOME NETWORK JUDGES

Julio Scherer's network could not have worked without an easily manipulable and corruptible Judiciary that allowed him to obtain favorable judgments, either through direct negotiation of judgments between law firms and judges, or through the influence and pressure capacity of the councils of the judiciary, where there are various methods of coercion for judges, as I explained in the first chapter of this book.

An indication that Scherer Ibarra and its associated firms obtained rulings in this way is the number of cases of interest that fell in the same courts or tribunals. It wasn't casual. As I also explained in the first chapter, the complaints that reach the Judiciary are taken to the judges in a supposedly random manner through a computer system or algorithm. Everyone knows, however, that system is manipulable and the fact that several cases of interest to the former adviser have been assigned to the same judges is very suspicious.

Matches are not few, both in federal and Mexico City justice. Just look at Figure 2 to find some examples that were referred to me.

In federal justice, as can be seen in figure 2, the Tenth District Court of Amparo in Criminal Matters of Mexico City, led by Judge Ruby Celia Castellanos Barradas, resolved important amparos of Oro Negro and Cruz Azul, promoted by GGyB. These and other matters in which Scherer Ibarra was interested were also worked at the same public ministry table, where very questionable injunctive relief was also sought before the same unit of the Superior Court of Justice of Mexico City.

In the Fifth Collegiate Criminal Court of the First Circuit, the appeals for review of Alonso Ancira, Juan Collado and Oro Negro (the first two sponsored by the Araujo office) fell. He was also the same district judge, Iván Aarón Zeferín Hernández, assigned to Almoloya de Juárez, who released arrest orders in the matters of Cruz Azul and the Jenkins

family, both equally sponsored by the office García González and Barradas. This judge, probably one of the most helpful to Scherer, resolved cases such as Infonavit fraud, which involved the El-Mann and Zaga Tawil families, as well as Emilio Zebadúa's issues with the Master Scam. In turn, the Eighth District Court of Amparo in Criminal Matters in Mexico City, headed by Luz María Ortega Tlapa, took over the arrest orders against Alonso Ancira and the Jenkins family.

In Mexico City justice, Scherer and his network of lawyers have had superlative influence, to the extent that they were able to behave "as owners and gentlemen" by having a large number of trial judges and magistrates of the Superior Court of Justice controlled. Some litigants claim that, during these years, "the mere mention that a matter was of Julio Scherer in local justice aligned all officials rudely."

In particular, Scherer was able to have a huge influence on the magistrate president of the Superior Court of Justice, Rafael Guerra. Much more than the case of Arturo Zaldívar, as president of the Court, the contubernium between War and Scherer appears in practically all the stories that I managed to gather. As it is suggested specifically in the case of Cruz Azul, which I set out in chapter 14, there may be an important economic link between Scherer and Guerra. Through the president of the court, Scherer and his partners managed to gain tremendous influence on criminal matters. Much of these were vented in Judicial Management Unit Number 12, where several arrest orders, injunctive measures and searches would be issued tailored to the interests of Scherer Ibarra. The three most conspicuous cases are judges Agustín Moreno Gaspar, Júpiter López Ruiz and Joel de Jesús Garduño Venegas. "Coincidentally" these three judges, who knew the matters in which Scherer line had been given—and were taken by the Barradas office—issued several apprehension orders against officials of Cruz Azul and Oro Negro.

It should be noted that Judge López Ruiz is the same one who issued a series of precautionary measures that allowed the office of Barradas to take control of the University of the Americas and was even denounced before the Attorney General's Office of the Republic for not following a suspension to return control of that university to the Jenkins family of Landa. In August 2021, this was worthwhile for the judge to receive an ultimatum from the Third District Court in the Matter of Civil Amparo of Puebla to do so.

Another judge who was also attached to that unit is Judge Enrique Cedillo García, who issued a very controversial measure by which it was ordered to take possession of the Black Gold platforms at sea to deliver them to a group of creditors hired by García González and Barradas. Interestingly, a few months later, this judge was promoted to magistrate in the Superior Court of Justice of Mexico City. And it should be said that Cedillo did not reach any position: he landed directly in the Seventh Criminal Chamber, one of the most influential and coveted, according to testimony, for the type of business that can be done in it. That promotion may be due, among others, to the loyalty and services provided to Guerra and Scherer himself.

Finally, it is not irrelevant that this same Judicial Management Unit Number 12 is the one that issued an arrest warrant against the business owner Carlos Cabal Peniche and his wife, through the control judge Héctor Fernando Rojas Pacheco, for alleged generic fraud in the purchase of Radiopolis from Televisa. According to different testimonies, the former adviser appears to have had a particular interest in avoiding that purchase, as he sought to take a part of this company, possibly through a third party.

Other suspicious matches that involve the dispatch of Barradas are Roberto Yáñez Quiroz, civil judge 24, and José Manuel Salazar Uribe, judge 60, who ruled on a precautionary seizure of the estate of the Jenkins family of Landa, in addition to being in charge of issuing the resolutions that did not know the presidency of Billy Álvarez on the board of directors of the cement company, in which Barradas represented the dissent of José Antonio Marín and Víctor Manuel Velázquez.26 26 7

It should also be noted that another of the elements closest to Julio Scherer Ibarra in the Judiciary of Mexico City has been the magistrate Francisco José Huber Olea Contró, member of the Sixth Civil Chamber. This character could not be missing from a list of the most questionable magistrates in Mexico City, since it weighs on it a long history of irregularities and accusations for improper behavior.27 By lottery, this magistrate was supposedly dropped by the 18 trials that the Cruz Azul cooperative has against Billy Alvarez Cuevas.27 7

That same magistrate, in addition, has been involved in Rafael Zaga Tawil's conflict with the El-Mann Arazi brothers, where he appears to have followed the line that the former legal adviser dictated to him to bravely take sides against Moses and Max El-Mann Arazi, showing, in addition, a frank complicity with the Judiciary of Mexico City, as reported by the first in an unfolding published on March 28, 2022, detailing a long list of irregularities.28 In addition to Scherer, Huber Olea has had a very close relationship with his partner, attorney Alonso Rivera Gaxiola.28 7

In a transparent judicial system and really aimed at doing justice, we would not see so many judges resolving cases that interest the same subject or office. If this were to happen only a couple of times, it could be normal, as there is certainly a statistical possibility that certain types of cases fall into the same judge.29 Still, can you think that all the cases mentioned above are mere matches or is it more realistic to say that there was a brain behind them, someone in charge of modifying the shifts in the federal and local Judiciary so that the cases of interest of the former adviser were in the hands of certain related profiles?29 5

[*Chapters 9 to 12 removed for brevity*]

# 13

## Black Gold – Personal Revenge

They say revenge is a dish that tastes cooler. Julio Scherer Ibarra was able to do so with the son of Vicente Fox's Secretary of Finance, Francisco Gil Díaz, almost 20 years after having been persecuted during the administration of the panista for the case of the Consorcio Azucarero Escorpión who was about to take him to prison. The same Julio Scherer Ibarra, who in April 2022 accused prosecutor Gertz Manero of "using his power and public resources to seek personal revenge,"[1] he used his influence on the Judiciary to do something similar: charge Gonzalo Gil White for the subject that he had pending with his father.[1 30]

## CASE HISTORY

Beginning in the six-year period of Vicente Fox, some niches of opportunity began to be generated for private investment in the energy sector. One of the characters who from that moment onwards managed to make their way in that area was Gonzalo Gil White, son of the Treasury Secretary, Francisco Gil Díaz. Together with José Antonio Cañedo White (nephew of one of Televisa's partners, Guillermo Cañedo White), Gonzalo founded Oro Negro, a company that began operations in 2012, when it became interested in the oil sector, to have its years of greatest expansion after the approval of Enrique Peña Nieto's energy reform.

Once capitalized with resources from the Banamex and Grupo Sura capacities, in just three years Oro Negro was able to obtain contracts for more than $500 million with Pemex,

thanks to the leasing of five oil rigs. With Emilio Lozoya at the head of the parastate, he was awarded the contracts to rent the Primus, Fortius, Laurus, Decus and Impetus platforms.

In the following years, however, the scenario changed radically. When international crude oil prices fell in 2017, the parastate entered into a difficult financial situation that forced it to renegotiate its contracts with several companies, including Oro Negro. In addition to this, the fact that, since February 2016, Pemex's general address had changed, and at the forefront was José Antonio González Anaya, who had an interest in favoring a company other than Gonzalo Gil White and its partners.

Faced with the complicated scenario faced by Oro Negro, the company entered into a situation of insolvency and, on September 11, 2017, it had no option but to go to commercial bankruptcy, the legal appeal that companies that are not in a position to comply with the payment to their creditors go to; in this way they can seek agreements to restructure their obligations. By not fruiting this option, on October 13, 2017, the oil company notified the company of the unilateral decision to terminate lease agreements early. In view of this, the company stated that the reasons for terminating the lease agreements were illegal and sued Pemex.

On February 20, 2019, a first instance judgment was issued where the judge gave the reason to Oro Negro, finding that the causes mentioned by Pemex did not justify the early termination of the lease agreements. With this, the oil company was ordered to pay up to one billion dollars to Oro Negro and comply with the contracts in their original terms. Such judgment, however, was subsequently reversed on October 25, 2019, as a result of an appeal.

## THE USE OF JUSTICE FOR PERSONAL REVENGE

As I mentioned in Chapter 2, more than two decades ago Julio Scherer Ibarra was accused of committing fraud, simulating exports to benefit from fiscal stimuli when he was at the helm of the Consorcio Azucarero Escorpión (Caze). The former counselor surely never forgot that meeting with former Treasury Secretary Francisco Gil Díaz, who his father went to ask for leniency for him. The secretary at that time responded to him, with all frialty, that the authority would act in accordance with the Rule of Law. Over the years, Julito would find the opportunity to avenge that embarrassing episode while billing a good sum through her network of judicial businesses.

They say that in the first instance it was the creditors of Oro Negro who arrived at Scherer in 2018, since they calculated that their matter would be more likely to succeed if they hired any of the associated firms who would have to be the future legal counsel of the president. They were sure to have previously informed about the political context and calculated that their case would move forward if they aligned their allegations against Gil

White with the legal counsel's personal antipathy. From what you saw, you got it right in your calculation. Scherer bit the hook without further difficulties.

So that his complaint against Gonzalo Gil White and his claim to receive a payment of $900 million could be vented more quickly and thrive in the justice system, they went to Guillermo Barradas and Roberto García González, whose office was skilled in obtaining favors between judges and magistrates, as we have already seen. It is not coincidental that, before acting in the federal Judiciary, these lawyers' strategy has focused on the local Judiciary, undoubtedly more corrupt and manipulable than the former. As already explained, for a long time, Scherer and its partners have operated at their best in the field of justice in Mexico City. So much so that the operation against Gil White did not require Scherer to reach the federal government: it began to set earlier, lending its influence on capital justice.

Indeed, on June 18, 2018, the legal representative of a set of bondholders (Black Gold Primus, Pte. Ltd.; Laurus Black Gold, Pte. Ltd.; Fortius Black Gold, Pte. Ltd.; Impetus Black Gold, Pte. Ltd.; and Decus Black Gold, Pte. Ltd.) filed a complaint with the FGR against two Mexican group companies: Driller Oro Negro and Integradora de Servicios Petroleros Oro Negro, as well as its principal officers and directors, including Gonzalo Gil White.

Generically and with little clarity, the lawsuit indicated that Oro Negro had violated the payment procedure established in a trust, although it concealed the purpose of collecting tax information from the aforementioned companies to then manufacture an alleged case of tax fraud through billing companies. In fact, just one week after the complaint was filed, the public ministry requested the information from the SAT, without a judicial authorization.

The information turned out to be false, as SAT itself later recognized. This showed the intention to produce evidence to accuse Black Gold of having turned to billing companies to evade taxes. It was based on that information, however, that on September 17, 2018, already during the government transition, the federal public ministry requested authorization from a federal judge to secure the bank accounts of Oro Negro. This, however, denied the request, arguing that the appeals intended to be secured were not related to any crime.

The office of García González and Barradas did not stop there, but instead resorted to the local area, where things were easier for lawyers in his profile, more so now that his partner Julio Scherer would occupy the Legal Department. Thus, they used again the apocryphal information that the SAT had provided, but now to prove luck before the Attorney General's Office of Justice of Mexico City. There they filed practically the same complaint as before, and this time the machinery would be activated to secure the bank accounts of Oro Negro and the aforementioned trust.

This was how Scherer and its partners assisted the Attorney General's Office of Justice of Mexico City and the Judicial Power of the capital to forcibly take the Black Gold platforms

at sea and then try to put Gil White in prison. To this end, they turned to Andrés Maximino Pérez Hicks, one of their pins in the prosecutor's office and the same agent of the C-6 Research Unit of the public ministry in which other matters of interest to Scherer "fall", such as that of the Cruz Azul cooperative, which will be seen below.

The proxy of the group companies requested restitution measures to take possession of the Black Gold platforms Fortius, Laurus, Primus, Impetus and Decus. When the case arrived at Judicial Management Unit Number 12 of the Superior Court of Justice of Mexico City (where the arrest warrant was also released against Carlos Cabal and the Cruz Azul case was involved) something unusual occurred: against what a federal judge had previously ordered, on October 19, 2018, Enrique Cedillo García, a member of the same unit, ordered through an injunction the provisional delivery of the oil rigs to the plaintiffs. To do this, he turned to the Navy to take the structures located in the territorial sea, whose maintenance and safety were in charge of Black Gold.

This decision is of very questionable legality, as a local court cannot make a federal decision. It also caught the attention, because a commercial bankruptcy was pending, and the normal thing in those conditions is to wait for the process to conclude and it is a federal judge who orders the delivery of the assets to whom it corresponds. Why hurry, this is the question. How to explain or justify the decision to order a takeover of the offshore platforms but for the arrangement that existed between the office García González and Barradas, representing the interests of Scherer, and certain elements of the Capital Prosecutor's Office and the Judiciary?

As has already been pointed out, if something characterizes corruption in the justice system, it is that ability to obtain precautionary measures in a way, with which it can reduce or gain time in matters. Even, on occasions like this, the injunctive measures that are issued without the affected party having the prior opportunity to defend themselves are of such magnitude that the case ends with them, regardless of the substantive resolution that is issued once the process has been exhausted. In the case of Black Gold, in particular, the company's creditors were able to advance a judicial decision that would have taken up to a year and a half longer in federal instances. Had it had that time, Oro Negro could have continued to operate its platforms and, in that period, possibly generated the necessary flow to restructure the debts to its creditors and save itself.

But that didn't happen. Scherer didn't want it to happen. Therefore, on Sunday, October 21, 2018, in compliance with the order of Judge Cedillo, an appreciative and quasi-cinemographic attempt was made to take the five Black Gold platforms at sea, using helicopters and Navy personnel. The attempt failed, however, because the staff hunted and repelled the act as if it were an invasion, activating the water cannons that are used in the face of pirate attacks by security protocol, so helicopters could not even land.

The day after these facts, columnist Darío Celis (who in his columns almost always supported Scherer's performance in one way or another) wrote an article criticizing Oro

Negro for having resisted the court order "endangering helicopters and their passengers: lawyers, mariners and federal police." Furthermore, it is to be said that the journalist also justified in his column the ruling of Judge Cedillo, pointing out that the decision was made after reviewing a "broad evidence of administrative fraud".2[2_29]

In the end, the injunctive relief issued by Judge Cedillo ended up being so fragile that they were reversed as soon as the matter escalated to federal justice. Despite this, Cedillo was soon promoted from judge to magistrate of the Superior Court of Justice, where he was assigned to one of the most coveted rooms for the type of business that is usually done in it.3[3_29]

This case, however, is not the only case where the participation of Scherer, his attorneys and consignment judges can be presumed. As already stated, in July 2019, another Mexico City judge, Joel de Jesús Garduño Venegas, attached to the same Judicial Management Unit Number 12 (the "Scherer Unit"), issued an arrest warrant against Gil White and other partners and officials of Oro Negro for fraudulent administration and abuse of trust.

In a clear sample of the factual use of justice, the order was released on the grounds of the alleged existence of improper payments for "maintenance" of the platforms, according to the exposure carried out by agent Maximino Pérez Hicks before this judge. It is noteworthy that in the investigation folder there is no evidence that such payments exist, suggesting that the public ministry would have falsified the facts and invented the existence of money transfers that were never made.

On November 28, 2019, the same judge, Joel de Jesús Garduño, issued a new arrest warrant against Gil White and two other Black Gold directors for an alleged diversion of resources for 160 million pesos. Like so many other matters of interest to Scherer, the order was processed unusually quickly and the investigation took place within a few days. It should be noted that this was issued without more evidence than the accusation and without calling for the defendants to testify, as Salvador García Soto referred to at the time.4 As the columnist also observed, if the judicial turns are supposedly assigned randomly or by lottery, how had this case fallen back into the same judge Joel de Jesús Garduño?[4_27]

Within the capital prosecutor's office, much of these investigations of Black Gold were set in the Financial Crimes area, at the season headed by Édgar Pineda Ramírez, as well as through the ministerial agent Maximino Pérez Hicks. As Jorge Fernández Menéndez wrote at the time, this official, already removed from office, had a public ministry dedicated exclusively to the Oro Negro case. According to the reporter's information, that office operated in an area closed to the public, next to the prosecutor's office, permanently monitored by cameras and microphones to prevent any leakage. In addition, the process was carried out "outside of the official computer system, so the parties investigated have no right to know the issues or to visit this area of work that requires a special registration".

That scheme, which Fernández Menéndez qualified as a "VIP package," guaranteed them, in the case of Black Gold, orders of attachment, insurement and arrests.5 5_27

   In hindsight, everything seems to indicate that, in the case of Oro Negro, the justice system at the service of Julio Scherer and his partners first falsified tax information, in order to secure bank accounts and take out the oil rigs of his debtor, and, later, distorted the facts and evidence existing to obtain arrest orders against Gil White and his partners. Needless to say, their capture was finally not possible because they managed to escape...

*[Remainder removed for brevity]*