**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SERVICIOS FUNERARIOS GG, S.A. DE C.V., | |
| Plaintiff, | |
| v. | |
| ADVENT INTERNATIONAL CORPORATION, | |
| Defendant, | |
| and | Civil Action No. 23-cv-10684-IT |
| ADVENT INTERNATIONAL CORPORATION, | Referral: Hon. Jennifer C. Boal |
| Counterclaim-Plaintiff, | |
| v. | |
| SERVICIOS FUNERARIOS GG, S.A. DE C.V., | |
| Counterclaim-Defendant. | |

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF AIC'S
OPPOSITION TO SERVICIOS FUNERARIOS' MOTION TO COMPEL
PRODUCTION AND IDENTIFICATION OF DOCUMENTS**

Defendant and Counterclaim-Plaintiff Advent International Corporation n/k/a Advent

International, L.P. ("AIC") submits this brief in opposition to Plaintiff and Counterclaim-

Defendant Servicios Funerarios GG, S.A. de C.V.'s ("SF") Motion to Compel Production and

Identification of Documents (Dkt. 116–118).[1]

---

[1] While SF's cover motion is styled as a "Motion to Compel AIC to Search Documents of
Requested Custodians," Dkt. 116, this appears to be an inadvertent re-filing of SF's prior motion
to compel on these same grounds, *see* Dkt. 111. Because SF's declaration and memorandum in
support of Dkt. 116 are both styled as supporting a "Motion to Compel Production and

## INTRODUCTION

SF is pursuing an escalating extortion scheme that involves threatening professionals who have committed no crimes with imprisonment in Mexico. As AIC has alleged, SF's abuses of the Mexican criminal justice system have already resulted in six illegitimate arrest warrants and Red Notices (among other sham orders) that SF, at least in this Court, cannot quite bring itself to defend. So it has turned to obfuscation and frivolous motion practice.

To be clear, contrary to SF's claims, AIC has agreed to—and has already produced—extensive discovery supporting its abuse-of-process counterclaims. SF's Motion seeks to hold AIC to an inapplicable production standard that is explicitly contradicted by the parties' Court-ordered ESI protocol, has no basis in the case law, and that SF is not following itself.

While SF spends pages blatantly mischaracterizing AIC's counterclaims, its Motion ultimately seeks relief only with respect to the format of AIC's document production. SF cannot contest that ***AIC has already agreed to produce documents responsive to SF's document requests*** (it has), so it contends that AIC must undertake the additional burden of identifying which particular documents correspond to each specific request. The case law SF invokes for this proposition, however, holds expressly the opposite. And tellingly, SF has not identified which of its own produced documents correspond to each of AIC's document requests—and it offers no reason why AIC should be held to a different, more burdensome standard.

SF's Motion barely tries to defend the relief it is seeking. Instead, it seems to have manufactured a motion in service of two improper motives. First, to try to distract from its misconduct in Mexico, SF recites a litany of purported grievances with AIC's counterclaims and

---

Identification of Documents," *see* Dkt. 117 ("SF Declaration"), Dkt. 118 ("Mot."), Dkt. 116 was presumably intended to seek the same relief.

discovery responses that are irrelevant to the requested relief.  In doing so, SF ignores the detailed information that AIC has already provided in support of its counterclaims and glosses over its own refusal to provide any discovery on critical aspects of the basis of its claims.  Second, SF offers an ominous and unmistakable statement about its intent to use materials identified through this Motion to target additional AIC personnel in Mexico.

AIC respectfully requests that the Court deny SF's Motion.

## **BACKGROUND**

This lawsuit relates to SF's coordinated extortionate scheme, following its 2021 purchase of Grupo Gayosso, S.A. de C.V. ("Gayosso"), a Mexican funeral services company, from affiliates of AIC.  Soon after it acquired Gayosso, SF asserted meritless civil claims in Mexico and sought, among other relief, an embargo to freeze hundreds of millions of dollars in assets owned by AIC-managed funds in Mexico.  When multiple Mexican civil courts denied that relief, SF turned to the Mexican criminal justice system for leverage, ultimately causing the issuance of (i) baseless arrest warrants against employees of AIC and its affiliates; (ii) Interpol Red Notices based on those warrants; and (iii) the same asset embargoes the civil court rejected, freezing assets owned by AIC-managed funds with no connection to the Gayosso transaction.

To apply additional pressure on AIC—and, as has become increasingly clear, to obtain additional materials to wrongfully funnel to the proceedings in Mexico—SF filed its complaint in this Court.  In response, AIC filed counterclaims, alleging that SF sought and obtained the extraordinary relief in Mexico for one simple reason: to coerce a lucrative settlement from AIC. And AIC alleged that SF did so through the improper influence of its Mexican criminal attorneys, who are well known in Mexico for transforming civil disputes into criminal investigations

overseen by cooperative prosecutors and judges.  Dkt. 14 (AIC's Answer and Counterclaims ("Counterclaims")) ¶¶ 1–40, 176–214.

SF admits (Mot. 4) that it initiated the criminal proceedings in Mexico and targeted the Advent employees who are now subject to arrest warrants and Red Notices—only after initiating civil proceedings concerning the same alleged "fraud," and being denied interim relief in the civil court.  To distract from that reality, as in this Motion, SF has attempted to create the false narrative that AIC lacks any support for its counterclaims.  In contrast to AIC and its affiliates, who are the victims of this scheme, SF plainly possesses the vast majority of relevant information concerning its pursuit of criminal process against AIC's affiliates in Mexico.  But SF has repeatedly stonewalled in producing highly relevant discovery.  Simultaneously, it has, among other things, tried to hold AIC to shifting and baseless discovery standards.  This Motion is an example of precisely that.

This Motion purports to concern "AIC's responses to requests numbered 33, 34, 35, and 36 of [SF's] First Set of Document Requests."  Mot. at 2.  AIC long ago agreed to produce any nonprivileged document in its possession related to its counterclaims, including in response to RFP Nos. 33–36.  *See, e.g.,* Dkt. 103-3 (AIC's Responses to SF's First Set of Requests For Production) at 22–24.  In fact, ***SF concedes that AIC "has agreed to produce documents responsive to the requests at issue.***"  Mot. at 9.  Despite this, SF has for months tried to manufacture a basis for a motion to compel on these requests.  *See, e.g.*, Dkt. 117-5 (June 16, 2023 Letter from C. Sires).  All of them were unsuccessful, because as AIC has told SF from the outset, and repeatedly confirmed, it was not withholding anything.  *See, e.g.*, Dkt. 117-6 (June 30, 2023 Letter from G. Soledad); Dkt. 131-4 (Aug. 16, 2023 Letter from G. Soledad); Decl. of Daniel V. Ward (October 17, 2023) ("Ward Decl."), Ex. A (Aug. 22, 2023 Email from G. Soledad).  The parties' original

Court-ordered substantial completion deadline was September 7, 2023. Dkt. 36. AIC was ready to produce by that date; SF was not. Dkt. 131-5 (Sept. 5, 2023 Email from C. Sires); Ward Decl., Ex. B (Sept. 5, 2023 Email from G. Soledad). As a courtesy, AIC consented to a one-month extension. Ward Decl., Ex. C (Sept. 7, 2023 Email from G. Soledad).

The next day, at a September 8, 2023 meet and confer, SF seized on the present "dispute," for the first time insisting that it was not enough for AIC to produce the documents but instead it now needed to specifically identify *within its production* the documents upon which it based its counterclaims. AIC asked SF if it would be willing to do the same for the documents that it contends support its own claims. Dkt. 131-6 (Sept. 9, 2023 Email from J. Margolies). SF said it would not be willing to do what it was asking of AIC. *Id.* AIC also asked SF to provide any authority supporting its position. *Id.* The next week, SF sent one case it contended supports its position, the same case it relies on in this Motion, *Traverse v. Gutierrez Company*, 2019 WL 12291348, at *1 (D. Mass. Aug. 15, 2019), without explaining why it believed that case supported its position. Dkt. 117-9 (Sept. 12, 2023 Email from C. Sires). AIC responded—again confirming that it had already agreed to produce the documents at issue—and explained that *Traverse* does not support SF's position because (among other reasons) it concerned an individual who did not have a "well-organized record-keeping system" rather than a commercial enterprise like AIC. Dkt. 117-10 (Sep. 14, 2023 Email from V. Ramos) (quoting *Traverse*, 2019 WL 12291348, at *2) (internal quotation marks omitted). Nevertheless, AIC indicated that it would be willing to continue to engage with SF "[i]f we are overlooking something in this authority or you have another case that is on-point." *Id.* SF did not provide any additional authority (because there is none) and did not explain how *Traverse* supports its argument (because it does not).

Instead, SF filed this Motion.

## **ARGUMENT**

After thirteen pages of mischaracterizing the record (which we address below in Part II), SF's turns briefly to its legal argument—an implausible reading of a solitary case that purportedly requires AIC to identify the specific documents that correspond to each of SF's document requests. Mot. at 13–14.  But the case SF cites does not say that, the broader case law does not say that, and SF itself is not complying with this non-existent requirement.  Rather, SF's Motion appears to serve primarily as a platform to miscast AIC's production and counterclaims (while ignoring glaring deficiencies in SF's own discovery conduct) and, more troublingly, to gin-up documents that it can leverage in the Mexican criminal proceedings, including in criminal actions against AIC employees.

## I.     AIC IS NOT REQUIRED TO IDENTIFY WHICH DOCUMENTS CORRESPOND TO WHICH REQUESTS.

SF's Motion hinges on its misinterpretation of this Court's decision in *Traverse*.  *Traverse* holds that a "producing party can choose whether to produce the documents as they are kept in the usual course of business or label and organize them."  2019 WL 12291348, at *1; *see* Fed. R. Civ. P. 34(b)(2)(E)(i).   Under *Traverse*, the "usual course of business" production—*i.e.* without organizing and labeling as responsive to specific requests as SF seeks here—is "available when the documents' natural organization makes finding critical documents reasonably possible."  *Id.* "A party demonstrates that it has produced documents in the usual course by revealing information about where the documents were maintained, who maintained them, and whether the documents came from one single source or file or multiple sources or files."  *Id.* (quoting *Valeo Elec. Sys., Inc. v. Cleveland Die & Mfg. Co.*, 2009 WL 1803216, at *2 (E.D. Mich. June 17, 2009)).  Here, pursuant to the parties' agreed-upon ESI protocol, AIC's productions include contextual metadata for emails (including to, from, CC, BCC, date sent, email subject, and date received) and other

documents (including author, creation date and time, file name, and file path).  *See* Dkt. 92 (Stipulation and Order for the Production of Documents and ESI) at 3.

In an attempt to circumvent this reality, SF distorts a single line from *Traverse*, creating a new production standard.  *Traverse* explained that production "in the usual course of business" is available if either of two conditions are satisfied; specifically, the option is "available to (1) commercial enterprises or entities that function in the manner of commercial enterprises and (2) records resulting from 'regularly conducted activity.'"  2019 WL 12291348, at *2.  Based solely on the "and" between the first and second prongs of this test, however, SF contends that *both* prongs must be satisfied to produce in the ordinary course.  But the existence of the word "and" does not compel such a conclusion.  *See United States v. Garcon*, 54 F.4th 1274, 1298–99 (11th Cir. 2022) ("[T]he word 'and' is not a word with a single meaning; like a chameleon, it takes its color from its surroundings. . . . As a result, courts are often compelled to construe 'or' as meaning 'and,' and again 'and' as meaning 'or.'" (cleaned up) (quoting, *inter alia*, *United States v. Fisk*, 70 U.S. 445, 447 (1865))).

Contrary to SF's claim, *Traverse's* own application of this test confirms its disjunctive nature, and thus, that meeting **either** prong is sufficient.  The court in *Traverse* expressly states that the individual producing documents had "not shown *either* that she and her husband operate in the manner of a commercial enterprise *or* that the produced records resulted from 'routine and repetitive' activity."  2019 WL 12291348, at *2 (emphases added).  Further, *Traverse*'s two-prong test is derived from *S.E.C. v. Collins & Aikman Corporation*, which **explicitly** describes the test in the disjunctive:

> [T]he option of producing documents 'as they are kept in the usual course of business' under Rule 34 requires the producing party to meet **either** of two tests.  *First*, this option is available to commercial enterprises or entities that function in

the manner of commercial enterprises. *Second*, this option **may also apply** to records resulting from 'regularly conducted activity.'

*S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 412 (S.D.N.Y. 2009) (emphases added). And *Collins & Aikman* is not alone in describing the test in the disjunctive. *See, e.g.*, *Del Socorro Quintero Perez v. United States*, 2016 WL 304877, at *4 (S.D. Cal. Jan. 25, 2016) ("The option of producing documents 'as they are kept in the usual course of business' requires the producing party to *either* be a commercial enterprise (or function in the manner of a commercial enterprise) *or* have records resulting from a regularly conducted activity." (emphases added)).

There is no dispute that AIC is a commercial enterprise. It thus undeniably satisfies the first prong of *Traverse*'s test, and therefore may produce documents as they were kept in the ordinary course of business. *See Nationwide Mut. Ins. Co. v. Spinal Imaging, Inc.*, 2012 WL 73303, at *2 (D. Mass. Jan. 9, 2012) ("[T]he option of producing documents 'as they are kept in the usual course of business' under Rule 34 ... is available to commercial enterprises or entities that function in the manner of commercial enterprises." (omission in original) (quoting *Collins & Aikman*, 256 F.R.D. at 412)); *Traverse*, 2019 WL 12291348, at *1 (same).

It nonetheless bears noting that AIC also satisfies the "regularly conducted activity" prong. SF's claim to the contrary again misapplies *Traverse*. SF contends that documents concerning AIC's counterclaims would not be part of AIC's regularly conducted activity. Mot. at 14. The question is not whether the subject matter at issue is typical, however, but whether a party's creation of the correspondence or documents is "regularly conducted" such as to "require a well-organized record-keeping system." *Traverse*, 2019 WL 12291348, at *1. As evidenced by the trove of accompanying metadata, AIC's documents and emails are sufficiently organized.

Confirming the above, the only cases SF cites in which a party was required to "organize and label" documents involved production by *individuals*. By definition, these individuals could

not meet the commercial enterprise prong, and, for various reasons, were also unable to demonstrate that their records were the result of regularly conducted activity. *See Traverse,* 2019 WL 12291348, at *1–2 (plaintiffs, "as individuals," were unable to demonstrate that they "keep documents in the usual course of business"); *Enargy Power (Shenzhen) Co. Ltd. v. Wang*, 2014 WL 4687542, at *3–4 (D. Mass. Sept. 17, 2014) (defendants, "as individuals," were unable to demonstrate that they "keep documents in the usual course of business," including because they "have not provided any details regarding where and how the documents were maintained").[2] Notably, the fact that the court also assessed whether the individuals' records resulted from regularly conducted activity further demonstrates that the test is disjunctive: if both conditions were required, individuals could never produce in the ordinary course because they would always fail the commercial enterprise prong.

Finally, even if all of the foregoing were not the case, SF and AIC agreed that "production of custodial files shall constitute production of documents as maintained in the ordinary course of business" and "[a]s such, ***Parties need not identify specific document requests to which each produced document corresponds***."   Dkt. 92 (Stipulation and Order for the Production of Documents and ESI) at 3 (emphasis added).   In doing so, SF already agreed to entirely exempt AIC's production from Rule 34's requirement that a party produce documents "as they are kept in the usual course of business or must organize and label them," which governs "[u]nless otherwise

---

[2] The other cases SF cites are even farther afield and add no support to SF's untenable position. *See* Mot. at 16; *Dunkin Donuts Franchised Rests., LLC v. Agawam Donuts, Inc.*, 2008 WL 427290 (D. Mass. Feb. 13, 2008) (motion to compel 30(b)(6) deposition testimony); *EEOC v. Baystate Med. Ctr. Inc.*, 2017 WL 4883453 (D. Mass. Oct. 30, 2017) (ordering party to produce documents without any specification as to whether party must identify which documents correspond to each request).

stipulated." Fed. R. Civ. P. 34(b)(2)(E).  And SF raises no issue with AIC's compliance with the stipulation.

Tellingly, SF itself is not abiding by the standard it seeks to impose on AIC.  Under SF's (mistaken) characterization of *Traverse's* "regularly conducted activity" prong, many of AIC's document requests to SF likewise seek documents relating to activity outside of SF's regular conduct, including the basis for SF's fraud claims and its criminal claims in Mexico.  *See, e.g.*, Dkt. 76-8 (SF's Responses to AIC's First Set of Requests For the Production of Documents), Request No. 2 ("All documents and communications that [SF] contend support the issuance of the Arrest Warrants, the Asset Embargo, and/or the Interpol Notices . . ."); Request No. 3 ("All documents and communications [SF] relied upon in bringing the fraud allegations [SF] have made in connection with the Gayosso Transaction in any civil or criminal proceeding or in any other filing, submission, or presentation to any governmental, judicial, or regulatory authority of any kind.").  The substantial completion deadline has passed, and SF has not identified a single produced document that corresponds to these or any other specific document requests.  SF cannot invent a new production standard, much less one that only applies to AIC.

The Court should reject SF's fabricated and one-sided standard.[3]

---

[3] SF's Motion at times meanders to a separate complaint regarding whether AIC's use of search terms is sufficient to capture documents responsive to SF's requests.  SF does not appear to seek any relief in connection with this particular issue, and, as AIC has explained, it is not limiting its search to only custodial files. Ex. A (Aug. 22, 2023 Email from G. Soledad).  In any event, discrete documents supporting AIC's counterclaims are highly likely to be subject to attorney-client privilege and work product protections, and any complaint regarding AIC's privilege designations is obviously premature—SF filed this Motion prior to the substantial completion deadline, and the parties have yet to even set the date on which privilege logs will be exchanged.

II.     **SF'S MOTION DISTORTS THE STATE OF DISCOVERY AND SEEKS INFORMATION THAT SF WANTS TO LEVERAGE IN THE MEXICAN PROCEEDINGS.**

Rather than attempt to develop its (flawed) argument that AIC should be subjected to a heightened production standard, SF dedicates the majority of its Motion to crafting a false narrative about the status of discovery.  Although, as explained above, SF's request fails as a matter of law and its false narrative is irrelevant to the relief sought, it bears noting just how backwards SF's Motion is.  It is most telling that SF has never tried to defend the facially illegitimate issuance of arrest warrants and Red Notices against Advent personnel who SF knows had no role in making the contractual representations at issue in this case; or the Mexican criminal court's freezing of hundreds of millions of dollars in unrelated Advent assets that a Mexican civil court had previously and summarily denied.  Moreover, SF's retelling: (1) overlooks the extensive discovery that AIC has provided on the basis of its counterclaims; (2) ignores that SF has impeded AIC from discovery of key sources of information on the basis of SF's claims; and (3) makes a thinly-veiled threat about SF's intent to use any materials identified in this Motion in additional proceedings in Mexico.

A.     **AIC Has Provided Significant Discovery on its Counterclaims**

SF repeatedly makes the absurd suggestion that AIC has not provided "a scintilla of evidence" supporting its counterclaims.  Mot. at 9.  In reality, even though there has not yet been a single deposition and SF's contention interrogatories—served before a single document was exchanged—were especially premature, ***AIC nevertheless provided a 20-page response to a single interrogatory detailing extensive evidence supporting AIC's counterclaim allegations***.  As described in detail in AIC's Opposition to SF's Motion for Reconsideration on the Protective Order (Dkt. 120), this response identifies overwhelming circumstantial evidence that the arrest warrants and asset embargos were the result of improper influence.  This includes citations to articles in the

11

Mexican press and a recently published book detailing how SF's criminal counsel has previously carried out similar schemes in which it gains leverage in standard commercial disputes by initiating baseless criminal proceedings to obtain asset embargoes and arrest warrants against its clients' civil adversaries. *See* Dkt. 120 at 10–12. AIC's interrogatory responses even explain that the specific prosecutor who sought the arrest warrants and asset embargo—and specific judges who granted the prosecutor's request, and later extended the asset embargo—are mentioned *by name* as known participants in SF's criminal counsel's criminal schemes. *Id.* Further, AIC detailed how the irregular nature of the criminal proceedings in Mexico—including the lack of evidence required by Mexican law—corroborates AIC's allegation that SF and its criminal counsel have engaged in another such scheme here. *Id.*

SF contorts itself in this Motion and in other more recent filings to disparage independent third-party sources and attack all of this evidence as lacking "basis." *See, e.g.*, Mot. at 9. While AIC certainly anticipates gathering *more* evidence—***not least, the evidence in the possession of SF, which is responsible for all of the conduct at issue***—no person other than SF itself would conclude that AIC's counterclaims are baseless given the evidence already proffered by AIC, even at this early stage of the case.[4]

---

[4] Of course, AIC is not required to have smoking-gun evidence in support of its counterclaims prior to the completion of discovery, much less when it has received almost no relevant discovery from SF. *See, e.g.*, *Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989) ("Circumstantial evidence is sufficient to prove a conspiracy."); *United States v. Weiner*, 3 F.3d 17, 21 (1st Cir. 1993) (proof of extortionate scheme "may rely entirely on circumstantial evidence"); *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) ("[D]irect evidence of a fact is not required. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."); *O'Brien v. Nat'l Gypsum Co.*, 944 F.2d 69, 72 (2d Cir. 1991) ("[I]t is beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts.").

**B.**     <u>**SF Has Withheld Key Discovery Concerning its Conduct in Mexico**</u>

SF's suggestions that AIC's counterclaims lack evidence is made doubly offensive by the fact that SF has continued to withhold critical sources of discovery concerning its actions in Mexico—information that is obviously within its exclusive possession.  Much of this is already detailed in AIC's pending motion to compel, including SF's refusal to produce: (1) the criminal investigative file in the Mexican proceedings; (2) documents from the El-Mann family concerning the basis for SF's fraud claims; and (3) documents from SF's experts in the Mexican proceedings. *See* Dkt. 75 at 2–3.  Each of these categories of materials is key to understanding what SF had in hand when bringing its claims in this action and in Mexico—and thus also highly relevant to AIC's counterclaims.

And SF has been no more forthcoming in its interrogatory responses.  For instance, although it amended its responses twice, SF's answer to AIC's request to describe the "complete factual and legal basis for identifying each of the Targeted Employees" in the Mexican criminal proceedings continues to provide nothing more than a generic, one-or-two sentence description of each individual's job duties.  *See* Dkt. 117-1 (SF's Second Supplemental Responses to AIC's First Set of Interrogatories dated Aug. 29, 2023) at 1–4 ("Enrique Pani Bano was an Advent Managing Director and the Chairman of Gayosso's Board, in addition to executing the SPA as a representative of Gayosso.  He was also a lead negotiator on the sale of Gayosso's shares and was believed to have knowledge of Gayosso's operations, business practices, and financial reporting."); *id.* ("Carlos Lukac Ostreche was CEO of Gayosso from October 2011 to January 2021.  He was a member of the Executive Committee of Gayosso.  He had knowledge of Gayosso's operations, business, practices, and financial reporting.").  The non-existent detail in SF's own discovery responses—***which purport to provide the "complete" basis for the criminal arrest warrants***—says all one needs to know about SF's attacks on AIC's counterclaims.

13

SF has since escalated its efforts to keep relevant information away from AIC with its recent actions surrounding Roberto Carlos Chagoya Hernández.  SF's identified Mr. Chagoya in its initial disclosures as an individual with "[k]nowledge concerning Gayosso's financial statements, financial reporting, and accounting practices" and who should be "contacted through counsel for Servicios Funerarios."  Dkt. 76-1 (SF's Initial Disclosures dated May 5, 2023).  And with good reason: Mr. Chagoya was a partner at MexCap (an entity SF acknowledges it controls and from whom it is purporting to produce documents) during the Gayosso transaction, and as a putative expert, he prepared a report on Gayosso's accounting and financial practices that SF furnished to the Mexico City prosecutor.  *See* Dkt. 48 at 4–5.  But when AIC requested that SF produce Mr. Chagoya's documents, SF responded with a slew of dilatory tactics, including the transparently false assertion that Mr. Chagoya—who sent emails from a Mexcap email address and lists employment with MexCap on his LinkedIn profile—was never a Mexcap employee.  Dkt. 98 (June 7, 2023 Email from C. Sires to G. Soledad).  While SF eventually retreated from this indefensible position, it continued to string AIC along, repeatedly promising that it was investigating the issue.  Finally, on 5:54 PM on the evening of the substantial completion deadline (as extended four weeks at SF's request), SF informed AIC that it would not be producing documents on behalf of Mr. Chagoya and—contrary to its initial disclosures—that it did not control him and had no ability to compel his cooperation.  Ex. D (Oct. 5, 2023 Email from B. Alexander).

As both a MexCap partner who worked closely on Gayosso's financials and a putative expert who submitted evidence on the same issues contested here to the Mexican prosecutor, Mr. Chagoya likely possesses an unparalleled wealth of information on the basis for SF's claims, both in this action and in Mexico.  AIC is entitled to that information.  Unlike this Motion, where

the parties contest merely the production format, SF has refused to produce *any* information on behalf of Mr. Chagoya.  While SF moralizes about the seriousness of AIC's counterclaims, there is no debating that SF's fraud claims against AIC—whose business model hinges on its reputation and ability to find willing transactional partners—are equally serious.  SF's baseless criminal complaints in Mexico that threaten the liberty of AIC personnel are even more so.[5]

  **C.**  **SF's Motion is Another Ploy to Obtain Documents for Leverage in Mexico**

  At bottom, SF's attempt to impose one-sided discovery obligations on AIC is an extension of its larger strategy of funneling documents to the proceedings in Mexico, where document discovery is unavailable.  AIC has detailed SF's scheme in its briefing on the protective order, *see* Dkt. 88, Dkt. 120, as well as in AIC's opposition to SF's first motion to compel, Dkt. 129.

  In an ominous preview of that strategy, SF's Motion asserts that AIC's thoroughly substantiated allegations of misconduct in its interrogatory response, which has never been published, are "defamatory per se" and have already caused it injury.  Mot. at 8.  This legally charged language can only be understood as a threat of further criminal process in Mexico, where SF has previously secured arrest warrants against AIC personnel on bases as threadbare as a signature on a single contract.  *See, e.g.*, Counterclaims ¶¶ 125, 196–207.  Indeed, upon service of the interrogatories, SF immediately insisted that AIC designate the responses such that they can be shared with SF's criminal counsel.  This Motion takes the scheme a step further by attempting to force AIC to handpick the precise documents that SF can use to identify additional targets for baseless criminal proceedings.  This Court should not permit SF to further its scheme through this Motion.

---

[5] While AIC may address this issue in a separate motion, it is relevant here to SF's attempt to impose one-sided discovery obligations.

## **CONCLUSION**

For the reasons stated in AIC's Motion and herein, AIC respectfully requests that the Court deny SF's Motion to Compel.

Dated: October 17, 2023

Respectfully submitted,

*/s/ Daniel V. Ward*

Andrew J. Rossman*
Nicholas A. S. Hoy*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
andrewrossman@quinnemanuel.com
nicholashoy@quinnemanuel.com

Gabriel F. Soledad*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW
Washington, D.C. 20005
(202) 538-8000
gabrielsoledad@quinnemanuel.com

Joseph H. Margolies*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400
josephmargolies@quinnemanuel.com

Peter L. Welsh (No. 643261)
Daniel V. Ward (No. 667158)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7050
Peter.Welsh@ropesgray.com
Daniel.Ward@ropesgray.com

*Admitted Pro Hac Vice*

*Counsel for Defendant and Counterclaim-
Plaintiffs*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2023, 2023, I served a copy of the foregoing document via ECF to all counsel of record.

*/s/ Daniel V. Ward*

Daniel V. Ward
*Counsel for Defendant and*
*Counterclaim-Plaintiff AIC*