# Exhibit D

## Presentation

Lies are the devil, the truth is revolutionary.

AMLO, December 14, 2019

"I want to announce that Mr. Julio Scherer Ibarra, legal advisor to the federal executive, has decided to leave the position because he will return to his activities as a lawyer," announced President Andrés Manuel López Obrador on the morning of September 2, 2021. The president wanted to show that the relationship between them ended amicably, so he immediately added: "Julio is like my brother; he has helped us a lot. He is part of the transformation process." Naturally, the corporate press and the bulk of commentators particularly noted the second part of the message.

However, the relevant part of his words was in a subtlety that only those who know Andrés Manuel well noticed. His commitment to political action goes far beyond the formal responsibilities of a bureaucratic position: "he has decided to leave the position and the task." There was the crux of the matter, the message he wanted to convey to those closest to him. With these words, AMLO not only ruled out the possibility that Scherer could hold a position in his government again but also that he would be involved in certain tasks or continue to orbit the Fourth Transformation or even be considered part of his trusted team. The subtext of the message was clear. Those who understood, understood; Julio Scherer Ibarra was completely out.

Ten months before that, López Obrador had dismissed another significant figure from his government, Alfonso Romo, albeit in a very different way. When the businessman left the Office of the Presidency, the president tweeted: "Poncho believes, as I do, that what's important is not the position, but the work. He has helped and will continue to help me. He is an independent, honest man, committed to just causes, and he is also my friend." AMLO also announced that Romo would continue to help him from the outside and clearly supported him by calling him "honest."

We know that, in reality, Alfonso Romo did not play a significant role again; perhaps he never did. But the fact to note here is that the president still considered him one of his own. In contrast, AMLO publicly thanked Scherer Ibarra for his contribution and work in good terms, but did not grant him the possibility of maintaining any "task" or open any door for him to continue helping. By the way, in his farewell, he did not refer to him as an honest man either. Perhaps things did not end as well as President López Obrador and his advisor tried to appear on that occasion.

This book tells the story that might explain what we saw that morning: a story of betrayal. The story of a man who earned the trust of President López Obrador and used his name and good reputation - that of an honest politician committed to the fight against corruption - to satisfy a growing ambition for money and power, fueled from the privileged position of being the legal advisor to the federal executive. He also wielded his enormous influence over the justice system and might have been, perhaps, the second most powerful man in the country during the first three years of this administration. A story of betrayal to the example the president has sought to set, to his political movement, and to the central narrative of eradicating corruption and separating

economic power from political power. But Julio also betrayed the legacy of his father, Don Julio Scherer García, an old friend of López Obrador, through whom he managed to approach the current president.

I became interested in the legal advisor a few months after López Obrador's government began. Figures close to the president, loyal to him, shared with me, under strict confidentiality, stories about alleged irregular conduct and business dealings in which the legal advisor to the Presidency was involved. I was particularly surprised to hear that individuals so committed to Obrador's ideals could speak in such a way about a man so close to the president. Was this one of those internal disputes, or was there a real background that justified their statements?

At first, I found it hard to believe everything I heard, but what repeatedly reached my ears became impossible to ignore. These were painful stories for some of the men and women who have continued to fight alongside López Obrador all these years, as well as for his supporters. That's why I began to gather information and testimonies from prominent figures of the 4T at various levels; people concerned about the behavior of a character who seemed to be taking more than his fair share.

The fight against structural corruption and the separation of economic power from political power have perhaps been the most important mantras of Obradorism. However, what was being revealed to me about Julio Scherer Ibarra increasingly deviated from this. Moreover, the way Scherer acted within the government, judging by the testimonies I managed to gather, says a lot about how these two expressions of power - economic and political - are closely linked in Mexico and are very difficult to separate.

The president entrusted Scherer Ibarra with many tasks in his capacity as a public official. It was shocking to witness the amount of power concentrated by such an obscure figure within a government that has sought to be different. Everyone came to see him: politicians from the ruling party and the opposition, union leaders, and businessmen passed through the office of an official who began to be perceived as a sort of vice president. "Julio gets things done, Romo doesn't," was the word in the business community. "He's the one who really has access to López Obrador."

Taking advantage of this position, the character was heavily involved in business. Several elements suggest that not only did he come across opportunities to make big deals along the way, but he had also been preparing to benefit economically even before coming to power, even if it meant deceiving or omitting inconvenient truths to President López Obrador.

What caught my attention from the beginning was that the advisor rarely appeared in public and almost never gave interviews. Why did someone with so much influence, who held the functions of an Interior Secretary, rarely show his face? I also began to notice that many within Morena and the government were very afraid of him (some still are), which probably made him doubly powerful, as there is no power comparable to that which emanates from fear. Even for many, it is still inconceivable to even question a figure like this.

In the midst of the 4T era, there was an untouchable character, someone who couldn't be talked about, and when he was discussed at meals or dinners, diners invariably lowered their voices.

"Don't mess with Julio, it's not in your best interest," some members of the 4T told me, and even executives from some media outlets when I began to talk and write about this character. Nothing motivated me more to publish this book than those kinds of comments, largely because, if I voted for López Obrador in 2018, and for all the candidates of his party in 2021, it wasn't to continue living in a country of untouchables. Why did Scherer Ibarra seem to be one? The curiosity to find out kept me restless.

The testimonies I began to gather suggested that Scherer Ibarra had set up a network of judicial businesses with a series of associated firms, along with which he was involved in alleged cases of corruption, extortion, and influence peddling. This was the claim made by lawyer Paulo Diez Gargari, the first to publicly point this out, in an interview with Carmen Aristegui in October 2021.

Julio was revealed in the testimonies as a character possessed by an excessive ambition for money, which led him to occupy all possible spaces and try to take advantage of every business opportunity that arose along the way. His ambition grew to such an extent that his actions became increasingly clumsy and left more and more traces. However, none of this became visible because the character knew how to shield himself with the morality of the 4T and take refuge behind the name of President López Obrador, just as he once did behind his father, a benchmark for journalistic ethics in Mexico.

Very conveniently, Scherer Ibarra took over an area little known to López Obrador, one he often shows great antipathy towards: the realm of lawyers and the justice system. Scherer, on the other hand, knew precisely what the matter was about and took advantage of a presidential blind spot to satisfy his interests and unleash his ambitions.

During this investigation, I realized that I had to go beyond Julio Scherer Ibarra. This case could and should shed light on an even deeper and more complex issue: the existence of a mafioso brotherhood among lawyers representing powerful economic interests, judges, and politicians who manage the business of justice in Mexico, as well as the market in which impunity is negotiated. The former advisor was just a piece of the mechanism. Someone who brought nothing new to the Legal Counsel of the federal Executive; everything he undertook was done sloppily, leaving many traces of his actions and a large number of aggrieved parties in his wake.

The advisor replicated, on a large scale and blatantly, a modus operandi employed by others before him: a scheme used time and again by other governments, through which certain brokers or intermediaries, at the local or federal level, modulate and intervene in a corrupt and corrupting relationship established between major law firms and the Judicial Power to obtain favorable rulings in elite trials.

The great paradox is that such a scheme, which some lawyers and politicians have been benefiting from for a long time, reached rarely seen extremes, precisely in the only government that has seriously proposed fighting structural corruption and dismantling privileges. A

government that, despite this, did not understand the need to transform the most opaque of all the powers of the union: the Judicial Power.

Between the end of 2020 and the first half of 2021, I sought out Julio Scherer Ibarra several times. As is customary among politicians, after writing a series of articles questioning him, he agreed to meet with me for a conversation. The meeting was set for August 3, 2021. It was a month before his departure from the government, in his office on Virrey de Mendoza, in Las Lomas, where he attended to both public matters and state issues as well as his private businesses.

On that occasion, we spoke for over two hours, and I questioned him on a wide variety of topics, including his business activities. Since it was an off-the-record conversation, I do not reproduce or quote his responses in these pages. However, I can say that the advisor looked worn out, tired, and annoyed. At times I had the impression that he was overacting, trying to generate empathy, presenting himself alternately as a victim and as the object of a series of injustices and acts of bad faith. I admit I found it hard to believe him. At one point, I felt uncomfortable when he raised his voice much more than usual, demanding that I look him in the eyes instead of taking notes.

In any case, I can say that I found in Julio Scherer an intelligent - especially shrewd - and pleasant conversationalist, and even that day I became convinced that the character was interesting enough in himself to write a book about. Ironically, when I was posing my questions to the still legal advisor, one of his collaborators present jokingly suggested that I write a book about his boss. If I was already considering this possibility, that day I decided to take the suggestion seriously.

On that occasion, in his private office in Las Lomas, the still legal advisor committed to answering any questions that might arise, and we agreed to establish a line of communication through the person in charge of his relationship with the media. At some point, I entertained the idea that I could count on a statement from Scherer on the record or at least expand my inquiry in the same previous modality. I tried to contact him two more times, but unfortunately, I was not successful.

Paco Ignacio Taibo II says that books are made with what you have, not necessarily with what you want. In that sense, what is presented here is nothing more than a series of clues from which, later on, conclusions can be drawn. It is beyond the scope of this investigation to conduct a thorough review of the alleged businesses that Scherer would have undertaken under the protection of power. The aim is to provide elements, many of which require more extensive research to be fully clarified.

This book, which consists of two parts, reviews the character from his personal and family history, before arriving in government and once he landed there. The first part begins with his personal and professional trajectory, as a lawyer, and ends with his consolidation as a litigator and justice broker. This section analyzes the various areas in which Scherer Ibarra committed a betrayal: to the legacy of his father, Don Julio Scherer García, whose name and political influence he always used to his advantage; to President López Obrador, whose trust he abused; to

Morena, which he sought to instrumentalize as if it were a money and power franchise, and to the most important values of the 4T. The second part closely examines the modus operandi of the judicial business network he commanded from the Legal Counsel of the federal Executive, based on seven specific cases I was able to reconstruct: Juan Collado, Alonso Ancira, Miguel Alemán, Cruz Azul, Aleatica, Oro Negro, and Banco Santander.

I felt it was essential to gather the information available up to this point about Scherer and his partners, both from what has appeared in the press and from the complaints filed against him and the existing investigation files, as well as some other documentary evidence, some of which resulted from transparency requests. My primary source, however, is about 80 testimonies. Relying on professional secrecy, I will not give their names, as most of them expressly requested it.

A significant portion of the testimonies was gathered from figures within the 4T itself, with roles and tasks of greater or lesser relevance, as well as from other public institutions at the federal and local levels. Another relevant part comes from litigators familiar with the functioning of the Judicial Power in Mexico, many of whom have known Julio Scherer for a long time or are aware of how the justice system operated during the current administration, and even before. I am deeply grateful to all of them for their contribution to this effort. I do not mention any of them by name, nor the many people who supported me in this investigation, so as not to harm them. They, in any case, know of my immense gratitude.

The main obstacle to this investigation has been the fear of my sources, who have generally been extremely cautious. Almost no one wanted to be the first to reveal information, and few were willing to share documents. All of this makes it challenging to specify details and provide more specific data, lest I expose and endanger those who provided testimonies.

I must say that I myself could not conduct this investigation with the comfort and ease I would have wished for; I had to move very carefully, as my sources inside and outside the government suggested. It is not easy, as a journalist, to investigate a profile like Julio Scherer's and his partners without putting oneself at risk. In fact, more than one media outlet I've collaborated with - not all of them - asked me to stop talking about this character, either because they received calls from him or because they had a business or interest relationship with the former advisor. Others refused to publish my texts, and in one case, they terminated my contract three days after learning about the type of investigations I was conducting. The message was very clear: don't mess with Julio.

In the final stages, I also received threats via social networks and email. One of them caught my attention especially because it occurred 30 hours after meeting in a public place with one of the alleged extortion victims of the former advisor. Given such events, which can hardly be coincidental, I felt compelled to file a criminal complaint and adopt protective measures. Due to all these circumstances, I couldn't always freely investigate, contrast positions, and listen to the version of all those involved (which ideally should be done in journalistic work) because I didn't want to raise more suspicions. Even so, I commit to disseminating in my social networks and other spaces where I collaborate those mentioned in this investigation who wish to exercise their right of reply.

I should also mention that in this investigation, I also referred to a series of audios that reached me anonymously after publishing several articles about Scherer. These audios contain compromising telephone conversations for the former legal advisor and his partners, both in the business realm and in the law firms related to him. There are more than 100 conversations, which I have mostly decided to keep confidential, although I will not hesitate to disclose them if the former advisor or his partners try to harm me. For this reason, I have entrusted these audios to a trusted person, whom I have asked to make them public if necessary.

In the following pages, I do not accuse anyone of committing any illicit conduct; I am merely the voice of my sources. Moreover, it's unlikely that an individual could generate the kind of evidence required to support a formal accusation about cases like those recounted here. What is presented in this book, in any case, is a recapitulation of investigations previously published in the press - some of my own authorship - as well as clues and additional approaches that could serve to conduct a broader investigation that can draw conclusions.

Ultimately, what I seek is to understand the challenges that justice presents in Mexico and to show the mechanisms through which corruption operates and perpetuates in the Judicial Power, especially in cases involving big capital. Focusing on Julio Scherer Ibarra is not only important because a character close to the president allegedly undertook businesses under the protection of power. It is also because his public conduct, as we will see, affected or could have affected the objectives set by the 4T.

Lastly, I am aware of the risks involved in denouncing the existence of a mafioso brotherhood between lawyers and judges controlling areas of the justice system, a mechanism that has brought them substantial profits. Mentioning some of its alleged members will not please them, and several, especially those who feel most alluded to, may feel that this journalistic exercise interferes with a business that has long thrived on the silence in which their actions transpire.

I know that Scherer and his lawyer partners will try to find some justification - however ridiculous - to take legal action against me or harm me in any way. They will perhaps argue that my journalistic activity affects their honor. Therefore, it is essential to remind them that our Constitution protects freedom of expression and that the Supreme Court of Justice of the Nation (SCJN), in cases like that of Humberto Moreira against Sergio Aguayo, has indicated that when the right to freedom of expression is in conflict with the right to honor, the former has a preferential place in the legal system, being considered a fundamental human and constitutional right.

Similarly, the Inter-American Legal Framework on the Right to Freedom of Expression establishes in its numeral 105 that, given the interest in the debate on public affairs, freedom of expression acquires a higher weighted value, while "expressions of public interest constitute a speech subject to special protection under the American Convention."

With all this, and even if legal reason does not assist them, I know that Scherer and his lawyer partners will try to use those salaried judges they usually resort to in an attempt to silence the messenger, prevent the message from being heard, and ensure that no one wants to talk about this topic again. I am prepared for that, and also to continue documenting - with all journalistic

interest - their modus operandi, even if the victim is myself. However, I believe that by acting in this way, they are probably thinking with the logic of the past. They will do so because they have not realized that this country - although it has not changed as much as we would like - is no longer the same as before.

In fact, I am convinced that it is not. The mere fact that a politician as powerful as Julio Scherer Ibarra had to say goodbye to the government and the Fourth Transformation is a sign that things are not the same. In previous administrations, profiles like that of the former legal advisor remained in their positions until the last day of their term, with the president fully aware of their actions. In this case, it was not like that. That's why I believed it was worth telling this story.

Mexico City, May 30, 2023

**Tracion En Palacio: Chapter 13 (Translated)**

**Black Gold: Personal Revenge**

They say revenge is a dish best served cold. Julio Scherer Ibarra knew how to do it with the son of Vicente Fox's Secretary of the Treasury, Francisco Gil Diaz, almost 20 years after being persecuted during the administration of the PAN member for the case of the Sugar Consortium Scorpion that almost sent him to prison. Julio Scherer Ibarra himself, who in April 2022 accused prosecutor Gertz Manero of "using his power and public resources to seek personal vendettas," used his influence over the Judiciary to do something similar: to settle the score with Gonzalo Gil White for the unresolved issue he had with his father.

**Background of the Case**

From the six-year term of Vicente Fox, some niches of opportunity began to emerge for private investment in the energy sector. One of the characters who from that moment managed to make their way in this field was Gonzalo Gil White, son of the Secretary of the Treasury, Francisco Gil Diaz. Along with José Antonio Canedo White (nephew of one of Televisa's partners, Guillermo Canedo White), Gonzalo founded Black Gold, a company that began operations in 2012 when it became interested in the oil sector, to have its years of greatest expansion after the approval of Enrique Peña Nieto's energy reform. Once capitalized with resources from Banamex and Grupo Sura's retirement funds, in just three years, Black Gold managed to obtain contracts for more than 1.5 billion dollars with Pemex, thanks to the leasing of five oil platforms. With Emilio Lozoya at the head of the state-owned company, contracts were awarded to rent the Primus, Fortius, Laurus, Decus, and Impetus platforms. In the following years, however, the scenario changed radically. When international oil prices fell in 2017, the state-owned company entered a complicated financial situation that forced it to renegotiate its contracts with several companies, including Black Gold. This was compounded by the fact that, since February 2016, the general management of Pemex had changed, and José Antonio Gonzalez Anaya, who was interested in favoring a company other than Gonzalo Gil White and his partners, was now in charge. Faced with the complicated scenario that Black Gold was facing, the company entered a situation of insolvency and, on September 11, 2017, had no choice but to go into commercial bankruptcy, the legal recourse used by companies that are not in a position to meet their payment obligations; in this way, they can seek agreements to restructure their obligations. When this option did not bear fruit, on October 13, 2017, the oil company notified the company of the unilateral decision to prematurely terminate the lease contracts. In response, the company argued that the reasons for terminating the lease contracts were

illegal and sued Pemex. On February 20, 2019, a first-instance sentence was issued in which the judge sided with Black Gold, finding that the reasons mentioned by Pemex did not justify the early termination of the lease contracts. With this, the oil company was ordered to pay up to one billion dollars to Black Gold and comply with the contracts in their original terms. However, this ruling was later reversed on October 25, 2019, as a result of an appeal.

## Using Justice for Personal Revenge

As I mentioned in chapter 2, more than two decades ago, Julio Scherer Ibarra was accused of committing fraud by simulating exports to benefit from fiscal incentives when he was in charge of the Sugar Consortium Scorpion (Caze). The former advisor surely never forgot that encounter with the former Secretary of the Treasury, Francisco Gil Diaz, to whom his father went to ask for mercy for him. The secretary at that time replied, with all coldness, that the authority would act according to the rule of law. Over the years, Julita would find the opportunity to avenge that shameful episode and, at the same time, bill a good sum through his judicial business network. They say that in the first instance, it was Black Gold's creditors who in 2018 came to Scherer, as they calculated that their case would have a better chance of success if they hired one of the firms associated with who would be the future legal advisor to the president. They surely informed themselves beforehand about the political context and calculated that their case would advance if they aligned their accusations against Gil White with the personal antipathy of the legal advisor. Apparently, they were right in their calculation. Scherer took the bait without much difficulty. For their complaint against Gonzalo Gil White and their claim to receive a payment of 900 million dollars to be processed more quickly and prosper in the justice system, they turned to Guillermo Barradas and Roberto Garcia Gonzalez, whose firm was skilled in obtaining favors among judges and magistrates, as we have already seen. It is no coincidence that, before acting in the federal judiciary, these lawyers' strategy focused on the local judiciary, undoubtedly more corrupt and manipulable than the former. As has already been explained, for some time now, Scherer and his partners have operated at their leisure in the field of justice in Mexico City. So much so that the operation against Gil White did not require Scherer to reach the federal government: it began to be hatched earlier, using his influence in the capital's justice system. Indeed, on June 18, 2018, the legal representative of a group of bondholders (Black Gold Primus, Pte. Ltd.; Black Gold Laurus, Pte. Ltd.; Black Gold Fortius, Pte. Ltd.; Black Gold Impetus, Pte. Ltd.; and Black Gold Decus, Pte. Ltd.) filed a complaint with the FGR against two Mexican companies in the group: Drilling Black Gold and Integrator of Oil Services Black Gold, as well as its main officials and directors, among whom Gonzalo Gil White appears. In a generic and unclear way, the lawsuit indicated that Black Gold had violated the payment procedure established in a trust,

although it concealed the purpose of collecting tax information from the aforementioned companies to later fabricate an alleged case of tax fraud through invoicing companies. In fact, just a week after the complaint was filed, the public prosecutor requested the information from the SAT, without a judicial authorization. The information turned out to be false, as the SAT itself later acknowledged. This showed the intention to fabricate evidence to accuse Black Gold of having used invoicing companies to evade taxes. Based on this information, however, on September 17, 2018, already during the government transition, the federal public prosecutor requested authorization from a federal judge to secure Black Gold's bank accounts. However, the judge denied the request, arguing that the funds they intended to secure were not related to any crime.

Garcia Gonzalez and Barradas' firm did not stop there but turned to the local arena, where things were simpler for lawyers of their profile, especially now that their partner Julio Scherer would take over the Legal Advisory. Thus, they again used the apocryphal information provided by the SAT, but now to try their luck before the Attorney General's Office of Mexico City. There they presented practically the same complaint as before, and this time the machinery was activated to secure the bank accounts of Black Gold and the aforementioned trust.

This is how Scherer and his partners made use of the Attorney General's Office of Mexico City and the Judicial Power of the capital to forcibly take over Black Gold's platforms at sea and then try to imprison Gil White. For this, they turned to Andrés Maximino Pérez Hicks, one of their pawns in the prosecutor's office and the same agent of the C-6 Investigation Unit of the public ministry in which other matters of interest to Scherer would "fall", such as the Cruz Azul cooperative that will be seen below.

The representative of the group's companies requested restitution measures to take possession of the Fortius, Laurus, Primus, Impetus, and Decus platforms, from Black Gold. When the case reached the Judicial Management Unit Number 12 of the Superior Court of Justice of Mexico City (where the arrest warrant against Carlos Cabal was also issued and the Cruz Azul case was involved), something unheard of happened: against what a federal judge had previously ordered, on October 19, 2018, Enrique Cedillo Garcia, a member of the same unit, ordered through a precautionary measure the provisional delivery of the oil platforms to the plaintiffs. For this, he turned to the Navy to take the structures located in the territorial sea, whose maintenance and security were in charge of Black Gold. This decision is of very dubious legality, as a local court cannot make a federal decision. It also drew attention because a commercial bankruptcy proceeding was underway, and under those conditions, it is normal to wait for the process to conclude and for a federal judge to order the delivery of assets to the

corresponding party. Why the rush? This is the question. How to explain or justify the decision to order a takeover of the platforms at sea if not for the arrangement that existed between the Garcia Gonzalez and Barradas firm, representing Scherer's interests, and certain elements of the Prosecutor's Office and the capital's Judicial Power?

As has already been pointed out, if anything characterizes corruption in the justice system, it is this ability to obtain tailor-made precautionary measures, with which time can be reduced or gained in matters. Even, on occasions like this, the precautionary measures that are issued without the affected party having a prior opportunity to defend themselves are of such magnitude that the case ends with them, regardless of the substantive resolution that is issued once the process is exhausted. In the case of Black Gold, in particular, the company's creditors were able to get ahead of a judicial decision that would have taken up to a year and a half longer in federal instances. If they had had that time, Black Gold could have continued operating its platforms and, in that period, possibly generated the necessary flow to restructure the debts to its creditors and save itself.

But that didn't happen. Scherer didn't want it to happen. That's why, on Sunday, October 21, 2018, in compliance with Judge Cedillo's order, there was a spectacular and almost cinematic attempt to take over Black Gold's five platforms at sea, using helicopters and Navy personnel. The attempt failed, however, because the staff entrenched themselves and repelled the act as if it were an invasion, activating the water cannons that are used by security protocol against pirate attacks, so the helicopters couldn't even land.

The day after these events, columnist Dario Celis (who in his columns almost always supported Scherer's actions in one way or another) wrote an article in which he criticized Black Gold for resisting the court order "endangering helicopters and their passengers: lawyers, sailors, and federal police." Needless to say, the journalist also justified Judge Cedillo's ruling in his column, noting that the decision was made after reviewing "extensive evidence of administrative fraud."

In the end, the precautionary measures issued by Judge Cedillo turned out to be so weak that they were reversed as soon as the matter escalated to federal justice. Despite this, shortly after, Cedillo was promoted from judge to magistrate of the Superior Court of Justice, where he was assigned to one of the most coveted chambers because of the type of business that is usually done in it.

This case, however, is not the only one where Scherer's participation, his lawyers, and consignment judges can be presumed. As already mentioned, in July 2019, another

judge in Mexico City, Joel de Jesus Garduno Venegas, attached to the same Judicial Management Unit Number 12 (the "Scherer unit"), issued an arrest warrant against Gil White and other partners and officials of Black Gold for fraudulent administration and breach of trust.

In a clear show of partisan use of justice, the order was issued on the grounds of the alleged existence of undue payments for "maintenance" of the platforms, according to the presentation made by agent Maximino Perez Hicks before this judge. It is striking that in the investigation file there is no evidence that such payments exist, suggesting that the public prosecutor may have distorted the facts and invented the existence of money transfers that never took place.

On November 28, 2019, the same judge, Joel de Jesus Garduno, issued a new arrest warrant against Gil White and two other Black Gold executives for an alleged diversion of funds amounting to 160 million pesos. As with many other matters of interest to Scherer, the order was processed with unusual speed, and the investigation was carried out in just a few days. It's worth noting that this was issued without more evidence than the accusation and without calling the accused to testify, as Salvador Garcia Soto pointed out at the time. As the columnist also noted, if judicial turns are supposedly assigned randomly or by draw, how is it that this case had fallen again to the same judge, Joel de Jesus Garduno?

Within the capital's prosecutor's office, much of these Black Gold investigations were hatched in the Financial Crimes area, then headed by Edgar Pineda Ramirez, as well as through the ministerial agent Maximino Perez Hicks. As Jorge Fernandez Menendez wrote at the time, this official, already removed from his post, had a public ministry dedicated exclusively to the Black Gold case. According to the journalist's information, that office operated in an area closed to the public, next to the prosecutor's office, constantly monitored by cameras and microphones to prevent any leaks. In addition, the process was carried out "outside the official computer system, so the investigated parties do not have the right to know the matters or visit this work area that requires special registration." This scheme, which Fernandez Menendez described as a "VIP package," guaranteed them, in the Black Gold case, orders for seizures, assurances, and arrests.

In retrospect, everything seems to indicate that, in the Black Gold case, the justice apparatus at the service of Julio Scherer and his partners first falsified tax information, with the aim of securing bank accounts and taking over the debtor's oil platforms, and later distorted the facts and existing evidence to obtain arrest orders against Gil White

and his partners. It should be noted that their capture was ultimately not possible because they managed to flee.

**Cruz Azul: The Crown Jewel**

In none of the cases involving the Scherer network have such high amounts of money been handled as in the case of the Cruz Azul cooperative. To understand the matter, it is necessary to remember that, for a long time, the wealth of this cooperative has been used as a booty by its directors and unscrupulous lawyers, all eager to extract huge sums of money.

Several of them have been involved in a series of fraudulent practices by an administration dedicated to the systematic looting of the cooperativists' resources, using front companies and simulating purchases or payments for services that never existed or were carried out with overpricing, thus diverting huge sums to tax havens. The main victims of this have been, evidently, the cooperativists, their workers, and retirees.

The situation could have changed with this government. It was López Obrador's wish that the members of the cooperative recover what is ultimately theirs. If this did not happen, it was largely because Cruz Azul, with its 715 members, has been immersed for years in so many legal disputes that it has become the crown jewel of any lawyer. And these lawyers have done nothing but prolong and deepen the conflict.

Moreover, with his good business sense, Julio Scherer Ibarra knew from the beginning that Cruz Azul was a gold mine. Therefore, instead of channeling the presidential will and seeking to return the cooperative to its rightful owners, he preferred to take a good slice of the huge Cruz Azul booty, at the cost of keeping at the head of the cooperative the accomplices of the corrupt administration that directed the company's destiny for many years.

To this end, the advisor enlisted a clique of lawyers like Roberto García, Guillermo Barradas, Jorge Arturo Galván, César González, Juan Arauja, and others. Naturally, Scherer also made indiscriminate use of his ability to influence the Judiciary, especially in Mexico City, where he had Rafael Guerra, the president of the Superior Court of Justice, as a strategic ally who, along with the former advisor, would end up being implicated in serious acts of corruption.

**The Story**

For a president with social concerns who has made probity his flag, the Cruz Azul issue could not be indifferent. AMLO empathized with the cooperativists and was convinced that something needed to be done to change things. It was convenient for the president that the cement company function properly, even to boast a successful model of cooperativism from his own vision and 4T program.

Thus, at the beginning of his second year in government, López Obrador requested that the complaints of several Cruz Azul members, who protested at the National Palace against the corruption of Guillermo Alvarez Cuevas, better known as Billy Alvarez, who managed Cruz Azul for about 30 years, be addressed. On that occasion, those involved left with a promise, formalized in a morning announcement, that the Ministries of the Interior and Labor would address the reasons for the dissatisfaction.

In reality, it was the legal advisor who ended up taking care of the matter. Without necessarily sharing AMLO's vision of the case, he took ownership of it for personal benefit and his network of judicial businesses. Some sources related to the matter believe that Scherer's hidden goal, his real calculation, was to take control of Cruz Azul to, through a frontman, be the one to provide the cement to be used in the major infrastructure works of the 4T.

It should be remembered that the history of scandals and conflicts within the Cruz Azul board is plagued with betrayals among family members and close friends; a thriller that in recent years has involved a set of lawyers used to divert resources, charge high fees, and buy favors among judges and magistrates.

According to rough estimates by one of the lawyers involved in one of the most important disputes among the cooperative's directors, just between 2010 and 2020, the embezzlement from the cooperative due to lawsuits related to internal problems exceeded 10 billion pesos.

According to various testimonies, lawyers like José Luis Nassar, Ángel Junquera, Diego Ruiz Durán, Fernando Martínez García de León, and his partner, Eduardo Osario Chong, to mention just a few, would have received substantial payments whose legality is in question.

The most visible figure within this plot is Guillermo Álvarez Cuevas, who led Cruz Azul for three decades as a sort of cacique: corrupt but benefactor and beloved by a significant part of the workers, whom he managed to unify in the different power groups within the cooperative for a long time.

In this context, Billy and his main partners -including lawyers like Angel Junquera- have been responsible for various criminal behaviors, among which the diversion of large sums of money, the creation of phantom companies, the use of invoice factories, the establishment of inoperative trusts, and the payment for unprovided services through various law firms stand out From the business scheme implemented by Billy Álvarez, it was known - and they would have been part of it - among many others, two individuals who today, thanks to Julio Scherer Ibarra and his partners, are at the forefront of the cooperative: Antonio Marín and Víctor Velázquez. Both held key positions in the direction of Cruz Azul and would have been complicit or co-authors of various criminal behaviors.

However, when the time came, Marín and Velázquez decided to betray Guillermo Alvarez to take control of Cruz Azul themselves. Velázquez, in particular, was indifferent to the very close relationship he always had with Billy, whom he even called "uncle" because he was married to a niece of his. He also did not care that thanks to him, he came to be the commercial director of the cooperative, one of the most envied positions for the kind of business that can be done and the commissions that are usually charged.

Thus, at the beginning of 2018, both Velázquez and Marín began to conspire against Billy and formed the so-called "dissident group" within the cooperative, with which they disputed control from their former boss and mentor. At the right moment, as we will see later, they would use the information they had managed to accumulate about his administration to denounce him, after reaching an agreement that allowed them to take control of the cement company.

To achieve their goal, Velázquez initially relied on his legal advisor, Rafael Anzures Ortiz, a young litigator with little experience, but who among his peculiar "virtues" had the advantage of being the son of Rafael Anzures Uribe, president of the Federal Tribunal of Administrative Justice between 2020 and 2022, a family connection that allowed him to obtain some favorable rulings in a justice system that has nepotism and corruption among its main vices.

Anzures Ortiz, in turn, approached Fabián Aguinaco Bravo and, through him -as some of my sources reveal-, reached out to Julio Scherer. By then, the advisor had already attempted to get involved in the cooperative. He did so through Juan Arauja and César González, with whom he sought to reach a peaceful settlement. In turn, the advisor relied on Jorge Arturo Galván, who presented himself as a relative of Scherer at a meeting held in a house in Coyoacán, where he threatened Miguel Borrell, Billy's Secretary of Finance, to hand over the direction or, otherwise, he and his entire group would end up in jail.

Due to the dimensions of the business, Julio had a clear interest in Cruz Azul: it was then the second most important cement company in the country, with four large plants and a production of 10 million tons per year, billing of 20 billion pesos, shopping centers, schools, hospitals, a hotel in Ixtapa, and two football clubs, one in the first division and another in the second division.

According to consulted sources, the advisor had at least three purposes: to find a "solution" to the Cruz Azul problem, which had already reached the doors of the National Palace; to charge -as in other cases referred to in this book- commissions through his network of law firms; and, finally, to benefit from the sale of the cooperative to some business group, acting as the intermediary of that sale.

By approaching the issue, Scherer not only operated against the president's conviction that the cooperativists could recover what belongs to them. He even sought to turn Cruz Azul into a variable capital company to be able to sell it. Doing this, in reality, was something extremely complex and legally unviable, because it is a cooperative. But Scherer's ambition here also showed no limits.

The advisor and his partners, apparently, had put a price close to a billion dollars on Cruz Azul. Both entrepreneurs and lawyers involved in the matter assert that, with Scherer's commission, characters like Juan Arauja and César González offered the cooperative to potential buyers. The offer reached executives from Cemex, Emilio Azcárraga, and Ricardo Salinas Pliego. Although the latter initially showed interest, they say he eventually decided to decline due to the enormous complications of buying a cooperative. While all this was happening, Julio Scherer Ibarra even took over the Cruz Azul football team, where in January 2021 he placed Alvaro Dávila in the executive presidency, who, in addition to being a figure close to Ricardo Salinas Pliego and husband of Paty Chapoy, is the father of Pablo Dávila, whose wife, Tania Villalobos, is the daughter of Scherer's father-in-law, the Secretary of Agriculture, Víctor Villalobos. It is so evident to what extent the Scherers made Cruz Azul a personal business, that on May 30 of that same year, when the team triumphed in the Liga MX - something that hadn't happened since December 1997 - in the middle of the pitch, Julio Scherer Pareyó (Julito II), husband of Jimena

Villalobos, took a photograph with the cup in his hands, alongside his friend and business partner Mika (identified as a supposed invoice generator, according to some sources), Alvaro Dávila, and other characters who paraded on the field as if it were their backyard.

Velázquez and Marín were useful to the advisor's objectives. Therefore, he formed an alliance with them in which he agreed to help them get rid of Billy and undertake a great business with Cruz Azul in exchange for providing them protection and impunity. Meanwhile, Scherer could make the president believe that he was returning the company to the "legitimate cooperativists," without actually informing him in whose hands the cement company was ending up, and obviously, concealing his plans for it.

Thus, together, Fabián Aguinaco and Julio Scherer devised a plan to issue arrest warrants against Billy and his main partners. To implement the strategy, the advisor asked Aguinaco to see his partner, Guillermo Barradas, who would proceed with a modus operandi similar to the one employed in other cases described in this book.

Although in various interviews you can hear the lawyer claim that in his firm they were "married to the cause" (he even said at one point that he worked pro bono), it is believed that Barradas managed to charge up to 180 million pesos, directly or through intermediaries. From the aforementioned figure, my sources provided evidence that, charged to the cooperative's budget according to the invoice shown in this book, Velázquez transferred a first payment of 51 million 434 thousand 400 pesos to this lawyer's firm (although there apparently exists another payment that would be around 70 million). The firm Anzures, Téllez y Asociados received, as also proven here, 28 million 713 thousand 480 pesos; while José Antonio García Alcacer, a partner of Barradas, pocketed 6 million 766 thousand 456 pesos. Although these amounts do not cover the equivalent to the 180 million dollars previously mentioned, apparently, they also charged significant sums to the lawyer Ricardo Cervantes, partner of El Chino and Memo, and Manuel Fletes Stadeler.

Another character that the firm García González y Barradas relied on, according to cooperativists, was Jesús Hernández Alcacer, a former bodyguard of La Quina who organized the violent takeover of the Cruz Azul facilities in Gran Sur, on August 6, 2020, and threatened several members of the cooperative with death, including Billy Alvarez himself. It is worth remembering that this character - who supposedly died of a heart attack in prison in September 2022, shortly after killing his wife - was known for being a coyote of the Superior Court of Justice of Mexico City. According to information published in the press, the lawyer had a very close relationship with Prudencia Jorge González Tenorio, advisor and operator of Rafael Guerra Alvarez, the president of the Tribunal, and there are even images of them together leaving the Suntory restaurant in the Del Valle neighborhood.

To corner Billy Alvarez and force him to resign, it was necessary to block his bank accounts. And this is where Santiago Nieto's role once again comes into question. As explained in chapter 8, the UIF is not legally empowered to block accounts on its own initiative. To do so, it must have a judge's order or receive a request from a foreign authority or international organization. Nieto, however, circumvented this requirement several times by simulating that there was an

international request. For this, he turned to the FBI attaché in Mexico, Joseph González, and, based on a communication from him, ordered on June 23, 2020, that Alvarez Cuevas's accounts be frozen.

In reality, it was not a formal request nor did it have institutional endorsement. It was merely an invitation to review the accounts, not a request to block them. Therefore, the way this decision was made was illegal and was based on false or partially false information, as it attributed to Guillermo Alvarez Cuevas the possession of 11 properties in the United States, when in fact they were in the names of his namesakes. This was certified by an independent law firm in the United States, through a document to which I had access through a source. For all these reasons, finally, on November 26, 2020, the seventh district judge, Laura Gutiérrez de Velasco Romo, ordered the UIF to unfreeze Billy's accounts.

Continuing with the case, the firm García González y Barradas was in charge of promoting a series of selective charges, thus obtaining various arrest warrants, many of which later proved to be quite weak. To corner
Guillermo Álvarez Cuevas and his close associates - such as Víctor Garcés, Ángel Junquera, Miguel Borrell, and Mario Sánchez - the firm, using the Prosecutor's Office as an extension of their own offices, turned to 10 tailored witnesses who were willing to testify against them.

The two most important witnesses, evidently, were Velázquez and Marín, who told a partial story, to the detriment of their former boss, careful not to incriminate themselves. Testimonies were also given by Juan Manuel Briseño González, María Alejandra Vázquez Paredes, Jorge Cruz Romero, Héctor Lara Avendaño, Delfina Pérez Rivera, Julián Luis Velázquez Rangel, Yolanda Ramírez Ramírez, and even Billy's brother, José Alfredo Álvarez Cuevas.

It's worth mentioning that, due to their tailored testimonies, all these characters - except José Alfredo, Billy's brother - ended up being rewarded with important positions within the very management of the cooperative that was soon formed. Velázquez and Marín would occupy the most important positions, taking charge of the administration and surveillance councils, the most relevant ones. Despite having been accomplices of Billy, these characters were never investigated as part of the Cruz Azul corruption scheme.

With the head of SEIDO, Alfredo Higuera Bernal - a close friend of Scherer - and Mauro Anselmo Jiménez Cruz - the head of the money laundering area in the Prosecutor's Office - following the advisor's instructions, an investigation folder was compiled, from which the arrest warrants were derived. One of the most significant testimonies in the case was from Billy's own brother, Alfredo Alvarez Cuevas, who, in a dubious legality action, Mauro Anselmo visited in June 2020 at his own home, near the Ángeles del Pedregal Hospital, to take his statement along with the lawyer Guillermo Barradas. Strictly speaking, the latter had no reason to be there, as he was not Alfredo's lawyer. This action, besides being unjustified and irregular (the accused was physically unable to testify and there was no reason to take the statement at his home), was part of a strategy to negotiate a plea bargain, whereby José Alfredo had to testify against his own brother.

Although the text of the false statement suggests that the above occurred within SEIDO itself, it can easily be verified that there is no record of his entry into that entity. Probably, taking Billy's brother's statement at his own home was a way to hide the murky way of proceeding and even the fact that Barradas was the one who actually drafted the statement. Later, Alfredo's then-lawyer would acknowledge this in a conversation he had with other lawyers, as I was able to verify in a recorded audio to which I had access.

Despite the case's great complexity and the number of witnesses who testified, the arrest warrants were requested and issued at a more than surprising speed. First, the FGR and then the Judicial Power acted with a speed that any ordinary citizen would envy. For example, Billy's treasurer, Briseño González, appeared on March 25, 2020, and Alfredo Alvarez Cuevas did so on June 5. By July 26, just five weeks later, the control judge Agustín Moreno Gaspar (from the Judicial Management Unit Number 12, also known as "the Scherer unit," for the number of cases of interest to the former advisor resolved there) issued an arrest warrant against Guillermo Alvarez Cuevas and nine of his collaborators. Thus, a process that, with much luck, takes six months was resolved in a record time. "Not even with money can things be done this quickly," commented a renowned litigator, "but in those instances, Scherer's power was superior to any amount of money."

Mauro Anselmo's role didn't end there. Although the new accusatory penal system prevents approaches like the one practiced here, the official also took care of operating before the judge Zeferín Hernández - one of the judges of record who most bent to Scherer and his partners' orders - so that both Billy and Borrell, Garcés, and Junquera were issued arrest warrants in the Altiplano prison, which happened on July 29, 2020.

The type of crimes attributed to the aforementioned individuals, in reality, did not justify sending them to a maximum-security prison, where high-danger inmates are held. A matter like this could have been handled by any other judge, in an ordinary prison. However, the presumably extortive machinery described here found in this strategy a way to intimidate the accused to quickly fold, avoid fighting the case, and force them to negotiate their exit from the cooperative.

When it was known that there was no room in the Altiplano for the four accused to enter, Scherer's influence managed to have someone from the Secretariat of the Interior order the transfer of four other inmates who were there, so that things could proceed according to plan, in less than an hour. Eventually, when Billy's lawyers and his associates learned through their informants (every elite lawyer tends to have them within the prosecutors' offices) that an arrest warrant was being issued against them, they fled.

### The Case of Junquera

A special mention deserves the case of the lawyer Ángel Junquera, who for several years was Alvarez Cuevas' lawyer and who faced several accusations, such as providing legal services without justifying the payments made to him, for which he received million-dollar amounts, either directly or through companies he apparently controlled, for services that never materialized. For instance, Billy's brother pointed out that these amounts reached up to 800

million pesos, whether directly or through apparently controlled companies, for services that never materialized.

Junquera, also lawyer for Miguel Alemán Magnani, had earned Scherer's dislike for his way of proceeding in the cases of Cruz Azul, Interjet, and Radiópolis, in which he had a personal interest. Scherer had been very clear with him in May 2020, telling him: "Stop crossing over," and warned both him and Alemán that if they did not do as he indicated, both could end up in jail.

The threat took effect: in no time, on August 22, Judge Iván Aarón Zeferín Hernández - clearly subordinate to Scherer, as has been noted - issued an arrest warrant against Junquera. Even more than in the previously mentioned cases, this order was issued at a Guinness Record speed, as it had been less than 48 hours after a witness included his name in a statement made on the 20th. This was probably the fastest of all the orders issued in the Cruz Azul case.

In this context, García González and Barradas, along with Aguinaco, approached Junquera to offer him a plea bargain that included reparations for the damage. To force him to accept the conditions imposed on him, which involved a significant transfer of his assets, media close to Scherer, such as Eje Central magazine by Raymundo Riva Palacio, began to publish stories about what kind of properties he owned.

The pressure increased later with other press notes published in very low-circulation and relevance media, falsely stating that there were arrest warrants against his sons, Ángel and Mauricio Junquera Fernández, for being involved in a supposed multimillion-dollar embezzlement. It's even possible that the pressure escalated to the point of threatening the lawyer's relatives with acts of violence, as people close to the family report that, in November 2020, the van of one of Junquera's daughters received a bullet impact and mysteriously caught fire outside her house the next day.

With these and other pressures, they finally managed to bend Junquera to negotiate a reparatory agreement by which the criminal process against him was stopped, in exchange for handing over 47 properties valued close to 700 million pesos. The agreement, in theory, should be fine-tuned in the mediation area of the General Attorney's Office of Mexico City (FGJCDMX), where authorities must review, as with any reparatory agreement, that it is equitable, legal, and judicially viable. However, the reality is that the text was entirely written in the office of García González and Barradas, who came to substitute for the prosecutorial authority.

But beyond that, the oddity is that an explicit commitment was included, to which I had partial access, stating on page 9 that the agreement would not be valid if within 30 days the arrest warrant issued by Judge Zeferín Hernández and even the international arrest or extradition order (red notice) that had already been issued as a consequence of that were not canceled. In other words, a "simple" law firm guaranteed in writing to a private individual that it would manage to withdraw an arrest warrant and an international capture notice in a much shorter time than normal (such a process would take at least three months), as if it were a justice procurement or delivery instance.

This agreement was signed between Junquera and Jonathan Julián Malina Suárez, a frontman for Barradas, before a notary public. On the day of the signing, according to my sources, were present Roberto García González, El Chino; Guillermo Barradas, Memo; Rafael Anzures Ortiz, and other less significant lawyers. The seriousness of the document that was signed is not so much the arrogance of these lawyers - Scherer's partners - and the security with which they seemed to believe their power would be eternal, as the fact that the agreement reached was elevated to the status of a reparatory agreement and was signed by the prosecutor Ernestina Godoy. With this, the General Attorney's Office of Mexico City endorsed that a private individual
carried out an act that corresponds to the authority.

Once the reparatory agreement was celebrated, Junquera began to divest himself of his properties. He had already delivered two apartments in Miami, valued at 8 million dollars, when the negotiation hit a wall at the General Prosecutor's Office of the Republic (FGR). The argument there was that the agreement signed did not proceed, since the crimes of money laundering and organized crime that were attributed to Billy Alvarez's lawyer could not be subject to such an agreement. It seems the influence that García González and Barradas had sold did not have the same effects in the FGR as it did in the FGJCDMX.

Later on, in February 2021, it was made known through the media that Junquera had filed a complaint with the General Prosecutor's Office of the Republic claiming they had been deceived and pressured by the García González and Barradas firm, in supposed collusion with Julio Scherer, to surrender their assets in exchange for a benefit they had not accessed. As of the completion of this publication, it is still unclear what will happen with the case.

### Judges at the Service of One of the Parties

The dispute over the control of the cooperative in the courts has been tainted by the decisions of a set of judges, many of whom could be part of a corruption and influence trafficking network, especially in Mexico City, whom the legal representatives of the cooperativists have considered criminally denouncing.

Sources from the Cruz Azul cooperative I spoke with said they knew with complete certainty that on March 9, 2021, at nine-thirty in the morning, in the offices of the Superior Court of Justice, on Avenida Juárez 104, very close to Alameda Central, the magistrate Guerra, along with one of his closest collaborators, received 14 million pesos from Billy Álvarez's lawyer, David Cohen, to stop any arrest warrant request against his client, something that he ultimately did not fulfill, as he acted in the exact opposite direction.

Magistrate Francisco José Huber Olea, a member of the Sixth Civil Chamber, is another one who might be involved in corruption cases linked to Cruz Azul. Several lawsuits against Billy Álvarez fell to this judge. Among the workers of the Cruz Azul cooperative, as Ricardo Raphael narrated in a column, it is said that the cars driven by the magistrate are the gifts that, allegedly, were given to him by its president, the questioned Guillermo Alvarez Cuevas, "to obtain a favorable treatment in the matters that this judge has in his portfolio; files whose value would exceed any imaginable figure."

On the other hand, several of the questionable decisions later taken by judges in Mexico City (see figure 3) could derive from other acts of corruption. Consistently and partially, a series of judges favored one of the parties in the litigation: that of Velázquez and Marín, Scherer's partners, issuing several rulings of dubious legality. This evident bias was systematic and did not occur in isolated cases.

One of the most significant rulings in favor of the so-called "dissidents" was by the 60th civil judge, José Manuel Salazar Uribe, who instructed the use of public force to take over the cooperative's facilities, located on Periférico Sur, in addition to being the one who removed the precautionary measures that had prevented Velázquez and Marín from performing their executive duties at the head of the cooperative. No less importantly, this same judge legalized a controversial assembly that took place on September 29, 2018, in which Velázquez and Marín were appointed presidents of the administration and surveillance councils. Despite this assembly not being convened according to the statutes (among other "details," the address where it would take place was not indicated, so many of the opposing cooperativists had difficulty arriving), Salazar Uribe legalized it without adhering to legal processes nor recognizing the procedural violations that had occurred.

These rulings by judge Salazar Uribe were later ratified at two federal levels: in October 2020, by the Seventh Civil Chamber of the Superior Court of Justice of Mexico City; and in September 2021, by the First Collegiate Tribunal in Civil Matters of Mexico City, where the legality of that assembly was also endorsed, unanimously voting on the sentence project of magistrate María del Carmen Aurora Arroyo Moreno, which stated that the appointment of the directive did comply with all legal requirements. In her ruling, the magistrate went to the risible extent of stating that "the address of the assembly is Mexico City" and determined that mentioning this fulfilled the requirement of the call. As has been pointed out, judge Salazar Uribe has a very close link with Rafael Anzures Ortiz's father, Rafael Anzures Uribe, who, as president of the Federal Tribunal of Administrative Justice, was precisely who evaluated judge 60 to allow him to reach his position. However, instead of recusing himself, he ruled in several trials in favor of the "dissidents." On multiple occasions, the cooperative's partners pointed out judge Salazar for acting in favor of Velázquez and Marín. This judge was responsible at the time for issuing arrest warrants against Guillermo Alvarez and his son Robin Alvarez, as well as other partners that formed the governing board of Cruz Azul.

To operate in local justice in favor of Velázquez and Marín, both lawyer Anzures Ortiz and Guillermo Barradas were favored by Júpiter López Ruiz, a control judge assigned to the already mentioned Judicial Management Unit Number 12 ("the Scherer unit"). In this unit, in December 2020, an arrest warrant was issued against several members of the cooperative's administration council who were contesting the power of the dissidents, including the president of the council, Francisco Javier Sarabia Ascencio, who, in August 2020, was elected for that position by 550 of the 715 members of the cooperative, along with Alberto López Morales.

Another judge who acted to meet the interests of Scherer and his lawyers was the 24th civil judge, Roberto Yáñez Quiroz, who issued precautionary measures to all authorities to refrain from issuing any resolution that would prevent Marín and Velázquez from continuing at the head

of the administration council. As previously mentioned, this judge also ruled in other sentences of interest to the García González and Barradas firm, such as the one related to the Jenkins family.

Another judge who also lined up in favor of the dissidents was the seventh civil judge, María Concepción Elisa Martín Argumosa, very close to Rafael Guerra, who issued a controversial and questionable precautionary measure, described as "unfounded and even criminal" by some lawyers. Through this ruling, the judge, due to a debt the cooperative had with Azul Concreto, one of its suppliers, ordered the blocking of the accounts of the cooperativists of the Cruz Azul cement plant in Hidalgo, occupied by the group that had resisted the usurpation by Velázquez and Marín. This measure, aimed at pressuring the cooperativists, has prevented them from receiving their salaries and pensions. In the precautionary measure issued by the judge, as explained by a lawyer familiar with the case, "there is an essential contradiction between the amount requested for obtaining the blockade to the company and the possibility of counter-guaranteeing the cooperativists individually for the full amount of the main petition of the trial."

Such biased behavior in the local Judiciary would hardly have been possible without the knowledge and complicity that Rafael Guerra Álvarez would have provided to Scherer within the Superior Court of Justice of Mexico City. According to cooperativists and lawyers related to the Cruz Azul case, the network involves, besides those already mentioned, civil judges like Alejandro Torres Jiménez, from the Eighth Civil Court; María Magdalena Malpica Cervantes, from the Ninth; Alejandro Rivera Rodríguez, from the 36th; and Yassmín Alonso Tolamatl, from the Civil Court 54. Almost all of them also issued rulings in favor of the group of Marín and Velázquez under conditions that deserve to be investigated. Among cooperativists and lawyers, it is still said that Guerra receives approximately one million pesos monthly to keep these individuals in their positions, a claim the author of this book is not in a position to verify.

At the federal level, several more judges would have operated in favor of Scherer and his partners. The most conspicuous of all is Zeferín Hernández, who issued the arrest warrants against Junquera, as already mentioned, as well as against the Álvarez Cuevas brothers, Borrell, Garcés, and Mario Sánchez, where he applied the Penal Code retroactively.

Other federal judges tilted the scales in favor of Velázquez and Marín with questionable rulings, such as the fifth federal district judge in civil matters, Alejandro Dzib Sotelo, who on August 7, 2020, improperly revoked a suspension of amparo ex officio, without notifying the parties, and argued that since Billy Álvarez was a fugitive, the cooperative could not be left leaderless, therefore ordering that it be handed over to Velázquez and Marín. This ruling, tailor-made for the situation, would have been operated by the lawyer David Cohen, activated by Anzures Ortiz and Scherer Ibarra. Judge Dzib, who has been denounced for his conduct, is being investigated by the FGR and the Federal Judiciary Council.

In favor of the interests of the advisor and his partners, sources say, the First Collegiate Tribunal in Penal Matters of the First Circuit in Mexico City also operated, comprised of magistrates Juan José Olvera López, Horacio Armando Hernández Orozco, and Francisco Javier Sarabia Ascencio. This tribunal, besides denying an amparo to Billy Álvarez,

confirmed, with the vote of two of its members, the decision to cancel the arrest warrant against Junquera, resulting from the previously described negotiations.

As this book concludes, the problems within the cooperative are far from being resolved. The way Scherer handled the Cruz Azul case left the cooperativists, workers, and pensioners most harmed. The suspension of monthly payments to about 250 cooperativists and retirees from the Cruz Azul plant in Hidalgo, decreed in December 2021, has prevented them from receiving their salaries, pensions, and social benefits.

This is seen by the affected cooperativists as a mechanism of extortion to force them to support the management of Velázquez and Marín, who seem to have a clear intention to perpetuate themselves in their positions, replicating the practices of Álvarez Cuevas and his close circle. These are the same practices that the then legal advisor of the Presidency contributed to maintaining because they proved functional to his network of judicial businesses.

Indeed, the way Scherer dealt with the Cruz Azul issue contributed to the conflict within the cooperative becoming more acute, even taking on violent connotations, as seen in Ciudad Sahagún, when people from Velázquez and Marín tried to take over the Tula plant in Hidalgo by force, occupied by a group of workers, resulting in eight dead and more than 12 injured.

obtener en el Poder Judicial federal (capítulo 12).

García González y Barradas, S. C. (GGyB)[15] es un despacho fundado en febrero de 2014 por Roberto García González y Guillermo Barradas (mejor conocidos en el mundo abogadil como "el Chino" y "Memo"), además de Ricardo Contreras, Sharon Hernández y Víctor Palacios como socios *junior*. Barradas y Scherer, en particular, tienen una relación personal desde hace tiempo, solidificada a partir de su vecindad domiciliaria. En este despacho, además, ha trabajado Valentina Scherer, hija de Hugo Scherer, primo de Julio.

En el pasado, se llevaron casos muy polémicos en este bufete, como el del exgobernador Javier Duarte, con quien Barradas parece haber tenido una relación muy cercana, además de que, según información publicada en la prensa, le ayudó a formular un "plan de contingencia" y obtener casas de seguridad en tres países para que pudiera refugiarse de la justicia.[16]

Aunque el despacho AGPRyC ha sido hasta ahora el más cuestionado en los medios, el

obtener en el Poder Judicial federal (capítulo 12).

García González y Barradas, S. C. (GGyB)[15] es un despacho fundado en febrero de 2014 por Roberto García González y Guillermo Barradas (mejor conocidos en el mundo abogadil como "el Chino" y "Memo"), además de Ricardo Contreras, Sharon Hernández y Víctor Palacios como socios *junior*. Barradas y Scherer, en particular, tienen una relación personal desde hace tiempo, solidificada a partir de su vecindad domiciliaria. En este despacho, además, ha trabajado Valentina Scherer, hija de Hugo Scherer, primo de Julio.

En el pasado, se llevaron casos muy polémicos en este bufete, como el del exgobernador Javier Duarte, con quien Barradas parece haber tenido una relación muy cercana, ade-

## Footnote 16

[16] Alejandro Saucedo, "Guillermo Barradas, ¿abogado de la corrupción?", Código Activista, 29 de diciembre de 2021. Disponible en https://codigoactivista.com/gobierno/guillermo-barradas-abogado-de-la-corrupcion/.

**See all footnotes**

Chapter 14, Page 178 Translation


García González y Barradas, S.C. (GGyB) is a law firm founded in February 2014 by Roberto García González and Guillermo Barradas (better known in the legal world as "el Chino" and "Memo"), along with Ricardo Contreras, Sharon Hernández, and Víctor Palacios as junior partners. Barradas and Scherer, in particular, have had a personal relationship for some time, solidified by their neighboring residences. In this firm, Valentina Scherer, daughter of Hugo Scherer, cousin of Julio, has also worked. In the past, this firm handled very controversial cases, such as that of the former governor Javier Duarte, with whom Barradas seems to have had a very close relationship, in addition to, according to information published in the press, helping him formulate a "contingency plan" and obtain safe houses in three countries so he could take refuge from justice.

16


Although the AGPRyC law firm has been the most questioned in the media so far, the…

---

16 Alejandro Sauceda,  "Guillermo Barradas, ¿abogado de la corrupción?", Código Activista, 29 de diciembre de 2021. Disponible en https://codigoactivista.com/gobierno/guillermo-barradas-abogado-de-la-corrupcion/.

Note for Reflection

For a long time, Don Jesús Silva spoke about corruption in Mexico, saying, "And the worst of evils is that they don't even lose their respectability."

AMLO in the morning press conference on July 8, 2019 ... and in various other instances...

Providing documentary evidence, testimonials from sources willing to give their names, and more precise information than what has been presented here remains a pending task, something that should be part of an investigation by institutions like the Attorney General's Office of the Republic, the Attorney General's Office of Justice of Mexico City, or the Financial Intelligence Unit. No individual can access data on bank accounts, offshore companies, national and international transactions, real estate investments, etc. Of course, this should also be the subject of other journalistic investigations, which requires the willingness and sufficient resources to thoroughly investigate each of the areas in which the former advisor and his network extended their tentacles.

As I pointed out at the beginning of this book, my intention here was not to accuse anyone of criminal conduct, but to draw attention to a former public official who was central during the first half of the current administration and who might be linked to some of the most significant corruption cases of this government. We are, in that sense, before a character that exemplifies how the business of justice operates in Mexico, one more of those alleged brokers who mediate the relationship between judges and large law firms, often obtaining favorable sentences for their clients in exchange for large sums of money.

My interest goes beyond a single man. In that sense, the intention was not to turn Julio Scherer into a subject of public mockery. That's why neither his name nor his photograph appear on the cover of this book. What interests me, rather than focusing on a person, is to draw attention to a mechanism, a modus operandi. Because the judicial corruption I have discussed here will not end the day the central character of this plot is no longer there operating the business of justice: the way it functions existed before and will continue to exist after him. The way brokers operate is so profitable that, when one of them leaves the game, a substitute quickly and relatively easily enters, something similar to what happens when a cartel of organized crime is decapitated, filling a void.

The story of Scherer is important for the left. It is because most of his actions are at the opposite end of a project of this nature, and even represent in many cases an obstacle to some of the most important policies of the 4T.

Because while President López Obrador always preached that "the poor come first," the advisor's motto seemed to be "my business comes first." Because while AMLO sought to increase revenue to strengthen public income and waged a determined fight against evasion,

avoidance, and tax fraud, Scherer made arrangements on behalf of certain tax debtors with whom he reached agreements to reduce their debts, presumably in exchange for some personal benefit.

Because while the president wanted to avoid the bankruptcy of Interjet, and the SAT and the Fiscal Prosecutor's Office sought to have Miguel Alemán Magnani, the head of that company, face a hefty accumulated tax debt, Scherer and his partners seemed more concerned about extracting about 40 million dollars from the businessman, in exchange for making things easier for him or negotiating his impunity. Because while López Obrador sought to have figures involved in acts of corruption, like Alonso Ancira or Juan Collado, pay back what they had taken and face justice, he profited from his network of judicial business and moved his influences so that Altos Hornos, Ancira's company, and Caja Libertad, belonging to Juan Collado, ended up in the hands of one of his main partners and friends. Because while López Obrador spoke of separating economic power from political power, Julito pulled the strings to take over a part of Grupo Radiópolis, through one of his partners.

Because while López Obrador wanted the cooperativists of Cruz Azul - their legitimate owners - to recover what is theirs and for years has been taken from them by corrupt executives and unscrupulous lawyers, Scherer operated behind the scenes to keep things the same, and that two accomplices of Billy Álvarez - the man who plundered the cooperative's resources for decades - would remain in charge and continue with the same type of corrupt business. Because, instead of thinking about the interest of the cooperativists - what would be expected of a left-wing government - the advisor saw Cruz Azul as the crown jewel to make a good sum of money, sell the cooperative to a private individual, and possibly benefit himself from the transaction.

Because while López Obrador committed to fighting against the corruption of OHL/Aleatica - Peña Nieto's favored company - and officials from the Ministry of Communications, Infrastructure, and Transportation made efforts to recover the Viaducto Bicentenario, which the firm had enjoyed for years through an illegal concession, the advisor operated in favor of said company, thwarted attempts to sanction it, and sought to give a veneer of legality to its actions. That's why, even today, as this book concludes, those who travel on that second level of the Periférico in the State of Mexico are forced to pay a toll charged illegally.

While the first president from the left in Mexico in several decades sought to promote public health and committed to banning glyphosate, vape pens, electronic cigarettes, and even with a nationalist energy policy that prioritized the public over private and foreign interests, Scherer betrayed his trust by signing off on decrees or law initiatives that were more about doing favors for powerful interest groups such as the agri-food industry, agribusiness, tobacco companies, or self-supply companies in the energy sector, likely capable of generously rewarding such favors.

Because, although López Obrador sought to close as much as possible the window through which economic power sneaks in to capture political power, Scherer took care of reopening it so that, through him, the owners of money could ask for favors, request exceptions, and obtain VIP treatment.

The betrayal of Scherer, as we have seen, also occurred in the political-electoral realm. Because while López Obrador and his movement were facing PAN members accused of corruption, like Maru Campos or Francisco García Cabeza de Vaca, the advisor was looking at ways to sell them protection and impunity, fulfilling their requests sometimes and other times not. Because while the government of Andrés Manuel supported efforts to extradite César Duarte, the advisor operated so that one of the beneficiaries of his "secret payroll" became governor of Chihuahua. And because while the Morena parliamentary group in the Chamber of Deputies voted for the impeachment of the former governor of Tamaulipas, Scherer maneuvered so that the PAN member could finish his term. But not only that: while Morena sought to make headway in midterm elections to expand its territorial presence in the country, the Scherers - Julio and Hugo - moved all possible strings to secure a franchise that seems to have had no other goal than to earn large sums of money from the campaigns and then secure lucrative contracts with the successful candidates. As mentioned here, that seems to have been the main reason for trying to stop the internal survey with which the party president was chosen in 2020, when the former advisor operated in the Electoral Tribunal, arguing that these were the wishes of the president.

I know that some militants and sympathizers of the 4T might find it strange that someone who has shown public conviction of the political project of the self-proclaimed Fourth Transformation has written a book like this. However, I have always taken seriously the "we are not the same" of President López Obrador. Being different does not mean that certain things stop happening, but that, when they do happen, it is possible to make the right decisions to prevent them from recurring.

In other words, when a case of corruption occurs within the ranks of the left, it should not be hidden under the pretext of giving weapons to the adversary or "playing into the reaction's hands." Thinking this way, in the end, is to close one's eyes to the obvious, when what is needed is to draw lessons on how and why the dust was bitten to ultimately prevent similar situations from repeating. In this sense, the movement that brought López Obrador to power is obliged today to ask itself how and why, in leftist governments, characters like Julio Scherer can become entrenched and become so powerful.

As I stated at the beginning of this book, I voted for Andrés Manuel López Obrador in 2018 and for Morena candidates in 2021. In 2024 I will vote for that party again. I have done so and will do so, convinced of its commitment to the less fortunate and that its political proposal is better than the existing ones. I also did it because I believe corruption is one of Mexico's main problems, although also knowing that it occurs in every government, especially in a country like ours, where it has a systemic character. Therefore, it is understandable and logical that this evil has not been eradicated.

For all these reasons, it is important to understand how that corruption could take place from the private offices of a key official in the Presidency of the Republic - precisely in a government that was clear that this is eradicated as stairs are swept: from top to bottom. It is evident, then, that the President of the Republic made a mistake by trusting Julio Scherer Ibarra; something he managed to amend in the middle of his term, when he decided to remove the power

he had granted him, as had never happened in previous governments with similar characters. Discreetly, López Obrador did something we had never seen before in this country.

But, even having corrected by removing Scherer from his position and his assignment, AMLO made a mistake by integrating such a profile into his team. The person in charge of overseeing the legality of the actions of the federal executive must be a competent lawyer and—in the case of a president like López Obrador—also one with an impeccable reputation. That was not the case. López Obrador should have been better informed and weighed whether the background of Scherer Ibarra was suitable for holding the position of Legal Advisor and assuming such an important role within a government set on cleaning up the country's public life. Instead, the president was largely guided by the name and reputation of Don Julio Scherer García, as well as by the friendship and respect he had for him, mistakenly assuming that honesty and commitment are hereditary qualities.

It's not about calling us to naivety: it's possible that even the most honest of politicians needs an operator like Scherer. Perhaps it was inevitable to resort to a character like this, capable of dealing with economic power and acting in the sewers of real politics. What was not inevitable was to entrust him with so many functions and so much power, a character whose actions were to be overseen, and above all, to have failed to place true checks and balances on him, as was done in many other areas of the government where officials with opposing views or political interests were appointed.

On more than one occasion, López Obrador has expressed that nothing happens in Mexico without the president's knowledge. Similarly, AMLO often promoted the idea that it was enough for the head of the Executive to be honest for the structure beneath him to align with this ethical commitment. Today, it's clear that this is a naive and romantic notion, as a president has no way to control ubiquitously what happens in the vast bureaucratic apparatus of public administration, and as we see, sometimes not even what happens in the offices adjacent to his own. Perhaps the president thought differently because, in his previous experience of power, at the head of the capital's government, it was easier for the head of the Executive to gather information about what was happening within the structure of his administration. At the federal level, things are very different.

The president was probably not fully aware that the power of a Presidential Legal Advisor is immensely greater than that of one at the local level. Above all, it seems he ignored that, over the last two decades, legal advisors have played a central role in the business of justice in Mexico. AMLO seemed completely unaware of how this operates, despite being one of the elements that perpetuate the privileges his government has sought to combat. It's also possible that what concerned the president the most was preventing the Judicial Power from obstructing his major government projects. Thus, seeing Julio fulfilling that task with apparent efficacy and yielding satisfactory results, he showed no interest in what was happening within his offices.

As I have reported in this book, the power that Scherer Ibarra amassed was both formal and informal. Formally, because he took upon himself the authority to appoint all the legal directors of the federal government, thereby obtaining a powerful weapon of political control

over all the Secretaries of State and high-ranking officials. Informally, because a large number of tasks beyond the legal competencies of a Legal Advisor fell into his hands, from relations with the Legislative and Judicial powers to interactions with factual powers. Functions like these, which probably should be exercised from the Ministry of the Interior, ended up in an office commanded by a figure not subject to public scrutiny and acting in opacity, without counterweights.

For a president so committed to fighting corruption as López Obrador, neglecting the importance of the Judicial Power and the corruption that takes place there has been one of the great mistakes of his administration. This oversight might respond to the fact that, in public debate, this is the most complex and least understood of the Union's Powers, but also the one that legalizes acts of corruption and facilitates the impunity of the corrupt.

WHAT SHOULD AMLO HAVE DONE DIFFERENTLY?

On one hand, he should have promoted figures of recognized prestige in all those positions related to the prosecution and administration of justice, as well as in areas responsible for litigation and the legal defense of public administration. The unfortunate experience of much of the members of the so-called Judicialization Table, mentioned in this book, or the profile of some of the ministers he proposed for the Court (like Yasmín Esquivel) show that this was not the case. Honest individuals with a clear commitment to the anti-corruption fight should have occupied the most prominent roles, instead of malleable figures prone to being coerced. Of course, it's worth asking to what extent these profiles exist and whether the president could trust those who were available.

On the other hand, AMLO made a mistake by renouncing to transform the Judicial Power from its roots and by entrusting the drafting of his legal reform to Arturo Zaldívar, without allowing a more plural debate where alternative voices could be heard. It's hardly conceivable that the head of the Judicial Power would substantively modify this power. It's like asking the police chief to lead a reform to change the corporation or entrusting the secretary of Defense to propose a reform of the Armed Forces. The risk of the final outcome being the maintenance of the status quo would be high in both cases.

To prevent a story like this from repeating, the 4T will have to have a firm attitude in the future, similar, for example, to that which led President López Obrador to force the rich to pay taxes in Mexico and to decisively fight tax fraud. Tasks like these require fundamental legislative changes, an unbreakable political will, and assigning responsibilities in key areas to officials with proven firmness and incorruptibility.

I began this book recalling how things unfolded during that morning press conference in which Julio Scherer Ibarra said goodbye to the government. Paradoxes of life and politics, the president gave his former advisor a more than generous treatment. Although he sent a clear message that the doors were closed for him at the end of "his position and task," he did not skimp on expressing words of gratitude. He called him "brother" and even allowed him to read a letter in which he said goodbye.

Some might wonder why AMLO was far from having the same deference with Irma Eréndira Sandoval when, on June 21, 2021, he published on his accounts a video in which he was shown around a table in front of the former Secretary of the Civil Service and the new head of the office, Roberto Salcedo Aquino. AMLO thanked the secretary for her contribution "during the beginning of the government" (not throughout the entire administration) and then gave her the floor. It had to be her, with a trembling voice and without the same opportunity given to Julio, who stole a few minutes to highlight what she considered the achievements of her administration.

Why was everything so different with the former advisor? Why was there a margin of ambiguity where it was not entirely clear how things had ended between them?

After all, the greatest sin of Irma Eréndira was using her position to promote her brother and conspire against the candidacy of Félix Salgado through leaks to the press. The sin of Julio and his betrayal, on the other hand, is so great that perhaps the Spanish language does not have a word that defines it.

Why then was there this feeling of confusion? Because of what Julio knew and knows? Because of what he saw? Because of the personal gratitude the president has for him, and above all, for the memory of his father? Because characters like him serve in real politics? Because he could be useful again in the future? Or because we still do not fully grasp what the great business of justice in Mexico is made of?

Penguin Random House Grupo Editorial

Betrayal in the Palace The Business of Justice in the 4T

Digital edition: June, 2023

D. R. © 2023, Hernán Gómez Bruera

D. R. © 2023, worldwide publishing rights in Spanish language: Penguin Random House Grupo Editorial, S. A. de C. V. Blvd. Miguel de Cervantes Saavedra no. 301, 1st floor, Granada neighborhood, Miguel Hidalgo borough, Postal Code 11520, Mexico City penguinlibros.com D. R. © Mario Gómez, for the author's photograph