# Exhibit E

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PERFORADORA ORO NEGRO, S. DE R.L. DE C.V., *et al.* | Case No. 18-11094 (SCC) (Jointly Administered) |
| Debtors in a Foreign Proceeding. | |
| GONZALO GIL-WHITE, PERSONALLY AND IN HIS CAPACITY AS FOREIGN REPRESENTATIVE OF PERFORADORA ORO NEGRO, S. DE R.L. DE C.V. AND INTEGRADORA DE SERVICIOS PETROLEROS ORO NEGRO, S.A.P.I. DE C.V. | Adv. Pro. No. _19-01294 |
| Plaintiff, | |
| -against- | |
| ALP ERCIL; ALTERNA CAPITAL PARTNERS, LLC; AMA CAPITAL PARTNERS, LLC; ANDRES CONSTANTIN ANTONIUS-GONZÁLEZ; ASIA RESEARCH AND CAPITAL MANAGEMENT LTD.; CQS (UK) LLP; FINTECH ADVISORY, INC.; DEUTSCHE BANK MÉXICO, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE; GARCÍA GONZÁLEZ Y BARRADAS ABOGADOS, S.C.; GHL INVESTMENTS (EUROPE) LTD.; JOHN FREDRIKSEN; KRISTAN BODDEN; MARITIME FINANCE COMPANY LTD.; NOEL BLAIR HUNTER COCHRANE, JR; ORO NEGRO PRIMUS PTE., LTD.; ORO NEGRO LAURUS PTE., LTD.; ORO NEGRO FORTIUS PTE., LTD.; ORO NEGRO DECUS PTE., LTD.; ORO NEGRO IMPETUS PTE., LTD.; PAUL MATISON | |

Case 1:23-cv-10684-JLR  Document 237-5  Filed 04/22/24  Page 3 of 35

LEAND, JR.; ROGER ALAN BARTLETT;
ROGER ARNOLD HANCOCK; SEADRILL
LIMITED; SHIP FINANCE
INTERNATIONAL LTD.; and DOES 1-100

　　　　　Defendants.

# COMPLAINT*

\* This Complaint was previously filed at ECF 1, as corrected at ECF 4-1. This identical copy is being refiled in its entirety as a separate docket entry for administrative purposes only, and with a full reservation of the Plaintiff's right to amend pursuant to Federal Rule of Civil Procedure 15, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................2

PARTIES ..............................................................................................................................7

I.      Plaintiffs ..............................................................................................................7

II.     Defendants ..........................................................................................................7

        A.      The Ad-Hoc Group Defendants ...........................................................7

                1.      Alterna ......................................................................................7

                2.      AMA ..........................................................................................8

                3.      Leand .........................................................................................8

                4.      Antonius ....................................................................................8

                5.      ARCM ........................................................................................9

                6.      Ercil .........................................................................................10

                7.      CQS ..........................................................................................10

                8.      GGB ..........................................................................................11

                9.      GHL ..........................................................................................11

                10.     MFC ..........................................................................................12

                11.     Bodden .....................................................................................13

                12.     SFIL ..........................................................................................13

                13.     Fredriksen ................................................................................14

        B.      The Seamex Defendants ......................................................................16

                1.      Fintech Advisory ....................................................................16

                2.      Seadrill .....................................................................................16

        C.      The Singapore Defendants ..................................................................17

                1.      The Five Singapore Rig Owners ...........................................17

                2.      The Singapore Directors .........................................................18

        D.      Deutsche México .................................................................................19

JURISDICTION AND VENUE .........................................................................................19

FACTS ................................................................................................................................21

PART I:  CORPORATE STRUCTURE AND KEY CONTRACTS .................................21

I.      Overview ...........................................................................................................21

II.     Oro Negro's Corporate Structure ....................................................................21

        A.      Integradora .........................................................................................21

B. The Rigs, Oro Negro Drilling and the Singapore Rig Owners ...............................22

C. Perforadora..................................................................................................................22

D. Employees...................................................................................................................23

III. The Bonds ...........................................................................................................................23

A. Overview.....................................................................................................................23

B. Security Rights............................................................................................................24

C. The Bond Agreement's Events of Default.................................................................25

D. The Ad-Hoc Group's Control of the Bonds..............................................................25

E. Bond Amendments......................................................................................................26

IV. The Bareboat Charters ........................................................................................................27

A. Overview.....................................................................................................................27

B. Charter Period.............................................................................................................27

C. Charter Hire.................................................................................................................28

D. The Singapore Rig Owners' Payment Obligations...................................................28

1. Expenses to Maintain the Rigs "in Class" ...................................................29

2. Costs to Maintain the Impetus Prior to the Charter Period.........................29

V. The Oro Negro Contracts ...................................................................................................30

A. Overview.....................................................................................................................30

B. Original Terms.............................................................................................................30

C. Termination.................................................................................................................31

D. Amendments................................................................................................................32

E. Performance and Payment...........................................................................................32

F. Seamex.........................................................................................................................33

G. Pemex's Pattern of Corruption..................................................................................34

H. Oro Negro was a Victim of Pemex's Pattern of Corruption ...................................34

VI. The Mexican Trust...............................................................................................................35

PART II: EVENTS FROM MARCH 2017 TO SEPTEMBER 11, 2017.......................................36

I. 2017 Proposed Pemex Amendments...................................................................................36

II. The Ad-Hoc Group..............................................................................................................37

A. Formation and Members.............................................................................................37

B. The Ad-Hoc Group's Advisors..................................................................................37

1. AMA and Leand ............................................................................................37

2. Aagaard .........................................................................................................39

| | | |
|---|---|---|
| | C. | The Coordinated Activities of Pemex and the Ad-Hoc Group ............................41 |
| PART III: EVENTS AFTER SEPTEMBER 11, 2017 ........................................................45 | | |
| I. | The *Concurso* Proceeding .........................................................................................45 | |
| | A. | *Concurso* Request .............................................................................................45 |
| | B. | Injunctions Protecting Oro Negro .........................................................................46 |
| | C. | Disputed *Concurso* of Oro Negro Drilling and the Singapore Rig Owners ..........48 |
| | D. | The Defendants' Actions in Contravention of the *Concurso* Proceeding..............49 |
| | | 1. Pemex and the Ad-Hoc Group Collude to Terminate the Oro Negro Contracts on October 3, 2017 ......................................................49 |
| | | 2. Pemex and the Ad-Hoc Group Collude to Ignore *Concurso* Court Orders...................................................................................56 |
| | | 3. The Ad-Hoc Group's Efforts to Unlawfully Terminate the Bareboat Charters.....................................................................58 |
| | | 4. The Ad-Hoc Group's Illegal Seizure of Control of the Singapore Rig Owners and Misuse of Estate Cash ....................................58 |
| | | 5. The Mexican Trust Fails to Comply with *Concurso* Court Orders, at the Ad-Hoc Group's Direction.................................................60 |
| II. | The Defendants Again Interfere with the Oro Negro Contracts .............................63 | |
| PART IV: LITIGATION OUTSIDE OF MÉXICO ...........................................................65 | | |
| I. | The Ad-Hoc Group Unleashes Litigation Around the World...................................65 | |
| | A. | The Singapore Litigation .....................................................................................65 |
| | B. | The New York Litigation ......................................................................................66 |
| | C. | The Norway Lawsuit .............................................................................................67 |
| II. | The Chapter 15 Proceeding..........................................................................................67 | |
| | A. | The Ad-Hoc Group's Discovery Misconduct ........................................................68 |
| | B. | Seadrill's and Fintech Advisory's Discovery Misconduct ....................................69 |
| PART V: THE MEXICAN CRIMINAL PROCEEDINGS..................................................71 | | |
| I. | Overview......................................................................................................................71 | |
| II. | Mexican Criminal Counsel .........................................................................................72 | |
| III. | The Four Criminal Proceedings ..................................................................................73 | |
| | A. | First Criminal Complaint ......................................................................................74 |
| | B. | Second Criminal Complaint...................................................................................78 |
| | C. | The Sham Companies Investigation .......................................................................79 |
| | | 1. Fabrication of Evidence .........................................................................79 |

            2.      Seizure Order ...................................................................................82

            3.      The Rigs Take-Over Order .............................................................83

        D.     The Fourth Criminal Proceeding .................................................................88

PART VI:  INTERFERENCE WITH ORO NEGRO'S KEY CONTRACTS, BUSINESS
          RELATIONSHIPS AND RESTRUCTURING EFFORTS ...................................90

I.     Interference with the Oro Negro Contracts and Perforadora's Relationship With
       Pemex .......................................................................................................................90

        A.     March 2017 – September 18, 2017 ...............................................................90

            1.      Background .......................................................................................90

            2.      The Defendants Place a Mole in Oro Negro ..................................90

            3.      Seadrill Analyzes Taking over Oro Negro......................................91

            4.      The Ad-Hoc Group's Communications with Pemex ......................91

            5.      Outcome of the Ad-Hoc Group's Interference ..............................92

            6.      Pressure on Perforadora to Accept the 2017 Proposed Pemex
                    Amendments .....................................................................................92

        B.     September 19, 2017 – October 11, 2017 .......................................................93

            1.      Plan against Oro Negro ...................................................................93

            2.      Interference with Pemex .................................................................93

            3.      Seizure of the Singapore Rig Owners ............................................94

            4.      Conspiracy with Seadrill and Fintech Advisory ...........................94

            5.      Outcome of the Plan.........................................................................95

            6.      Aagaard's Assistance ......................................................................95

            7.      The *Concurso* Court's Injunctions ................................................96

        C.     October 2017 – February 2018 .....................................................................96

            1.      Common Interest Agreement with Pemex .....................................96

            2.      Interference with the Reactivation of the Oro Negro Contracts .............97

            3.      Attempt to Interfere with the *Afores* ...........................................97

II.    Interference With the Bareboat Charters and Perforadora's Relationship With the
       Singapore Rig Owners ...............................................................................................97

        A.     Interference with the Bareboat Charters ....................................................97

        B.     Interference with Perforadora's Relationship With the Singapore Rig
               Owners ..........................................................................................................98

III.   Acts to Sabotage Integradora's and Perforadora's Reorganization Efforts .....................98

IV.    The Defendants Profited from Interfering with Oro Negro's Contracts and
Business .................................................................................................................99

PART VII:  DAMAGES ............................................................................................100

CAUSES OF ACTION ..............................................................................................101

COUNT ONE (Tortious Interference and Conspiracy to Tortiously Interfere with
the Oro Negro Contracts against the Ad-Hoc Group Defendants (Except
GGB) and the Seamex Defendants)..................................................................101

COUNT TWO (Aiding and Abetting Tortious Interference with the Oro Negro
Contracts against the Seamex Defendants)..........................................................103

COUNT THREE (Tortious Interference and Conspiracy to Tortiously Interfere
with Perforadora's Business Relationship with Pemex against the Ad-Hoc
Group Defendants (Except GGB) and the Seamex Defendants ) ........................103

COUNT FOUR (Aiding and Abetting Tortious Interference with Pemex's
Business Relationship with Perforadora against the Seamex Defendants)..........105

COUNT FIVE (Alternative to Counts One to Four) (Intentional Torts Under
Mexican Law against the Ad-Hoc Group Defendants (Except GGB) and
the Seamex Defendants) ..................................................................................106

COUNT SIX (Alternative to Count Five) (Negligent Torts Under Mexican Law
against the Ad-Hoc Group Defendants (Except GGB) and the Seamex
Defendants)......................................................................................................107

COUNT SEVEN (Intentional Torts under Mexican Law in Connection with
Integradora's and Perforadora's Reorganization Efforts against All
Defendants)......................................................................................................108

COUNT EIGHT (Alternative to Count Seven) (Negligent Torts under Mexican
Law in Connection with Integradora's and Perforadora's Reorganization
Efforts against All Defendants) ........................................................................109

COUNT NINE (By Gil Personally and as the Foreign Representative) (Abuse of
Process and Conspiracy to Commit Abuse of Process against the Ad-Hoc
Group Defendants (Except Antonius) and the Singapore Defendants) ...............111

COUNT TEN (Alternative to Count Nine) (By Gil Personally and as the Foreign
Representative) (Intentional Torts under Mexican Law in Connection with
the Mexican Criminal Proceedings against the Ad-Hoc Group Defendants
(Except Antonius) and the Singapore Defendants)..............................................112

COUNT ELEVEN (Alternative to Ten) (By Gil Personally and as the Foreign
Representative) (Negligent Torts under Mexican Law in Connection with
the Mexican Criminal Proceedings against the Ad-Hoc Group Defendants
(Except Antonius) and the Singapore Defendants)..............................................113

COUNT TWELVE (Violation of the Implied Covenant of Good Faith and Fair
Dealing in the Bareboat Charters against the Singapore Rig Owners)...............114

COUNT THIRTEEN (Tortious Interference and Conspiracy to Tortiously Interfere in the Bareboat Charters against the Ad-Hoc Group Defendants (Except GGB and Antonius), the Seamex Defendants and the Singapore Directors) ..........................................................................................115

COUNT FOURTEEN (Tortious Interference and Conspiracy to Tortiously Interfere in Perforadora's Business Relationship with the Singapore Rig Owners against the Ad-Hoc Group Defendants (Except Antonius) and the Singapore Directors) ...........................................................................116

COUNT FIFTEEN (Alternative to Counts Sixteen and Seventeen) (Intentional Torts under Mexican Law in Connection with the Bareboat Charters and the Singapore Rig Owners against the Ad-Hoc Group Defendants (Except Antonius), the Seamex Defendants and the Singapore Directors).......................117

COUNT SIXTEEN (Alternative to Count Fifteen) (Negligent Torts under Mexican Law in Connection with the Bareboat Charters and the Singapore Rig Owners against the Ad-Hoc Group Defendants (Except Antonius), the Seamex Defendants and the Singapore Directors).................................119

COUNT SEVENTEEN (Breach of the Bareboat Charters for Failure to Pay the Reimbursement Costs against the Singapore Rig Owners) ................................121

COUNT EIGHTEEN (Declaratory Judgment and Damages against the Ad-Hoc Group Defendants and the Singapore Defendants for Violations of 11 U.S.C. § 1520(a)(1) and the Comity Order) ........................................................121

COUNT NINETEEN (Prima Facie Tort against All Defendants)..................................123

COUNT TWENTY (Negligence against the Ad-Hoc Group and the Singapore Rig Owners)..........................................................................................................125

COUNT TWENTY-ONE (Unjust Enrichment and Conspiracy to Commit Unjust Enrichment against the Ad-Hoc Group and the Singapore Rig Owners) ............126

Gonzalo Gil-White ("Gil"), personally and in his capacity as the foreign representative of Integradora de Servicios Petroleros Oro Negro, S.A.P.I. de C.V. ("Integradora") and Perforadora Oro Negro, S. de R.L. de C.V. ("Perforadora" and, together with Integradora, "Oro Negro") (the "Foreign Representative")[1] files this complaint (the "Complaint") against the following entities and individuals (together, the "Defendants"):

- The Ad-Hoc Group Defendants: Alp Ercil ("Ercil"); Alterna Capital Partners, LLC ("Alterna"); AMA Capital Partners, LLC ("AMA"); Andres Constantin Antonius-González ("Antonius"); Asia Research and Capital Management Ltd. ("ARCM"); Kristan Bodden ("Bodden"); CQS (UK) LLP ("CQS"); García González y Barradas Abogados, S.C. ("GGB"); GHL Investments (Europe) Ltd. ("GHL"); John Fredriksen ("Fredriksen"); Maritime Finance Company Ltd. ("MFC"); Paul Matison Leand, Jr. ("Leand"); and Ship Finance International Ltd. ("SFIL");

- The Singapore Rig Owners: Oro Negro Primus Pte., Ltd. ("Oro Negro Primus"); Oro Negro Laurus Pte., Ltd. ("Oro Negro Laurus"); Oro Negro Fortius Pte., Ltd. ("Oro Negro Fortius"); Oro Negro Decus Pte., Ltd. ("Oro Negro Decus"); and Oro Negro Impetus Pte., Ltd. ("Oro Negro Impetus");

- The Singapore Directors: Roger Alan Bartlett ("Bartlett"); Roger Arnold Hancock ("Hancock"); and Noel Blair Hunter Cochrane, Jr. ("Cochrane") (together, the Singapore Rig Owners and the Singapore Directors, the "Singapore Defendants");

---

[1]    *See* ECF 189.

-1-

- The Seamex Defendants: Fintech Advisory, Inc. ("Fintech Advisory") and Seadrill Limited ("Seadrill");

- Deutsche Bank México, S.A., Institución de Banca Múltiple ("Deutsche México"); and

- The Doe Defendants: Jane and John Does 1-100;

and, on information and belief, alleges as follows:

## INTRODUCTION

1.      This is an egregious tortious interference case in which a company's creditors and its only customer colluded to drive the company out of business and take over its only assets. The victim is Oro Negro, a Mexican oil services company with five state-of-the-art jack-up rigs used for offshore drilling in the Gulf of México (the "Rigs"). The creditors are a group of investors owning the majority of Oro Negro's bonds (the "Ad-Hoc Group"). Oro Negro's only customer is Petróleos Mexicanos ("Pemex"), México's oil company and the largest company in the country.

2.      The Ad-Hoc Group and México, including through Pemex, destroyed Oro Negro because the Ad-Hoc Group wanted to, and eventually did, take over Oro Negro's only assets, the Rigs. The Rigs are valuable assets—according to the Ad-Hoc Group's own estimates, even without the Oro Negro Contracts, each Rig is worth approximately $150 million.

3.      Oro Negro was founded in 2012 by well-known entrepreneurs; it was, at the time, the only Mexican oil services company to raise equity capital from large international investors, including prominent United States investors. Further, in 2014, it raised $900 million in debt from international investors (collectively, the "Bondholders") by issuing bonds (the "Bonds").

-2-

4. Oro Negro's five Rigs are among the best jack-up rigs in México, including because they extract oil in deeper water; few other Mexican oil companies own comparable rigs. Oro Negro leased the Rigs to Pemex under five contracts (the "Oro Negro Contracts"). Oro Negro had the best performance, including safety record, of any company in the industry.

5. Pemex is owned and controlled by the Mexican government; indeed, it is part of the government and by far México's largest source of revenue. Pemex had a monopoly over oil production until 2015; since then, although others may participate in the market, Pemex continues exercising monopoly-like power. As Pemex is a monopoly, Oro Negro could only provide services to Pemex, which was thus Oro Negro's only client.

6. During prior administrations, Pemex demonstrated to be a highly corrupt company. For example, Emilio Lozoya ("Lozoya"), Pemex's Chief Executive Officer ("CEO") from 2012 to 2016, is currently at the center of one of the largest corruption scandals in the world for allegedly receiving over $10 million in bribes from Odebrecht, S.A., a large Brazilian construction company. México's new administration has been carrying out commendable and historic efforts to prosecute the corruption and "pay-to-play" bribery system that for decades was pervasive within México, including Pemex.

7. The Ad-Hoc Group is comprised of investment funds based in the United States, Europe and Asia. The Ad-Hoc Group holds approximately 60% of Oro Negro's Bonds. The Bonds are secured by the Rigs. The Ad-Hoc Group is led by Fredriksen, a Norwegian-born billionaire and one of the most powerful businesspersons in the oil industry. The Ad-Hoc Group's financial advisor is AMA, one of the most well-known offshore and maritime financial advisors, owned by Leand, a powerful industry insider.

8.      Oro Negro's primary competitor is Seamex Limited ("Seamex"), a joint venture between Seadrill and Fintech Investments Limited ("Fintech Investments"), an offshore shell company managed by Fintech Advisory and owned by David Martínez Guzman ("Martínez"), a controversial Mexican billionaire who appears to be under investigation by the United States government for financing Venezuela's dictatorship.  Seamex has the industry's best contracts with Pemex, including in that they have superior prices, longer duration and do not contain unilateral termination clauses, in contrast to the contracts of all of Seamex's competitors, including the Oro Negro Contracts.

9.      Indeed, the core of this case involves the efforts by the Ad-Hoc Group, advised by AMA, and Pemex, to purport to terminate the Oro Negro Contracts so that the Ad-Hoc Group could take over the Rigs and hand them over to Seamex for Seamex to lease the Rigs to Pemex. These efforts began with Pemex demanding to dramatically amend the Oro Negro Contracts, including by reducing its payments to Oro Negro, and refusing to pay Oro Negro over $100 million in past due invoices.  The efforts by Pemex and the Ad-Hoc Group culminated in Pemex purporting to cancel the Oro Negro Contracts, which led to Oro Negro's financial distress and the Ad-Hoc Group successfully taking over the Rigs.   Oro Negro was forced to file for reorganization in bankruptcy court in México and later commenced a Chapter 15 proceeding before this Court.

10.     Throughout 2017 and 2018, the Ad-Hoc Group and Pemex closely coordinated and strategized—colluded—on how best to cancel the Oro Negro Contracts, what to do with the Contracts after their termination and what to do with the Rigs.  And throughout, Pemex and the Ad-Hoc Group and its advisors and co-conspirators, including AMA, Seadrill and Fintech, likewise coordinated to have the Oro Negro Contracts assumed by Seamex.

11.     To force Oro Negro to capitulate, in 2018, the Ad-Hoc Group and México, initiated criminal cases seeking to seize Oro Negro's cash and the Rigs and to imprison Oro Negro's management based on false and fabricated evidence.  And they resorted to movie-like sensational efforts to seize the Rigs including by illegally hiring a squadron of helicopters under the protection of the Mexican government to forcibly board and seize the Rigs.  They did so while flagrantly violating numerous orders of the Mexican bankruptcy court and this Court prohibiting the cancellation of the Oro Negro Contracts and any efforts by the Ad-Hoc Group to seize the Rigs and while the Ad-Hoc Group systematically misrepresented to this Court that it did not want the Rigs.  Seadrill and Fintech similarly misrepresented to the Court that they had no interest in Oro Negro.

12.     The Ad-Hoc Group's intention has been to extract as much cash as it can from Oro Negro via interest payments and eventually take over the Rigs.  On information and belief, none of the members of the Ad-Hoc Group purchased the majority of their Bonds at 100% of the Bonds' value and, instead, purchased them at prices ranging from 45% to 65% of the Bonds' value—i.e., they have paid from $243 million to $351 million for their Bonds.  As such, given that the Rigs (even without the Oro Negro Contracts) are each worth at least approximately $150 million (for a total of approximately $750 million), the Ad-Hoc Group stood to substantially profit simply by taking over the Rigs.  Seadrill and Fintech similarly stood to gain in eliminating from the market Seamex's largest competitor, while absorbing the Rigs and the Oro Negro Contracts.

13.     Because Pemex would continue leasing the Rigs from the Ad-Hoc Group through Seamex, this arrangement also benefited Pemex.  More importantly, the Mexican government gladly yielded to the Ad-Hoc Group's influence for its own reasons—an overt intention from the

-5-

prior administration to retaliate against Oro Negro because Oro Negro persistently refused to pay bribes to Mexican government officials, including Pemex officials. México's acts of retaliation against Oro Negro are the subject of a claim by Oro Negro's United States shareholders against México under the North American Free Trade Agreement ("NAFTA").

14.     Oro Negro now brings this case as the only avenue available to obtain redress from the Defendants for colluding with the prior Mexican administration to illegally purport to terminate its only contracts, the Oro Negro Contracts, and seize its only assets, the Rigs.

15.     The factual background of this Complaint (paragraphs 16 to 447) is divided into the following sections:

- **Part I**: Oro Negro's corporate structure and key contracts;

- **Part II**: events from March 2017 to September 11, 2017;

- **Part III**: events after September 11, 2017, which include the commencement of Oro Negro's bankruptcy proceedings, Pemex's attempted termination of the Oro Negro Contracts and the Ad-Hoc Group's acts of collusion with Pemex;

- **Part IV**: the proceedings outside of México including the New York Litigation, proceedings initiated in Singapore and Norway at the direction of the Ad-Hoc Group, the commencement of Oro Negro's Chapter 15 proceeding in New York and the Ad-Hoc Group's extraordinary resistance to discovery;

- **Part V**: the Mexican criminal proceedings initiated by the Ad-Hoc Group;

- **Part VI**: the Defendants' interference with Oro Negro's key contracts, business relationships and reorganization efforts; and

- **Part VII**: the damages caused to Oro Negro.

## PART V:  THE MEXICAN CRIMINAL PROCEEDINGS

**I.**     <u>**Overview**</u>

306.    Having failed to take over the Rigs in October 2017, knowing that Oro Negro might prevail against Pemex such that Pemex would have to pay the $96 million owed since October 2017, and having failed to stop discovery in the Chapter 15 Proceeding, the Ad-Hoc Group grew desperate.  So did AMA, which saw its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

307.    But they had another card to play, one that involved their Mexican lawyers.  The Ad-Hoc Group, AMA and their agents have launched a relentless campaign to criminally prosecute Integradora, Perforadora, and their directors, executives and employees, including Gil, based on fabricated evidence.

308.    As result of those criminal investigations, they came close to forcibly seizing control of the Rigs (but failed).  They did, however, succeed in freezing all of Perforadora's cash in the Mexican Trust.

309.    Even though, as described below, the criminal investigations have gone nowhere, the relevant Defendants succeeded in their end-game; Perforadora finally ran out of money earlier this year and, on May 15, the *Concurso* Court ordered them to turn over the Rigs to the Singapore Rig Owners.

310.    All told, the Ad-Hoc Group's and the Singapore Defendants' brazen abuse of Mexican criminal proceedings had devastating consequences on Oro Negro and its directors, officers and employees, including Gil.  The Ad-Hoc Group Defendants and the Singapore Defendants managed to seize all of Oro Negro's cash, suffocating Oro Negro and depriving it of its ability maintain the Rigs, which ultimately allowed them to take over the Rigs.    The actions of the Ad-Hoc Group Defendants and the Singapore Defendants have destroyed Gil's reputation and his business as a financial advisor and investment manager.

-71-

## II.    Mexican Criminal Counsel

311.    ███████████, the Ad-Hoc Group retained GGB, a Mexican criminal law firm. GGB has two partners and a handful of associates.

312.    ██████████████████, without talking to a single Oro Negro employee, and without even notifying the *Concurso* Court or this Court, GGB commenced four separate criminal proceedings in the name of the Singapore Rig Owners.

313.    GGB accomplished this feat by using fabricated evidence against Oro Negro.

314.    ████████████████████████████████████
████████████████████████████████

315.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████

316.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

317.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

318. 

319.

320.

## III.   The Four Criminal Proceedings

321.    In the space of six months, GGB, on behalf of the Singapore Rig Owners, acting under the Ad-Hoc Group's unlawful control, filed four separate criminal complaints against Oro Negro, its directors, officers and employees, including Gil.

322.    Tellingly, the Ad-Hoc Group has not made any similar accusations in any other proceedings, including in the *concurso* or in the Chapter 15 Proceeding.  If the Ad-Hoc Group truly believed Oro Negro or its representatives had engaged in criminal behavior, it would have brought this to the attention of the *Concurso* Court or this Court to cause the removal of such persons from overseeing Oro Negro.

323.    For example, the Ad-Hoc Group could have objected in this Court to the recognition of the *concurso* proceedings, or sought modification of the recognition, on the basis that the Foreign Representative was a criminal.  Or the Ad-Hoc Group could have sought relief

-73-

from orders of this Court to permit it to seize the Rigs on the basis that Oro Negro had

committed a crime. Of course, that would have opened the door to discovery, cross-examination

under oath and adjudication.

### A.   First Criminal Complaint

324.   On June 18, 2018, GGB, on behalf of the Singapore Rig Owners, acting under the

Ad-Hoc Group's unlawful control, filed a criminal complaint before the *Procuraduría General

de la República* (the "PGR"), México's federal prosecutors' office, against Integradora,

Perforadora, Gil, Integradora's CEO, and three of their employees falsely accusing them of

mismanaging funds in the Mexican Trust.

325.   The Singapore Rig Owners' criminal complaint falsely alleges that during 2017,

Perforadora obtained from the Mexican Trust more funds than Perforadora required to maintain

and operate the Rigs.

326.   The Ad-Hoc Group knows that this allegation is false and was conjured by Leand

and AMA. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

327.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

328.   Because the Mexican Trust should disburse to the Singapore Rig Owners as

Charter Hire the Pemex revenue that is left after paying for Perforadora's expenses, ████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

329.    AMA and Leand know and understand how the Mexican Trust works and knew

that it was impossible to infer mismanagement due to the facts ████████████████

AMA and Leand knew that their conclusion was false because:

(a)    the Mexican Trust disburses funds to Perforadora based on the expenses that

Perforadora incurs in connection with its services to Pemex (Perforadora keeps an

accounting of the specific expenses it incurs in connection with the services

underlying each of the invoices it issues to Pemex);

(b)    for each payment by Pemex of each invoice submitted to it by Perforadora, the

Mexican Trust must disburse to Perforadora the expenses that Perforadora

incurred in connection with the services subject to that invoice; and therefore

(c)    AMA and Leand could not have calculated how much the Mexican Trust had to

disburse in 2017 to the Singapore Rig Owners without determining what expenses

Perforadora had incurred in connection with the invoices that Pemex paid during

2017.

330.    Neither AMA nor any member of the Ad-Hoc Group ever requested any

information from Perforadora to determine which invoices Pemex paid in 2017, much less the

expenses Perforadora incurred in connection with the services supporting each of those invoices.

331.    In his April 26, 2019 deposition in this Chapter 15 Proceeding, Leand ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

-75-

██████████████████████████████████████████

███████████████████████

332.    Perforadora's 2017 expenses are obviously unrelated to services underlying invoices issued in 2016.

333.    At no time did AMA or the Ad-Hoc Group ask Perforadora or its managers and employees about the allegedly missing $16 million, nor did they take any action in the *Concurso* Court to obtain discovery into this issue.

334.    Importantly, as further discussed below, on September 18, 2018, following a request by the PGR to seize the Mexican Trust and all of the Mexican Trust's and Perforadora's bank accounts, a Mexican federal judge concluded that the allegations of mismanagement of the Mexican Trust were ***completely baseless*** and that the PGR had ***no evidence*** demonstrating that the Mexican Trust was in any way related to any criminal conduct.

335.    The Ad-Hoc Group and their agents caused the Singapore Rig Owners to file that complaint knowing that it had no merit and did that solely as a vehicle to obtain information regarding Perforadora from the *Servicio de Administración Tributaria* (the "SAT"), México's tax agency, that the Singapore Rig Owners subsequently used in another criminal proceeding.

336.    On June 25, 2018, just one week after the Singapore Rig Owners filed their complaint, the PGR sent a broad request to the SAT, seeking all available tax information regarding Perforadora.

337.    The SAT responded less than one week later and provided all the information the PGR requested.    The SAT sent to the PGR a disc with hundreds of tax filings filed by Perforadora and tax filings by third-parties reflecting services supposedly provided to them by Perforadora (tax filings by an entity reflecting its vendors are known as *Declaraciones*

*Informativas de Operaciones con Terceros*, "DIOT[s]"), as well as charts summarizing these tax filings.

338.   The PGR's broad request, and the SAT's response, is highly unusual.  Article 69 of the *Código Fiscal de la Federación*, México's federal tax code, prohibits tax authorities from disclosing tax information to anyone, including other government agencies, unless required by a court order or in money laundering or tax evasion criminal investigations, which is not the case here.  On information and belief, the SAT often denies similar requests by the PGR because it considers them a violation of Article 69.

339.   GGB allegedly "found" in the documents provided by the PGR one Excel spreadsheet reflecting that from 2014 to 2017, Perforadora had supposedly issued invoices, totaling approximately $500,000, to 16 companies blacklisted by the Mexican government because they facilitate tax evasion.

340.   As further described below in this section, the information in that spreadsheet is demonstrably false and GGB knew it.

341.   Notably, when SAT provided this information to the PGR, the Minister of Finance of México (the SAT is part of the Ministry of Finance) was González, who served as Pemex's CEO when Pemex purported to unilaterally terminate the Oro Negro Contracts ██████ ████████████████████████████████████████████

342.   Oro Negro learned of this investigation because it appeared in the front page of *Reforma*, the largest newspaper in México, on July 11, 2018. ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████

-77-

### B. Second Criminal Complaint

343. On June 18, 2018, the Singapore Rig Owners, acting under the Ad-Hoc Group's unlawful control, filed a second criminal complaint before the *Procuraduría General de Justicia de la Ciudad de México* (the "México City DA"), México City's local prosecutors' office, against Alonso Del Val ("Del Val"), the then-Foreign Representative, for signing on behalf of Integradora, on September 20, 2017, shareholder resolutions of Oro Negro Drilling and the Singapore Rig Owners authorizing Jesus Guerra ("Attorney Guerra"), Integradora's and its subsidiaries' Mexican attorney, to file *concurso* petitions on their behalf.

344. The Singapore Rig Owners argue in their complaint that Del Val purportedly misled the *Concurso* Court by allowing Attorney Guerra to act on behalf of Oro Negro Drilling and the Singapore Rig Owners because, according to the Bondholders, they control Oro Negro Drilling and the Singapore Rig Owners and they did not authorize Attorney Guerra to act on their behalf. The Singapore Rig Owners allege that this constitutes a crime called procedural fraud (*fraude procesal*), which is to mislead a public official.

345. This investigation is based on allegations that warrant no serious consideration.

346. First, Integradora's shareholder authorization to Attorney Guerra is dated September 20, 2017, Attorney Guerra filed the petitions on September 29 and Nordic Trustee exercised the Oro Negro Drilling Share Charge on October 3. Thus, the authorization was almost two weeks before, and the *concurso* filing was six days before, the date when Bondholders purportedly became the owners of Oro Negro Drilling.

347. Second, the *Concurso* Court has not yet decided whether Nordic Trustee properly exercised the Oro Negro Drilling Share Charge and thus, whether it validly owns and controls Oro Negro Drilling and the Singapore Rig Owners.

348. This case remains pending.

### C.    The Sham Companies Investigation

#### 1.    Fabrication of Evidence

349.    In early September 2018, based on the allegations of mismanagement of the Mexican Trust (which are described above) and the SAT's false evidence, the Singapore Rig Owners, through GGB, requested that the PGR obtain a court order from a Mexican federal judge seizing the Mexican Trust and all of Perforadora's bank accounts.

350.    On September 17, 2018, the PGR obliged and requested the seizure order.  One day later, a Mexican federal judge denied the seizure as baseless.  The federal judge determined that the Singapore Rig Owners had failed to provide ***any*** evidence that the Mexican Trust or any of the bank accounts of the Mexican Trust or Perforadora were in any way related to, or held proceeds of, any criminal conduct.  As such, the federal judge concluded that the allegations of mismanagement of the Mexican Trust were baseless, much less justified the seizure of the Mexican Trust or any bank account.  Additionally, the federal judge gave no weight whatsoever to the SAT's false evidence.

351.    The Ad-Hoc Group, through GGB, decided to go around the Mexican federal courts and procured the assistance of friendly México City prosecutors and judges.

352.    On September 14, 2018, the Singapore Rig Owners, still acting under the Ad-Hoc Group's unlawful control, filed a criminal complaint before the México City DA against Perforadora accusing it of issuing invoices, totaling approximately $500,000, from 2014 to 2017 to 16 companies that supposedly facilitate tax evasion.  The complaint alleges that by supposedly issuing these invoices, Perforadora committed a crime called fraudulent administration (*administración fraudulenta*), which is to knowingly mismanage the finances and assets of a company.

-79-

353.    By this date, Pemex had finally complied with *Concurso* Court orders and paid $96 million into the Mexican Trust (*supra* ¶ 225).  The Ad-Hoc Group knew this.  The Ad-Hoc Group's plan to starve Perforadora of cash so that it would abandon the Rigs was on the verge of failing.

354.    On September 21, 2018, Ricardo Contreras ("Contreras"), an associate at GGB, sat for an interview with the México City DA.  In the interview, Contreras stated to the México City DA that in the PGR investigation, the PGR had obtained from the SAT tax information regarding Perforadora and that GGB had reviewed that information.

355.    Contreras stated that the SAT sent the PGR a disc with hundreds of tax filings filed by Perforadora and DIOTs (tax filings that companies must file every month reflecting their vendors) submitted by third-parties reflecting services supposedly provided to them by Perforadora, as well as charts summarizing these tax filings.

356.    Embedded in the hundreds of documents provided by the SAT to the PGR, GGB supposedly "found" one Excel spreadsheet reflecting that from 2014 to 2017, Perforadora had issued invoices totaling approximately $500,000 to 16 "sham" companies.

357.    Contreras, however, did not provide in his interview with the México City DA a copy of the Excel spreadsheet, much less copies of the underlying DIOTs allegedly reflecting the invoices that Perforadora purportedly issued to these "sham" companies.

358.    These "sham" companies are notorious in México, which explains why GGB chose them as the supposed "sham" companies.  At the time of Contreras' interview, two of these 16 companies were on a list the SAT maintains of companies that facilitate tax evasion (known in Spanish as *Empresas que Facturan Operaciones Simuladas*, "EFOS").  Since Contreras' interview, the SAT has added 11 of these 16 companies to its list of EFOS.

-80-

359. Additionally, most of the 16 companies were on a list published in 2017 by a Mexican investigative think tank accusing them of being vehicles for Javier Duarte ("Duarte"),[16] the governor of the Mexican state of Veracruz from 2010 to 2016, to embezzle public funds.

360. The Singapore Rig Owners' accusations are demonstrably false.

361. First, Perforadora provides services only to Pemex thus, it makes no sense whatsoever that it would have ever invoiced anyone else, much less "sham" companies.

362. Second, on information and belief, not one of the 16 companies has anything to do with Pemex or with operating the Rigs.

363. Third, Perforadora conducted a comprehensive internal investigation and determined that these allegations are false. Under Mexican law, every company, including Perforadora, must upload their invoices to an electronic database that the SAT keeps of all invoices. As the SAT has now confirmed in writing to Perforadora, there is no record in the SAT's database of Perforadora ever issuing an invoice to these sham companies.

364. Additionally, Perforadora reviewed all its internal accounting records, which are electronically stored in SAP, a standard software that companies use to keep all their business and accounting records, and found no records of any transactions of any kind related to the "sham" companies.

365. GGB knew or should have known that the evidence on the SAT's disc was false. The SAT's disc contained—and GGB reviewed—another document reflecting exactly the opposite of the Excel spreadsheet containing the "sham" companies. In particular, the disc contained a file listing all the companies to which Perforadora had ever issued invoices and

---

[16] Coincidentally, GGB used to be Duarte's counsel and has been accused by the media of acting as a strawmen for Duarte by holding real estate properties on his behalf.

which had ever issued invoices to Perforadora—the "sham" companies are nowhere to be found in that file.

366.    Further evidence that GGB knew or should have known that the Excel spreadsheet contained false information is that it never took any steps whatsoever to confirm the information there, such as, for example, obtaining and reviewing the underlying DIOTs supposedly reflecting that Perforadora had been a vendor of the "sham" entities.

367.    At no time did GGB, or any other representative of the Ad-Hoc Group, ask Perforadora about whether Perforadora had ever contracted with any of the 16 "sham" companies.

2.    Seizure Order

368.    Solely based on Contreras' September 21 interview, and despite the patent falsity of the Singapore Rig Owners' accusations, on September 25, 2018, the México City DA, at the Singapore Rig Owners' behest, sought and obtained an order from Judge Enrique Cedillo-Garcia ("Judge Cedillo"), a local judge in México City, seizing all the bank accounts of the Mexican Trust and of Perforadora (the "Seizure Order").   At the time, there were approximately $83 million in the Mexican Trust.

369.    GGB did not disclose to the México City DA or Judge Cedillo that a Mexican federal judge had already denied the very same seizure request.

370.    ████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████

371.    GGB, the México City DA and Judge Cedillo provided no notice whatsoever to Perforadora about the criminal investigation, much less the Seizure Order.   Instead, Perforadora

learned of the criminal investigation and the Seizure Order because the Mexican media published
articles regarding the investigation and Seizure Order on October 1, 2018.

      3.    The Rigs Take-Over Order

372.    Emboldened by the success of the Seizure Order, and again solely based on
Contreras' interview, on Thursday, October 18, 2018, GGB, acting on behalf of the Singapore
Rig Owners, sought and one day later obtained a second unlawful order from Judge Cedillo.  In
this order, Judge Cedillo authorized the Singapore Rig Owners, as restitution, to take possession
of the Rigs (the "Rigs Take-Over Order").  The hearing in which GGB requested the Rigs Take-
Over Order and in which Judge Cedillo issued the Order was recorded on video.[17]

373.    Given that each Rig is worth approximately $150 million, Judge Cedillo in effect
authorized the Bondholders to dispossess Integradora of approximately $750 million in value,
based on invoices Perforadora allegedly sent to 16 "sham" companies totaling $500,000.

374.    ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

375.    Shortly after learning of the Rigs Take-Over Order, Integradora and Perforadora
demanded that the Ad-Hoc Group and its counsel turn over the video recordings of the hearing
where GGB sought and obtained the Order.  The Ad-Hoc Group lied, representing that it did not
have any copies.

---

[17]   Courts in México City routinely take video recordings of hearings.  The parties may file written requests or
request the issuance of written orders.  The Singapore Rig Owners did not request in writing this Order and Judge
Cedillo did not issue a written order and thus, the only record of this is the video recording of the hearing.

376.    Weeks later, in the course of an *amparo* filed by Perforadora against the Rigs Take-Over Order, Perforadora obtained the video recordings of the hearing.  The recordings show attorneys from GGB requesting and obtaining a copy of the video.

377.    Upon reviewing the hearing recordings, it became obvious why the Ad-Hoc Group concealed it from Integradora and Perforadora.  The video recordings of the hearing reflect that GGB's summary of the facts in support of its request lasted less than 45 minutes, and did not include the submission of any corroborating documentation.  On the basis of that summary, and without asking so much as a single question, or requesting any documentation, Judge Cedillo issued the Rigs take-over order.

378.    Further, to ensure that GGB and the Singapore Rig Owners would have all the possible assistance from the Mexican government to enforce the Rigs Take-Over Order, Judge Cedillo also issued orders to the *Agencia de Investigación Criminal* (the "AIC") of the PGR, which is the police force of the PGR, and to the *Fuerzas Armadas*, the Mexican army, to provide all possible assistance to the Singapore Rig Owners in taking over the Rigs.

379.    The events that ensued on the evening of Friday, October 19, and during the following days, defy reality.  The Ad-Hoc Group and its agents, led by Aagaard, placed their crews in helicopters and deployed the helicopters on the evening of October 19 to fly over the Rigs.

380.    On Saturday, October 20 and Sunday, October 21, the helicopters attempted to land by force on the Rigs.

381.    On October 21, one of the helicopters flew dangerously close in attempting to land by force on the *Decus* and three men jumped onboard.  In attempting to land by force, the helicopter almost caused one of the *Decus'* crewmembers to fall overboard.

-84-

382.    Of the three men who forcibly landed on the *Decus*, one was a police officer from the AIC; one purported to be a private security guard hired by GGB; and the other was Contreras, the GGB associate who provided to the México City DA the interview that served as the sole basis for the Seizure and the Rigs Take-Over Orders.

383.    The AIC police officer left the *Decus* the same day, but Contreras and his security guard stayed on the *Decus* for almost a week, refusing to leave.  While they were on board, GGB's partners falsely asserted, via media appearances, that Oro Negro had kidnapped Contreras and his security guard.

384.    In addition, during that week, Aagaard called crewmembers aboard the Rigs and threatened them with criminal prosecution and losing their licenses to work in oil drilling platforms if they did not let the Bondholders take over the Rigs.

385.    The actions of the Ad-Hoc Group and the Singapore Rig Owners violated 11 U.S.C. § 1520, which stays all actions against property of a debtor located in the United States, because they were interfering with Perforadora's rights under the Bareboat Charters, which are contracts that constitute property located within the territorial jurisdiction of the United States.

386.    The actions of the Ad-Hoc Group, the Singapore Rig Owners, and their agents also violated this Court's July 11, 2018, Order which gave recognition to and enforcement of the October 5 and October 11 Orders issued by the *Concurso* Court.  These orders prohibited interference with Perforadora's possession rights under the Bareboat Charters.

387.    The Ad-Hoc Group's restitution actions were halted by this Court.  On October 23, 2018, upon a motion by Integradora and Perforadora, this Court entered a temporary restraining order (the "TRO") prohibiting the Ad-Hoc Group and its agents from continuing to attempt to

take over the Rigs or in any way deprive Perforadora of its possession of the Rigs.  The TRO expressly applied to the Singapore Rig Owners and their agents.

388.    GGB's partners publicly disregarded the TRO and stated that their clients would not comply with it.  Specifically, after this Court issued the TRO, Roberto Garcia, one of GGB's partners, made several media statements calling for México to continue using police and military forces to assist the Singapore Rig Owners in taking over the Rigs and stating that they would not comply with the TRO.  For example, during a press conference on October 24, Roberto Garcia stated that "public forces should be used" to enforce the Rigs Take-Over Order.  During the same press conference, Roberto Garcia also stated that, although "there might be a purported order from a United States judge," because the TRO had not been served on him, "it might as well not exist."

389.    Following the TRO, late on October 24, the *Concurso* Court also ordered the Singapore Rig Owners to cease their unlawful actions and instructed Judge Cedillo to withdraw the Rigs Take-Over Order, which Judge Cedillo refused to do.

390.    Perforadora then filed an *amparo* against the Rigs Take-Over Order and requested its stay pending resolution of the *amparo* on the ground that the Singapore Rig Owners had obtained it surreptitiously and without notice to Perforadora.  On October 26, Perforadora obtained a stay of the Order until a final resolution of the *amparo*, which is still pending. Ultimately, three different court orders (from the *Concurso* Court, this Court and the *amparo* court) determined that the Ad-Hoc Group's conduct was unlawful and instructed it to stop.

391.    Given the chronology of events, there are numerous obvious red flags that Mexican officials were bribed to (a) convince the SAT to fabricate or deliver to the PGR fabricated evidence; and/or (b) procure the Seizure Order and/or the Rigs Take-Over Order.  The

Foreign Representative has sought discovery of GGB's documents, which the Ad-Hoc Group vehemently resisted at every turn, requiring multiple interventions by this Court. Ultimately, GGB produced almost exclusively filings and court orders in the various Mexican proceedings and produced no other documents or communications.

392. Counsel for the Foreign Representative wrote to counsel for the Ad-Hoc Group about these red flags and requested an investigation into whether GGB engaged in corruption in México. To date, over four months after that letter, there has been no written response.

393. The red flags include that:

(a)    the SAT delivered false evidence to the PGR;

(b)    the SAT sent to the PGR broad tax information regarding Perforadora, a request that the SAT often denies the PGR;

(c)    GGB "found" that false evidence, imbedded in the numerous records provided by the SAT to the PGR;

(d)    GGB knew or should have known that the information was false because other documents that it reviewed indicated that Perforadora did not have any relationship of any kind with the "sham" companies and GGB made no attempt to verify it;

(e)    in only eleven days after launching the investigation in the México City DA, GGB obtained the Seizure Order;

(f)    the Seizure Order seized $84 million, while the accusation against Perforadora is that it issued invoices for $500,000 to 16 companies, an accusation that has nothing to do with and is blatantly disproportionate *vis-à-vis* the Seizure Order;

-87-

(g)     Judge Cedillo issued the Seizure Order with no supporting evidence and based solely on Contreras' *ex parte* and unsupported statements;

(h)     the Ad-Hoc Group and its agents knew that Judge Cedillo would issue the Rigs Take-Over Order almost two weeks in advance of the day when they requested and obtained it;

(i)     the Rigs Take-Over Order authorized the seizure of close to $750 million in value, while the accusation against Perforadora has nothing to do with and is blatantly disproportionate *vis-à-vis* the Rigs Take-over Order;

(j)     GGB obtained the Rigs Take-Over Order based solely on a short, 40-minute summary at a hearing, without providing and without Judge Cedillo requesting any evidence; and

(k)     

### D.     The Fourth Criminal Proceeding

394.    On October 21, 2018, the Singapore Rig Owners, acting under the Ad-Hoc Group's unlawful control, filed a fourth criminal complaint against Perforadora and its employees before the PGR's office in Ciudad del Carmen, a city in México close to where the Rigs are located.

395.    The Singapore Rig Owners filed this complaint during the week when they were attempting to enforce the Rigs Take-Over Order. The complaint alleges that Perforadora and its employees were in contempt of the Rigs Take-Over Order because they did not allow the Singapore Rig Owners to take over the Rigs. Of course, three courts have held that the Ad-Hoc

Group, the Singapore Rig Owners and their agents, were restrained from enforcing the Rigs
Take-Over Order.

396.    In January 2019, the PGR filed charges against three Perforadora employees who
were on board the Rigs during the week when the Singapore Rig Owners attempted to take over
them.

397.    A federal judge dismissed the charges on the ground that federal prosecutors and
judges do not have jurisdiction over the investigation.  Since then, nothing else has happened in
the case.

Dated:  June 6, 2019
New York, New York

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

/s/     Juan P. Morillo

Juan P. Morillo (*pro hac vice*)
Derek L. Shaffer
Gabriel F. Soledad
Daniel Pulecio-Boek
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Facsimile:  (202) 538-8100
Email:  juanmorillo@quinnemanuel.com
Email:  derekshaffer@quinnemanuel.com
Email:  gabrielsoledad@quinnemanuel.com
Email:  danielpulecioboek@quinnemanuel.com

Scott C. Shelley
Samantha Gillespie (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile: (212) 849-7100
Email:  scottshelley@quinnemanuel.com
Email:  samanthagillespie@quinnemanuel.com

Eric D. Winston (*pro hac vice*)
William C. Price (*pro hac vice forthcoming*)
865 S. Figueroa St., 10th Floor
Los Angeles, California  90017
Telephone:  (213) 443-3000
Facsimile:  (212) 443-3100
Email:  ericwinston@quinnemanuel.com
Email:  williamprice@quinnemanuel.com

Sara C. Clark (*pro hac vice*)
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile:  (713) 221-7100
Email:  saraclark@quinnemanuel.com

*Attorneys for Gonzalo Gil-White, in his personal capacity and as Foreign Representative*

-129-