# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

---

SERVICIOS FUNERARIOS GG, S.A. DE C.V.,        Case No. 23-cv-10684

      Plaintiff / Counter-Defendant,

      v.

ADVENT INTERNATIONAL CORPORATION,

      Defendant / Counter-Plaintiff.

_____/

## MEMORANDUM IN SUPPORT OF SERVICIOS FUNERARIOS GG, S.A. DE C.V.'S RULE 11 MOTION FOR SANCTIONS AGAINST ADVENT INTERNATIONAL CORPORATION AND ITS COUNSEL

**LESSER, NEWMAN, ALEO & NASSER LLP**
Michael Aleo
Thomas Lesser
39 Main Street, Suite 1
Northampton, MA 01060
Telephone: (413) 584-7331
Facsimile: (413) 586-7076
aleo@LLN-law.com
lesser@LLN.law.com

*Counsel for Plaintiff / Counter-Defendant, Servicios Funerarios GG, S.A. de C.V.*

**BOIES SCHILLER FLEXNER LLP**
David Boies
Brooke A. Alexander
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300
dboies@bsfllp.com
balexander@bsfllp.com

Carlos M. Sires
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
csires@bsfllp.com

*Counsel for Plaintiff / Counter-Defendant, Servicios Funerarios GG, S.A. de C.V.*

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

I.      INTRODUCTION ...........................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND ......................................................2

        A.      The Fraudulent Sale of Gayosso ........................................................................ 2

        B.      The Mexican Litigation....................................................................................... 2

        C.      The False Allegations of Corruption in the Counterclaim .................................. 4

        D.      AIC's Interrogatory Answers Show the Corruption Allegations are Baseless........ 4

III.    ARGUMENT ...................................................................................................................6

        A.      Rule 11's Purpose and Standard.......................................................................... 6

        B.      The False Allegations in the Counterclaim Violated Rule 11(b)(3)...................... 8

                1.      When it Filed its Counterclaim, AIC Lacked Evidentiary Support for its
                        Factual Allegations of Corruption................................................................ 8

                2.      It Was Not "Likely" That AIC's Corruption Allegations Would Have
                        Support After Discovery ........................................................................ 12

        C.      The Counterclaim Violated Rule 11(b)(1) ........................................................ 19

III.    CONCLUSION...............................................................................................................20

CERTIFICATE OF SERVICE ................................................................................................22

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Other Authorities</u>

*Anaqua, Inc. v. Schroeder,*
  2014 WL 1795310 (D. Mass. May 5, 2014) ................................................................ 7

*Arruda v. Zurich American Ins. Co.,*
  951 F.3d 12, (1st. Cir. 2020) ...................................................................................... 13

*Balerna v. Gilberti,*
  708 F.3d 319, (1st Cir. 2013) ....................................................................................... 7

*Bay State Towing Co. v. Barge American 21 (O.N. 517472),*
  899 F.2d 129 (1990) .................................................................................................... 20

*Bishop v. Swanson,*
  2023 WL 1786468 n.7 (D. Minn. Jan. 24, 2023) ....................................................... 13

*Bletas v. Deluca,*
  2011 WL 131308679 (S.D.N.Y. 2011) ....................................................................... 12

*Charest v. President and Fellows of Harvard College,*
  2016 WL 614368 n.3 (D. Mass. Feb. 16, 2016) ......................................................... 18

*Clark v. The Walt Disney Co.,*
  748 F.Supp.2d 792 (S.D. Ohio 2010) ........................................................................... 7

*Cooter & Gell v. Hartmarx Corp.,*
  496 U.S. 384 (1990) ...................................................................................................... 6

*CQ Int'l Co. v. Rochem Int'l, Inc., USA,*
  659 F.3d 53 (1st Cir. 2011) ............................................................................. 7, 8, 19

*Cruz v. Savage,*
  896 F.2d 626 (1st Cir. 1990) ............................................................................... 7, 8

*Doe v. Amherst College,*
  238 F.Supp.3d 195 (D. Mass. 2017) .......................................................................... 13

*Doe v. Brown Univ.,*
  166 F.Supp.3d 177 (D. Mass. 2017) ............................................................................ 9

*Evanowski v. BankWorcester Corp.,*
  788 F. Supp. 611 (D. Mass. 1991) ............................................................................. 10

*Foresight Graphics, Inc. v. Digital Control Systems, Inc.*,
  1992 WL 78797 (D. Mass. April 1, 1992) ............................................................. 7

*Giganti v. Gen-X Strategies, Inc.*,
  222 F.R.D. 299 (E.D. Va. 2004) ........................................................................ 20

*Goldman v. Barrett*,
  825 Fed.Appx. 35 (2d Cir. 2020) ...................................................................... 14

*Hall v. Brooks*,
  2009 WL 348183 (D. N.H. Feb. 10, 2009) ....................................................... 12

*Hayduk v. Lanna*,
  775 F.2d 441 (1st Cir. 1985) ............................................................................ 10

*Herrera v. Los Unified School District*,
  2017 WL 7888037 (C.D. Cal. Nov. 6, 2017) .................................................... 12

*Home Ins. Co. v. Hartford Fire Ins. Co.*,
  164 Fed.Appx. 950 (11th Cir. 2006) ................................................................ 13

*In re Ames*,
  993 F.3d 27 (1st Cir. 2021) ................................................................................ 7

*JT IP Holding, LLC v. Florence*,
  2020 WL 5217118 (D. Mass. Sept. 1, 2020) ...................................................... 9

*Kunstler v. Britt*,
  914 F.2d 505 (4th Cir. 1990) ............................................................................ 20

*Landress v. Phoenix Mut. Life Ins. Co.*,
  291 U.S. 491 (1934) ......................................................................................... 13

*Langadinos v. American Airlines, Inc.*,
  199 F.3d 68 (1st Cir. 2000) ................................................................................ 9

*Leavitt v. United Servs. Auto. Ass'n*,
  2024 WL 218504 (D. Mass. January 19, 2024) .......................................... 6, 8, 11

*McCarty v. Verizon New England, Inc.*,
  731 F.Supp.2d 123 (D. Mass. 2010) ............................................................ 6, 7, 8

*Menard v. CSX Transport., Inc.*,
  698 F.3d 40 (1st Cir. 2012) ............................................................................ 9, 10

*Mendez-Aponte v. Bonilla*,
  645 F.3d 60 (1st Cir. 2011) .............................................................................. 14

*Morrison v. Walker,*
    2018 WL 9812756 (E.D. Tx. Aug. 22, 2018) ................................................... 13

*Norris v. Moroney,*
    2023 WL 5310902 (D. Mass. Aug. 17, 2023) ............................................. 9, 12

*Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P.,*
    171 F.3d 52 (1st Cir. 1999) ............................................................................... 6

*Resolution Trust Corp. v. Gold,*
    30 F.3d 251 (1st Cir. 1994) .............................................................................. 11

*Rivera-Molina v. Casa La Roca, LLC,*
    2022 WL 1302130 (D. Puerto Rico April 29, 2022) ..................................... 20

*Rotella v. Wood,*
    528 U.S. 549 (2000) .......................................................................................... 13

*Specialty Marketing Group, Inc. v. Katz,*
    2014 WL 2453105 (D. Mass. May 30, 2014) ................................................... 9

*Triantos v. Guaetta & Benson, LLC,*
    91 F.4th 556 ..................................................................................................... 14

*Trigano v. Bain & Co.,*
    380 F.3d 22 (1st Cir. 2004) .............................................................................. 18

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
    125 F.3d 899 (5th Cir. 1998) ............................................................................. 9

*Unanue-Casal v. Unanue-Casal,*
    898 F.2d 839 (1st Circuit 1990) ....................................................................... 20

*Walker v. Bank of America Corp.,*
    2019 WL 3766824 n.4 (D. Md. Aug. 8, 2019) ............................................... 10

*Wilhem v. Wilhem,*
    2010 WL 2640113 (D. Md. June 28, 2010) .................................................... 20

*Young v. City of Providence ex rel. Napolitano,*
    404 F.3d 33 (1st Cir. 2005) ........................................................................ 7, 14

## **Rules**

Fed. R. Civ. P. 11 ................................................................................................ passim

## I.  <u>INTRODUCTION</u>

"Should it become apparent over the course of litigation that a [party's] filings bespeak an *in terrorem* suit, the district court has at its call its own *in terrorem* device, in the form of a wide array of Rule 11 sanctions."

-   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 593 n.13 (2007) (Stevens. J., dissenting).

In its Counterclaim, (Doc. No. 14; the "Counterclaim"), Advent International Corporation ("AIC"), through its counsel, Quinn Emanuel Urquhart & Sullivan, LLP ("QE") and Ropes & Gray LLP ("RG"), levels the most serious of allegations against Servicios Funerarios GG, S.A. de C.V. ("SF"): that SF engaged in criminal corruption of the judicial system in Mexico.[1] ***That incendiary claim is patently false***. Period. Not only are AIC's allegations baseless, but they also cannot be reconciled with SF ***choosing*** to litigate its fraud claims in ***this*** Court. If, as AIC contends, SF's Mexican counsel could corruptly guarantee SF would prevail on its fraud claims in Mexican courts, SF would never have turned to this Court—which AIC would not dare accuse of corruption—to seek justice. AIC ignores that inconvenient elephant in the room.

To be sure, AIC has asserted its baseless allegations of corruption for their *in terrorem* effect, in the hope that it can avoid litigating the merits of SF's fraud claims. AIC's own discovery responses have confirmed that AIC lacked any evidentiary support for its allegations of corruption when it asserted the Counterclaim and still lacks it today. When asked to provide a basis for its allegations, AIC pointed to unsourced speculation about SF's counsel (and not SF) rooted, not in fact, but in unproven and baseless allegations by QE in an unrelated case in which SF is not involved. Put simply, AIC's allegations are made up of whole cloth. The fact they were asserted for the first time long after the alleged corrupt conduct and only after SF filed this action, speaks

---

[1] This motion seeks sanction against AIC and its counsel. Thus, all references to AIC, except when otherwise stated or the context otherwise indicates, includes QE and RG.

to the improper retaliatory and coercive purpose of the Counterclaim. AIC's assertion of these factually unsupported claims of criminality by SF is exactly the type of conduct Rule 11 is intended to sanction.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.     The Fraudulent Sale of Gayosso

This action arises from AIC's fraudulent sale of Grupo Gayosso, S.A. de C.V. ("Gayosso") to SF (the "Sale"). (Doc. No. 1 at ¶ 1.) AIC makes equity investments in portfolio companies, such as Gayosso, and sells those companies over time, with the objective of achieving a return on the investment. (*Id*. at ¶¶ 3, 35, 36.) On January 24, 2020, AIC caused the Twibel entities to enter into a Stock Purchase Agreement (the "SPA") with SF and the Sale closed in January 2021. (*Id*. at ¶¶ 7, 10.) The Sale was negotiated on the sell-side by AIC employees Enrique Pani (also Gayosso's Board Chairperson), Carlos Paz (head of AIC's Latin American operations), and James Westra (AIC's general counsel). (*Id*. at ¶¶ 43-44.) The SPA represented that the financial disclosures made to SF during the negotiations were true and accurate. (*Id*. at ¶¶ 11-13.) But, as described in detail in the Complaint, the financial statements misrepresented Gayosso's financial condition in several ways. (*Id*. at ¶¶ 22-33.) The misrepresentations induced SF to purchase Gayosso for a price vastly greater than its value such that, rather than acquiring a "healthy, profitable company" —as represented by AIC—SF ended up buying "a company with a negative valuation." (*Id*. at ¶ 16.)

### B.     The Mexican Litigation

As a result of the fraud perpetrated upon it, SF filed a civil complaint in Mexico against the TwiBel Entities (Advent-owned special purpose vehicles and nominally owners of Gayosso), Advent International PE Advisors S.C. (AIC's Mexican division), and AIC. (Mexican Civil

---

[2] The facts underlying SF's claims against AIC are set out in detail in the Complaint. (Doc. No. 1.) To use the limited pages more efficiently, we do not restate all of those facts here.

Compl., Ex. A, Doc. No. 337-1.) As permitted by Mexico's Penal Code, SF also filed a criminal complaint with the Strategic Prosecutor's Office for Financial Crimes of the Attorney General's Office of Mexico City ("Prosecutor's Office"), in an effort to recover its damages. (SF's Ans. Interrog. No. 8, Ex. B, Doc. No. 337-2 at 3-4.) The Prosecutor's Office investigated the criminal complaint and commenced a criminal action (the "Criminal Action"), as part of which it independently sought the issuance of the arrest warrants (the "Arrest Warrants"), including against the AIC employees who negotiated the Sale (the "Arrest Warrants"). (Countercl., Doc. No. 14 at ¶¶ 180, 196)

The issuance of the Arrest Warrants has recently been affirmed by a Mexican federal *amparo* court (and one that AIC has not accused of corruption). (Doc. No. 263-2 at 72-100.) That court found that the Arrest Warrants were issued "correctly" because, "under the required standard of proof, there is information that establishes that an act that the law indicates is a crime has been committed, as well as the probability that the complainants participated in its commission." (*Id*. at 83, 88-89.) SF also sought, again as permitted by Mexican law, the issuance of an embargo (the "Embargo") against property located in Mexico in which Advent or its affiliates had an ownership or controlling interest subject to being embargoed under Mexican law. (Doc. No. 337-2 at 3-4.) The request was granted by the criminal court that had issued the arrest warrants. (*See id*.) The Embargo was eventually replaced by an *aseguramiento* or "asset seizure" which, although the subject of appeal, has not been overturned, to SF's knowledge. At no time during the course of the Mexican criminal proceedings—even when they have appealed them—have AIC or its employees contended that the Arrest Warrants or the Embargo were issued as a result of corruption by SF or its counsel, Garcia Gonzalez y Barradas ("GGyB"). In fact, it appears that AIC never asserted to anyone, anywhere that these orders were obtained through corruption; that is, until SF filed this

action.

### C.       The False Allegations of Corruption in the Counterclaim

Because the Mexican civil action was at a standstill due, in part, to AIC's failure to appear, in March 2023, SF filed this action against AIC. The action alleges that AIC committed fraud against SF in connection with the Sale. (*See* Doc. No. 1 at ¶¶ 21, 30, 32-33.) In response, AIC filed its 48-page, 291-paragraph Counterclaim.[3] (Doc. No. 14 at 14.) At the heart of the Counterclaim is the incendiary assertion that SF, through GGyB, corruptly influenced Mexican prosecutors and judges to cause the issuance of the Arrest Warrants and Embargoes through: "illegitimate means," *id*. at ¶¶ 181, 193, 206, 214, 257; "improper influence," *id*. at ¶ 195; "improper means," *id*. at ¶ 252; "abuse" of the Mexican criminal justice system, *id*. at ¶¶ 1, 20, 22, 33, 35, 47, 53-56, 195, 215, 256, 262-263, 289; and "fabrication" of evidence, *id*. at ¶ 289 (the "Corruption Allegations"). The specific conduct that violates Rule 11(b) is the assertion of unsupported and false factual contentions, including the Corruption Allegations, accusing SF of corrupt conduct, the bringing of claims based on those false and unsupported allegations, and the filing of the Counterclaim for improper purposes, all as more fully described, *infra*.

### D.       AIC's Interrogatory Answers Show the Corruption Allegations are Baseless

AIC's responses to SF's Interrogatories 10 and 11 (Ex. C, Doc. No. 337-3, respectively, and collectively, the "Interrogatories") make clear that AIC lacked evidentiary support for the Corruption Allegations. Interrogatory 10 requested the "complete factual" basis for AIC's allegations of corruption by SF. (Doc. No. 103-5 at 2-3.) Interrogatory 11 asked AIC to identify

---

[3] In the very first paragraph of its Answer, AIC accuses Servicios Funerarios of "flagrant abuse of the Mexican justice system." (Doc. No. 14 at 2.) In addition, in its Answer, AIC asserts a defense of "unclean hands." (*Id.*, Fourth Affirmative Defense, at 12.) Although, for simplicity's sake, we refer here to the claims and allegations in the Counterclaim, this Motion is also directed to these allegations of illegal or corrupt conduct in the Answer.

"each instance where Servicios Funerarios used illegal, improper, or illegitimate means or conduct with respect to the Mexican criminal justice system." (*Id*. at 4.) Initially, AIC refused to respond substantively claiming (incredibly) that it "cannot be expected to provide answers to this request before at least the completion of fact discovery." (*Id*. at 3, 5.) But, as this Court has recognized, a litigant cannot "withhold all information reasonably available to [it] until" the completion of discovery, particularly in light of "Rule 11's requirement that the parties have a good faith basis for pleading any claim." *Guarriello v Family Endowment Partners, LP*, 2015 WL 13694425, at *3 (D. Mass. Oct. 30, 2015) (Talwani, J.).

When, on the threat of a motion to compel, AIC finally provided a substantive response, it erased any doubt about the baselessness of its claims. In response to Interrogatory 10, AIC provided a novella in the form of a 16-page narrative. (*See* Doc. No. 337-3.)  Despite its length, it contained no evidentiary support for the Corruption Allegations. Rather, it consisted of ██████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████ (*See id.* at 5-8.) ████████████████████████████

███████████████████ Tellingly, in response to Interrogatory 11, AIC merely "incorporate[d] by reference its response to" Interrogatory 10. (*Id*. at 20.) Interrogatory 11, however, asked for different information: it asked AIC to identify any instance in which SF had acted in a corrupt or illegal fashion. (*Id*. at 19.) AIC failed to identify ***a single instance*** of illegal, improper, or illegitimate conduct by SF. ***Not one***.

It is worth noting that discovery, which has included production by SF of over 700,000

documents, has failed to turn up any support for AIC's allegations.[4] Yet, AIC has continued to advance these false contentions. (*See, e.g.*, Doc. No. 234 at 6; Doc. No. 188 at 3; Doc. No. 129 at 5-6; Doc. No. 120 at 3.) Indeed, just last week, AIC doubled down on its false contentions, referencing SF's alleged "abuses of the Mexican criminal justice system" in a motion for a protective order. (Doc. No. 291 at 1.)

## III.   ARGUMENT

### A.   Rule 11's Purpose and Standard

It is "clear that the central purpose of Rule 11 is to deter baseless filings in district court." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 392 (1990). The Rule seeks to accomplish that goal "by impos[ing] a duty on counsel to investigate their clients' claims before making any filings and to reassess them throughout the litigation." *Leavitt v. United Servs. Auto. Ass'n*, 2024 WL 218504, at *9 (D. Mass. Jan. 19, 2024) (alternation original) (Talwani, J.). Thus, Rule 11 provides "standards of reasonable inquiry for legal and factual contentions embodied in pleadings and presented to a court." *Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P.*, 171 F.3d 52, 58 n.2 (1st Cir. 1999). An attorney who signs a filing certifies "that they have conducted

---

[4] Desperate for anything it can point to as "evidentiary support," AIC, long after filing the Counterclaim, seized on the engagement letter (the "Engagement Letter") between SF and GGyB, which was produced during discovery, arguing it provides evidence that "Mexican criminal counsel was retained for an improper purpose" because it provides that GGyB (i) could use "arrest warrants, asset embargoes, and other criminal process as leverage against AIC" and (ii) ███████████ ███████████████████ (Doc. No. 209 at 2-3.) Contrary to AIC's characterization, the actual terms of the Engagement Letter are legal and not atypical in Mexico in cases involving commercial fraud. (*See* Becerra Aff., Doc. No. 244-1.) Mexican law permits a crime victim to seek restitution through tools provided by the criminal justice proceedings, including arrest warrants and embargoes. Equally without merit is AIC's insinuation that there was anything improper about the Engagement Letter's ████████████████████████████████████████████████████████████ ███████████ is not only permissible, but customary, when crime victims file criminal complaints to recover their damages. (*See id*. at 7–9.) In any event, this post-filing argument does not vindicate the filing of the Counterclaim. *CQ Int'l Co., Inc. v. Rochem Int'l, Inc., USA*, 659 F.3d 53, 63 (1st Cir. 2011) (Rule 11 should be viewed from "the appropriate vantage point (*i.e.*, the time of filing the complaint)") (internal quotation marks and citation omitted).

a reasonable inquiry" and that the filing is "well grounded in fact." *McCarty v. Verizon New England, Inc.*, 731 F. Supp. 2d 123, 133 (D. Mass. 2010). Absent "such a substantiated belief," Rule 11 sanctions are appropriate. *Id*.

AIC thus bears the burden of showing that it conducted a reasonable pre-filing inquiry. *Foresight Graphics, Inc. v. Digital Control Sys., Inc.*, 1992 WL 78797, at *1 (D. Mass. April 1, 1992) (finding that attorney "met his burden"); *see also Clark v. The Walt Disney Co.*, 748 F. Supp. 2d 792, 797 (S.D. Ohio 2010) ("After a Rule 11 motion is filed … the burden shifts to the nonmovant to show that it made a reasonable pre-suit investigation."); *but see Anaqua, Inc. v. Schroeder*, 2014 WL 1795310, at *3 (D. Mass. May 5, 2014) (placing burden on Rule 11 movant). In determining whether Rule 11 has been violated, "a court generally must use an objective standard, asking what is reasonable under the circumstances." *In re Ames*, 993 F.3d 27, 34 (1st Cir. 2021). "A lawyer who makes an inaccurate factual representation must, at the very least, be culpably careless to commit a violation" of Rule 11(b). *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 39 (1st Cir. 2005). A claim that is "not well-grounded in fact" is frivolous and its assertion may be sanctioned under Rule 11(b)(3). *In re Ames*, 993 F.3d at 34; *see also Cruz v. Savage*, 896 F.2d 626, 632 (1st Cir. 1990). Moreover, unfounded accusations of criminal conduct, as is the case here, are clearly sanctionable under Rule 11. *Balerna v. Gilberti*, 708 F.3d 319, (1st Cir. 2013) (affirming Rule 11 sanctions because "claim that Gilberti converted funds was never supported by any evidence").

In addition, sanctions are appropriate pursuant to Rule 11(b)(1) when a claim is presented for "an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). Finally, Rule 11 permits a court to impose sanctions on both a party and its lawyer for presenting an unfounded claim or filing a lawsuit for an improper

purpose.[5] *CQ Int'l*, 659 F.3d at 60; *see also Leavitt*, 2024 WL 218504, at *9 (motion may be brought against a "party or its attorney").

### B.    The False Allegations in the Counterclaim Violated Rule 11(b)(3)

Rule 11(b)(3) requires that "factual contentions have evidentiary support" or "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). AIC's allegations of corruption fail on both counts.

### 1.    When it Filed its Counterclaim, AIC Lacked Evidentiary Support for its Factual Allegations of Corruption

AIC's response to Interrogatory 11 shows that, when it filed its Counterclaim, it did not have evidentiary support for the factual contention that SF engaged in corrupt conduct in connection with the Mexico Criminal Action.[6] *See Cruz*, 896 F.2d at 631 (conduct assessed as of "the time the attorney acted"). Interrogatory 11 was straightforward: it asked AIC to "[i]dentify each instance where Servicios Funerarios used illegal, improper, or illegitimate means or conduct with respect to the Mexican criminal justice system." (Doc. No. 337-3 at 19.) In response, AIC merely "incorporate[d] by reference its response to Interrogatory No. 10."[7] (*Id.* at 20.) But the response to Interrogatory 10, which asked a different question, does not identify any corrupt conduct by SF. ***Put simply, AIC did not identify even one act of corruption committed by SF.***

That AIC made its allegations of corruption "upon information and belief," (Countercl.,

---

[5] While Rule 11 sanctions may not be imposed upon a client under section (b)(2)—which implicates unsupported legal contentions—they may be imposed upon a client under section (b)(3) for the assertion of baseless factual contentions. *McCarty*, 731 F. Supp. 2d at 134-35 (sanctions against party appropriate if party involved in direct management of the litigation).

[6] To this day, AIC itself has not signed its responses to the Interrogatories, although they have been signed by RG.

[7] █████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ This "response" makes the point that AIC had no evidentiary support for its corruption allegations.

Doc. No. 14, at ¶¶ 181, 193, 195, 206, 214, and 257), further confirms that it lacked evidentiary

support. "Information and belief" allegations are an admission that the alleging party does not have

supporting evidence and, thus, "may need discovery to gather and confirm its evidentiary basis."

*Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 198 (D. Mass. 2017) (internal quotations and citation

omitted). In other words, if AIC had evidence that SF engaged in corrupt acts, it would not have

made allegations on "information and belief."[8] *JT IP Hldg., LLC v. Florence*, 2020 WL 5217118,

at *7 (D. Mass. Sept. 1, 2020) (Talwani, J.); *see also Menard v. CSX Transport., Inc*., 698 F.3d 40,

44 n.5 (1st Cir. 2012) ("information and belief" allegations constitute "second hand information").

But AIC can find no comfort in "information and belief" allegations because no ***factual***

allegation in the Counterclaim supports its conclusory allegations of corruption. Allegations made

upon "information and belief" are subject to "the reasonable inquiry that Fed. R. Civ. P. 11(b)

requires." *Langadinos v. Am. Airlines, Inc*., 199 F.3d 68, 73 (1st Cir. 2000). And they may not

consist of "conclusory statements," as they do here. *Norris v. Moroney*, 2023 WL 5310902, at *12

(D. Mass. Aug. 17, 2023) (Talwani, J.). Thus, when conclusory statements—for example, that

"Servicios Funerarios and its counsel influenced the judge's issuance of arrest warrants by use of

illegitimate means," (Countercl., Doc. No. 14 at ¶ 206)—are made upon "information and belief,"

they nevertheless "must rest on pleaded facts." *Menard*, 698 F.3d at 44; *see also U.S. ex rel.*

*Thompson v. Columbia/HCA Healthcare Corp*., 125 F.3d 899, 903 (5th Cir. 1998) ("[E]ven where

allegations are based on information and belief, the complaint must set forth a factual basis for

such belief."). Thus, AIC "must still provide supporting facts and not mere conclusions." *Specialty*

---

[8] AIC's Initial Disclosures also confirm its lack of evidentiary support for its claims of corruption against SF. Nowhere did AIC specifically identify a single individual with knowledge of the alleged corruption that it may use to support its claims. (Doc. No. 117-2 at 4-5.) Nor did AIC's Initial Disclosures identify any document (or category of documents) that support its allegations of corruption. (*Id*. at 5-6.)

*Marketing Grp., Inc. v. Katz*, 2014 WL 2453105, at \*7 (D. Mass. May 30, 2014). As the First Circuit put it in *Menard*, if AIC "had any facts to support this assertion, they should have been set forth." 698 F.3d at 44. None were.

This means, of course, that "information and belief" allegations cannot rest upon speculation. *See* Advisory Committee's Note, Fed. R. Civ. P. 11 ("Tolerance of factual contentions in initial pleadings by plaintiffs or defendants when specifically identified as made on information and belief … is not a license to … make claims … without any basis or justification."). A party may thus not "freely suffuse their pleadings with unsupported allegations simply by qualifying those allegations as having been made 'upon information and belief.'" *Walker v. Bank of Am. Corp.*, 2019 WL 3766824, at \*4 n.4 (D. Md. Aug. 8, 2019). And even when the facts are claimed to be in the possession of the opposing party, "'[i]nformation and belief' does not mean pure speculation." *Menard*, 698 F.3d at 44. Rather, "where allegations are based on information and belief, supporting facts on which the belief is founded must be set forth in the complaint," and that "holds true" even with respect to "matters peculiarly within the knowledge of the opposing party." *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985) (cleaned up). Put simply, speculation cannot support conclusory allegations made on "information and belief" because speculation "does nothing to show that [a wrong] was actually committed." *Evanowski v. BankWorcester Corp.*, 788 F. Supp. 611, 615-16 (D. Mass. 1991) (internal quotation marks omitted).

The Counterclaim fails to allege a single ***fact*** that supports AIC's conclusory "information and belief" allegations of corruption by SF. Instead, it rests those allegations on top of other conclusory allegations and on rank speculation. For example, AIC attacks the issuance of the Arrest Warrants and Embargo as "clearly in violation of Mexican law," (Countercl. Doc. No. 14 at ¶ 27), and asserts that "[t]he arrest warrants that were issued have no basis in any wrongdoing, criminal

or otherwise, and are not supported by probable cause," (*id*. at ¶ 199), that issuance of an arrest warrant before an initial charging hearing "is an extraordinary measure," (*id*. at ¶ 28), and that a "broad asset embargo is an extreme and rarely imposed measure that, under the Mexican law, is not warranted under the circumstances presented in this case," (*id*. at ¶ 188.) It then makes a giant leap from these conclusory and speculative allegations to yet another conclusory (and self-serving) assertion: that "[t]he prosecutor's and judge's failure to adhere to the most basic principles of Mexican criminal law reflects the lack of basis for the requests, the extortionate nature of the scheme, and Servicios Funerarios' counsel's improper reach in the Mexican criminal justice system." (*Id*. at ¶ 32.) As this Court observed in *Leavitt*, these types of allegations improperly rest on pure conjecture.[9] 2024 WL 218504, at *11 (rejecting as "conjecture" contention that "impermissible ex parte communications must have occurred" because "it would be an inhuman feat [for the judge] to have read hundreds of pages" and "to issue ruling amounting to only an endorsement without application of law to facts within less than a 24 hour period"). AIC's allegations plainly "offer[] no facts supporting" the "information and belief" allegations. *Id*. Indeed, AIC's allegations fly in the face of the facts, including the affirmance of the Arrest Warrants by Mexican a federal judge whom AIC does not assert is part of the so-called "web" of corrupt judicial officers. In short, allegations made upon "information and belief" require an evidentiary basis, *Resolution Tr. Corp. v. Gold*, 30 F.3d 251, 254-55 (1st Cir. 1994), and are meaningless where the factual allegations of a complaint do not support the asserted "belief."[10]

---

[9] Similarly, AIC's allegations that the Embargoes were issued "without prior notice to AIC or any of its affiliates to be heard," (Countercl., Doc. No. 14 at ¶ 182), and that the "embargo hearing lasted roughly nine minutes," (*id*. at ¶ 184) plainly do not support an allegation that the Arrest Warrants and Embargoes were issued as a result of corruption by SF.

[10] Also unavailing are AIC's allegations that SF's counsel (but not SF) engaged in corrupt conduct in other, unrelated cases not involving SF. As discussed in section II(B)(2), *infra*, the allegations concerning those other cases are themselves pure speculation based upon unsourced and, even

*See Norris v. Moroney*, 2023 WL 5310902, at *12 (information and belief allegations must be supported by facts sufficient to "infer" the belief).

AIC has exacerbated its violation of Rule 11(b)(3) by continuing to press its false factual contentions in practically every one of its filings, including as recently as last week. *See Cruz,* 896 F.2d 626, 630 (1st Cir. 1990) ("Under the rule, attorneys are also under a continuing obligation to ensure that the proceedings do not continue without a reasonable basis in law and fact.").

### 2.   It Was Not "Likely" That AIC's Corruption Allegations Would Have Support After Discovery

For one who, like AIC, lacks evidentiary support for an allegation, Rule 11(b)(3) provides a limited safe harbor: "if specifically so identified," the claimant can certify that the factual contention "***will likely*** have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3) (emphasis added). "While Rule 11(b)(3) permits parties to specifically identify 'factual contentions … [that] will likely have evidentiary support after a reasonable opportunity for further investigation or discovery,' this allowance cannot be understood to give parties free reign [sic] to fire shots in the proverbial dark because a reasonable inquiry must still support the likelihood of the inference drawn." *Bletas v. Deluca*, 2011 WL 13130879, at *10 (S.D.N.Y. 2011). Rule 11(b)(3)'s safe harbor thus does not permit allegations of fact "simply because the plaintiff speculates that those facts will eventually be discovered." *Herrera v. Los Angeles Unified Sch. Dist.*, 2017 WL 7888037, at *3 (C.D. Cal. Nov. 6, 2017); *see also Hall v. Brooks*, 2009 WL 348183, at *9 (D.N.H. Feb. 10, 2009) (Rule 11(b)(3) "does not allow lawsuits premised on such fanciful speculation"). It requires more—a certification that the

---

more problematic, *unproven* allegations made by QE in the *Oro Negro* litigation, in which SF was not even involved. Remarkably, despite urging the Court to accept this so-called "evidentiary" basis, QE failed to advise the Court that the unproven allegations had been made by QE itself.  Of course, QE's unproven allegations do not constitute "evidentiary support," at all.

evidentiary support is "likely" to be procured by discovery. *See CQ Int'l.*, 659 F.3d at 63 ("[A] party who brings a suit … based on nothing more than a prayer that helpful facts will somehow emerge, and who through sheer fortuity is rewarded for his carelessness, is nevertheless vulnerable to sanctions."). AIC cannot find any protection under the Rule 11(b)(3) safe harbor for multiple reasons.

*First*, AIC did not avail itself of this safe harbor. When it filed the Counterclaim, it failed to specifically identify any factual contention for which it lacked evidentiary support but for which it "will likely" have support after discovery or further investigation.[11] *See, e.g.*, *Bishop v. Swanson*, 2023 WL 1786468, at *6 n.7 (D. Minn. Jan. 24, 2023) (complaint failed to identify "carveouts" under Rule 11(b)(3)); *Morrison v. Walker*, 2018 WL 9812756, at *6 (E.D. Tex. Aug. 22, 2018) (complaint must identify "future evidentiary support expected").

*Second*, even if AIC had availed itself of the safe harbor (it did not), its allegations would not have qualified for it. A certification that an unsupported allegation "will likely" have evidentiary support after discovery is tantamount to a certification that such evidentiary support is ***probable***.[12] *Arruda v. Zurich Am. Ins. Co*., 951 F.3d 12, (1st. Cir. 2020) ("According to common

---

[11] AIC cannot argue that it "specifically identified" its allegations of corruption by making them upon "information and belief." In view of Rule 11's provision that ***all*** factual contentions carry a certification that they are made upon information and belief, the inclusion of "upon information and belief" phrase is "surplusage which does nothing to make or support a claim." *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 219 n.4 (D. Mass. 2017). Indeed, AIC was required under Rule 11(b)(3) specifically to provide a certification availing itself of that safe harbor and it did not.

[12] The Supreme Court has referred to this provision of Rule 11(b)(3) as "allowing pleadings based on evidence reasonably anticipated after further investigation or discovery." *Rotella v. Wood*, 528 U.S. 549, 560 (2000). That is to the same effect. *See Landress v. Phoenix Mut. Life Ins. Co*., 291 U.S. 491, 500 (1934) ("reasonably anticipated" is a result which ordinarily follows); *Home Ins. Co. v. Hartford Fire Ins. Co*., 164 F. App'x. 950, 954 (11th Cir. 2006) (same).

dictionary definitions, 'likely' establishes a probability.").[13] In other words, Rule 11(b)(3)'s reference to discovery does not permit an attorney to "rely on discovery to manufacture a claim that lacks factual support in the first instance." *Goldman v. Barrett*, 825 F. App'x 35, 38 (2d Cir. 2020). Yet, the only "basis" for AIC's allegations of corruption consisted of "speculation and conclusory allegations," *Mendez-Aponte v. Bonilla*, 645 F.3d 60, 68 (1st Cir. 2011), lacking any actual evidentiary support. As discussed, *supra*, AIC's 16-page narrative "answer" to Interrogatory 10 not only establishes that AIC lacked any actual evidentiary material to support the Corruption Allegations but, further, that AIC would not have had any basis to certify that it "will likely" have that support after discovery (which is why it did not so certify).

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████  To start, the Book could ***not*** have been the basis for any allegation in the Counterclaim—or any certification that the allegations "will likely be" supported by evidence—because it was not published until June 2023, the month ***after*** the Counterclaim was filed. (*See* Ex. D, Doc. No. 337-4 at 30). But even if the Book had been in print before the filing of the Counterclaim, it would have provided no promise of evidentiary support for the allegations against SF. The Book does not contain any ***facts*** establishing that SF or GGyB has engaged in any wrongdoing. Indeed, it does not even mention SF, Pablo Peña (Servicios Funerarios' principal), the Gayosso transaction, the Mexican Criminal Action, or this action.

The gist of the Book is that a group of Mexican lawyers and law firms, including AIC's

---

[13] Rule 11 must be interpreted "according to its plain meaning." *Triantos v. Guaetta & Benson, LLC*, 91 F.4th 556, 564-65 (1st Cir. 2024); *see also Young*, 404 F.3d at 39 (rejecting construction "at odds with plain language of Rule 11").

own criminal and civil lawyers in Mexico, along with GGyB, corruptly influence Mexican prosecutors and judges.[14] (Doc. No. 337-4.) Even a cursory review of the Book demonstrates that it is, pure and simple, a political hit job against Julio Scherer, a former attorney to Mexican President Lopez Obrador, who supposedly betrayed the president and his policies (thus, the Book's title, which in English is "Treason in the Palace"). ████████████████████████

████████████████ (Doc. No. 337-3 at 6.) In truth, the Book is wholly unsourced. It is so devoid of any actual evidence that the author admits in a prefatory paragraph labeled "Warning," that his "main source" consists of so-called "testimonies" which, "[o]n the basis of **professional secrecy**," he does not reveal, as "expressly requested" by his purported sources. (Doc. No. 76-10 at PDF 5 (emphasis added).) In addition, the author acknowledges that he relied on "a series of audios that reached me anonymously."[15] (Doc. No. 337-4 at 6.) Recognizing the utter lack of support for his accusations, the author advises the reader that "[i]n the following pages I do not accuse anyone of committing any illicit conduct, I am merely the voice of my sources"—secret and anonymous as they may be (if they even exist). (*Id.*) He thus cautions that "[w]hat is presented here is nothing more than a series of clues from which, later on, conclusions can be drawn." (*Id.* at 4.) As is typical with this type of smear publication, the Book is based strictly on speculation and innuendo.

---

[14] The Book asserts, without any support, that the judge who issued the Arrest Warrants and the Embargoes, Jupiter Lopez Ruiz, "favored" one of the partners at GGyB (whatever that means). (Doc. No. 337-4 at 18.) Yet, AIC failed to disclose that seven reviewing judges—none of whom are mentioned in the Book—affirmed or otherwise passed on matters relating to the Arrest Warrants and Embargoes and none overturned those orders. In fact, as discussed, *supra*, *amparo* judge Jorge Antonio Medina Gaona, who is not mentioned in the Book or alleged by AIC to be corrupt, recently affirmed the Arrest Warrants as being issued "correctly." (Doc. No. 263-2 at 83.)

[15] The excerpts of *Traición en Palacio*, as well as the articles attached hereto as Exhibit D, F, and G, Doc. Nos. 337-4, -6, and -7, are machine translations, conducted with the assistance of counsel's support staff.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████ (Doc. No. 337-3 at 7, 9;) (Doc. No. 120 at 11.) Two chapters of the Book

discuss litigation (unrelated to SF) in which GGyB was counsel. Chapter 13 is devoted to the *Oro*

*Negro* litigation; and Chapter 14 is about the *Cruz Azul* litigation.[16] Neither contains a shred of

evidentiary support for its allegations against GGyB (let alone SF).

The *Oro Negro* litigation (actually, a series of cases) arose from a dispute between the Oro

Negro companies (the "ON Companies")—lessors of oil rigs to Pemex, Mexico's state-owned oil

and gas company—and the bondholders who had financed the ON Companies' purchase of the

leased oil rigs. (*See* 7.10.19 Compl., Ex. E, Doc. No. 337-5 at ¶¶ 1-5.) After the ON Companies

filed for bankruptcy, which constituted a default under the Bond Agreement, the bondholders

proceeded to enforce their rights under the agreement, including with respect to fraudulent misuse

of money received from the leases. The oil rig owners were among the numerous parties to the

litigation and were represented by GGyB. The rig owners lodged criminal complaints against,

among others, persons at the ON Companies who had engaged in fraudulent mismanagement of

funds. As a result of the filing of the criminal complaint, the Mexican courts issued asset seizures

and arrest warrants.

In support of the allegation that these were corruptly issued, the Book makes conclusory

---

[16] Because it is impossible to adequately describe the vacuous nature of the Book (or to fully discuss it within the page limit for this motion), we append a translation of these two chapters, as well as the author's "Notes for Reflection," as Exhibit D, Doc. No. 337-4. Reading them is perhaps the best way to appreciate just how egregious it was for AIC to claim that the Book provides evidentiary support for its claims of corruption.

assertions, such as that the arrest warrants were "processed with unusual speed and the investigation was completed within a few days," and that the assets seizures were of "dubious legality." (Doc. No. 337-4 at 10, 12.) It then rhetorically asks how these orders could be "explain[ed]" or "justif[ied]" "if not for the arrangement that existed between the [GGyB] law firm, representing Scherer's interests and certain elements of the Prosecutor's Office and the capital's Judicial Power?" (*Id*. at 11.) Yet, beyond this rank speculation—which mirrors the rank speculation in the Counterclaim, (*see, e.g.*, Countercl., Doc. No. 14, at ¶ 32)—the Book sets out no evidence that GGyB engaged in a single corrupt or illicit act in the *Oro Negro* litigation. Indeed, to the best of SF's knowledge, each of the orders procured by GGyB as counsel for the rig owners was later affirmed by a reviewing court. Put simply, the unproven accusations against GGyB in the *Oro Negro* litigation provide zero support for any claim that AIC "will likely" uncover evidence of corruption in **this** case.

Beyond their speculative nature, the *Oro Negro* allegations are concerning here because of their provenance. Although AIC cites the Book as support for the accusations, they did not originate there. Instead, the allegations originated **with QE** in filings it made in the *Oro Negro* cases, where it was also counsel adverse to GGyB.[17] ***To be sure, what AIC has touted to this Court as the evidentiary pillar of its claims of corruption consists of nothing more than allegations made by its own counsel in an unrelated case—a fact QE inexplicably failed to disclose to this Court when it*** ███████████████████████████ ███████ (Doc. 337-3 at 6.) On the contrary, those allegations have never been proven, much less adjudicated as fact by any court or other authority. They remain—six years after being leveled by

---

[17] Mr. Soledad, one of QE's lawyers in this case, was also one of the lawyers for the ON Companies in the *Oro Negro* case. (Ex. E, Doc. No. 337-5, at 129.)

QE—rank speculation. AIC's reliance upon its own counsel's unsupported allegations in the *Oro Negro* case to level its charge of corruption against SF simply "piles speculation upon speculation."[18] *Trigano v. Bain & Co.*, 380 F.3d 22, 29 (1st Cir. 2004). Rule 11 prohibits that. *Charest v. President and Fellows of Harvard Coll.*, 2016 WL 614368, at *7 n.3 (D. Mass. Feb. 16, 2016) ("[T]his specific allegation was speculation cobbled together from inadequate circumstances and raw conjecture, raising serious Rule 11 issues.").

Besides the Book, the other two items that AIC characterized as "[e]xtensive journalistic reporting," (Doc. No. 120 at 4), are not worth the paper they are printed on. The first, published in what is apparently a Mexican blogsite by the name of *Código Activista* (in English, "Activist Code") is purportedly authored by someone named Alejandro Saucedo (details about whom SF has been unable to locate through internet searches).[19] The other piece, is from *e-consulta*, which calls itself a Mexican digital newspaper. (*See* Velazquez Art., Ex. G, Doc. No. 337-7.) Relying on this piece, AIC asserted that ███████████████████████████████ ██████████████████████████. (Doc. No. 337-3 at 7.) Yet, since the piece was published in February 2022—over two years ago—there has been no public announcement of any investigation, much less the bringing of criminal charges, involving GGyB.

Finally, the only other basis AIC identifies in its response to Interrogatory 10 for its

---

[18] Chapter 14 of the Book, concerning the *Cruz Azul* litigation in which GGyB was one of many law firms, contains similar unsourced and conclusory accusations, such as that GGyB "was in charge of promoting a series of selective accusations, in order to obtain various arrest warrants, several of which later ended up being quite flimsy." (Doc. No. 337-4 at X.)

[19] This piece contains illuminating statements such as: "Guillermo Barradas [a named partner at GGyB] has a history of being an attorney for special cases where his clients appear to have conflicts of interest and make the situation one where victims are harmed by abuse of power." (Saucedo Art., Ex. F, Doc. No. 337-6.) Illustrating the lack of actual evidentiary material submitted by AIC, this unsourced blog piece is itself cited by the Book's author in support of his own baseless allegations. (Saucedo Citation, Ex. D, Doc. No. 337-4 at 23.)

allegations of corruption consists of vague and self-serving assertions that ███████████

██████████████ (*see, e.g.*, Doc. No. 337-3 at 13 ████████████████████████

████████████████████████; *id.* at 9 █████████████████████████████████

██████████████████████████████████████████████████████████████

██████████ *id.* at 13 ████████████████████████████████████████

██████████████; *id.* at 16 ███████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████)). Of course, this type of vague and unsupported assertion is eons

away from evidentiary support for AIC's allegations.[20]

## C.  <u>The Counterclaim Violated Rule 11(b)(1)</u>

AIC is liable under Rule 11 because it filed the Counterclaim for an improper purpose.

Rule 11(b)(1) permits a court to sanction "a party or lawyer for … filing a lawsuit for some

improper purpose." *CQ Int'l.*, 659 F.3d at 60. The rule defines an "improper purpose" as "to harass

or to cause unnecessary delay or needless increase in the costs of litigation." Fed. R. Civ. P.

11(b)(1); *see also Unanue-Casal v. Unanue-Casal*, 898 F.2d 839, 842 (1st Cir. 1990); *Bay State*

*Towing Co. v. Barge Am. 21 (O.N. 517472)*, 899 F.2d 129 (1st Cir. 1990). Filing a claim for the

purpose of retaliation and intimidation constitutes an improper purpose.[21] *Wilhelm v. Wilhelm*,

---

[20] As explained in Note 4, *supra*, long after filing the Counterclaim, AIC first argued that the
Engagement Letter between SF and GGyB, which was produced during discovery, is evidence that
supports its allegations of corruption because it provides that GGyB (i) could use "arrest warrants,
asset embargoes, and other criminal process as leverage against AIC" and (ii) would be entitled to
a success fee. (Doc. No. 209 at 2-3.) But, contrary to AIC's assertions, the terms of the Engagement
Letter are not only legal but are typical in Mexico in cases involving commercial fraud. (*See*
Becerra Aff., Doc. No. 244-1 at 8.)   Even this newfound "evidence" does not support the
allegations of corrupt conduct by SF and its counsel.

[21] The fact that a party makes allegations lacking evidentiary support (or the prospect of it) counsels
in favor of finding improper purpose. *Kunstler v. Britt*, 914 F.2d 505, 519 (4th Cir. 1990). That is
because the filing of a baseless claim permits the inference that it "was filed either for the purposes
of harassment, or some purpose other than to vindicate rights through the judicial process." *Id.*

2010 WL 2640113, at *2 (D. Md. June 28, 2010).

An improper purpose may be inferred from the timing of a claim. *Id.*; *see also Giganti v. Gen-X Strategies, Inc.*, 222 F.R.D. 299, 313 (E.D. Va. 2004). And that a claimant would "sit back" and take no action for months is a "red flag" in the Rule 11 analysis. *Rivera-Molina v. Casa La Roca, LLC*, 2022 WL 1302130, at *5 (D.P.R. April 29, 2022). The timing of the Counterclaim here is not just a red flag, but a red flare. AIC alleges that the Arrest Warrants and Embargo have caused it "grievous harm." (Countercl., Doc. No. 14 at ¶ 35.) Yet, AIC never asserted in a court proceeding or publicly that these orders were the result of corruption until it asserted the Counterclaim in April 2023—six months after the issuance of the Arrest Warrants and only after it was sued here by SF. (*See id.*) This delay is all the more damning because AIC and its employees sought review of the issuance of the orders—yet never asserted that they were the result of corruption. (*See* Doc. No. 263-2.) AIC's failure to seek relief in Mexico (or anywhere else), despite its claim of ongoing "grievous" harm, demonstrates the improper purpose of the Counterclaim.[22]

## III.   <u>CONCLUSION</u>

AIC has effectively conceded that it lacks evidentiary support for the Corruption Allegations. Instead, it relied on unsupported allegations in the Book which, in turn, parroted unsupported and unproven allegations made in an unrelated case by AIC's counsel, QE (who failed to disclose this critical fact to the Court). This conduct is precisely why Rule 11 was enacted. *CQ Int'l*, 659 F.3d at 62 (Rule 11's central purpose is to "deter baseless filings").

---

[22] AIC is a corporation with deep financial and legal resources, with vast experience in Mexico since 1996. (*See* Advent International, Mexico, available at https://www.adventinternational.com/global-reach/mexico/, last accessed Mar. 22, 2024.) And it obviously has a belief in the integrity of the Mexican judiciary, given that in January 2021, it agreed to the SPA being subject to the laws of Mexico and that all disputes would be venued in Mexico City. (Doc. No. 235-1 at ¶ 22.)

Dated: March 22, 2024                          Respectfully submitted,

**LESSER, NEWMAN, ALEO & NASSER LLP**          **BOIES SCHILLER FLEXNER LLP**
Michael Aleo                                   By: /s/ *Carlos M. Sires*
Thomas Lesser                                  David Boies*
39 Main Street, Suite 1                        Brooke A. Alexander*
Northampton, MA  01060                         333 Main Street
Telephone: (413) 584-7331                      Armonk, NY  10504
Facsimile: (413) 586-7076                      Telephone:  (914) 749-8200
aleo@LLN-law.com                               Facsimile:  (914) 749-8300
lesser@LLN.law.com                             dboies@bsfllp.com
                                               balexander@bsfllp.com

*Counsel for Plaintiff / Counter-Defendant,*   Carlos M. Sires*
*Servicios Funerarios GG, S.A. de C.V.*        401 East Las Olas Blvd., Suite 1200
                                               Fort Lauderdale, FL 33301
                                               Telephone: (954) 356-0011
                                               Facsimile: (954) 356-0022
                                               csires@bsfllp.com

                                               *Counsel for Plaintiff / Counter-Defendant,*
                                               *Servicios Funerarios GG, S.A. de C.V.*


                                               *Indicates attorney admitted pro hac vice

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing document was served on all counsel of record via electronic mail on the date below pursuant to Rule 5 and Rule 11(c)(2).

Date:   March 22, 2024                                              By: <u>/s/ *Carlos M. Sires*     </u>
                                                                                    Carlos M. Sires

## <u>CERTIFICATE OF SERVICE</u>

I, Carlos M. Sires, hereby certify that the above was filed through the ECF system and that I have caused a true and correct copy of the above to be served on Plaintiff's counsel.

Date:   April 22, 2024                                              By:<u>/s/ *Carlos M. Sires*</u>
                                                                                    Carlos M. Sires

22