# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SERVICIOS FUNERARIOS GG, S.A. DE C.V., | |
| Plaintiff, | |
| v. | |
| ADVENT INTERNATIONAL CORPORATION, | |
| Defendant, | |
| and | Civil Action No. 23-cv-10684-IT |
| ADVENT INTERNATIONAL CORPORATION, | |
| Counterclaim-Plaintiff, | |
| v. | |
| SERVICIOS FUNERARIOS GG, S.A. DE C.V., | |
| Counterclaim-Defendant. | |

## DEFENDANT AND COUNTERCLAIM-PLAINTIFF ADVENT INTERNATIONAL, L.P.'S OPPOSITION TO SERVICIOS FUNERARIOS' MOTION FOR SANCTIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11

**TABLE OF CONTENTS**

**Page**

BACKGROUND ................................................................................................................ 2

    A.    After SF and Fibra Uno Purchased Gayosso From Advent Affiliates, SF
Initiated Civil and Criminal Proceedings.................................................... 2

    B.    AIC Challenged SF's Abusive Tactics In Its Counterclaims.................................. 4

    C.    AIC Rigorously Justified The Allegations In Its Counterclaims ........................... 4

        1.    *SF's Counsel Is Notorious for the Precise Abuses AIC Suffered Here* ...... 5

        2.    *The Criminal Proceedings Are Incompatible With Legitimate Process* ..... 5

        3.    *SF's Conduct Is Incompatible With Its Fraud Claims* ............................... 7

    D.    Subsequent Evidence Has Confirmed the Allegations in the Counterclaims ........ 7

    E.    The Court Affirmed the Sufficiency of AIC's Interrogatory Responses.............. 10

    F.    SF's Frivolous Rule 11 Motion ........................................................................ 10

I.      AIC'S COUNTERCLAIMS ARE SUPPORTED BY EXTENSIVE EVIDENCE.......... 12

    A.    AIC Had Ample Basis for the Allegations in its Counterclaims ......................... 12

    B.    Subsequent Evidence Has Only Bolstered AIC's Claims.................................... 14

    C.    SF's Motion Is Further Meritless Because All Direct Evidence of SF's Abuse
Is Within SF or GGB's Sole Possession .......................................................... 17

II.    AIC BROUGHT ITS COUNTERCLAIMS FOR THE PROPER PURPOSE OF
RECOVERING DAMAGES ARISING FROM SF'S EGREGIOUS MISCONDUCT .. 17

III.    THE COURT SHOULD REJECT SF'S ATTEMPT TO OBTAIN A MERITS
RULING ON AN INCOMPLETE RECORD ................................................................ 18

IV.    SF SHOULD BEAR AIC'S FEES FOR OPPOSING SF'S FRIVOLOUS MOTION..... 19

## <u>TABLE OF AUTHORITIES</u>

<b><u>Page(s)</u></b>

### <u>Cases</u>

*Allscripts Healthcare, LLC v. DR/Decision Res., LLC*,
  495 F. Supp. 3d 47 (D. Mass. 2020) ....................................................................11, 18, 19, 20

*Am. Modern Home Ins. Co. v. United Yacht Sales*,
  2017 WL 5760914 (D. Mass. Sept. 7, 2017) .................................................................11, 18

*Anaqua, Inc. v. Schroeder*,
  2014 WL 1795310 (D. Mass. May 5, 2014).........................................................................11

*Anderson v. Cryovac, Inc.*,
  96 F.R.D. 431 (D. Mass. 1983)............................................................................................17

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*,
  633 F.2d 583 (1st Cir. 1980)................................................................................................16

*Chadwick v. WellPoint, Inc.*
  561 F.3d 38 (1st Cir. 2009)..................................................................................................13

*Citibank Glob. Mkts., Inc. v. Rodriguez Santana*,
  573 F.3d 17 (1st Cir. 2009)............................................................................................11, 12

*Colella v. Androus*,
  2024 WL 1239697 (D.D.C. Mar. 22, 2024).........................................................................19

*CQ Int'l Co. v. Rochem Int'l, Inc., USA*,
  659 F.3d 53 (1st Cir. 2011)......................................................................................11, 14, 17

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003)...............................................................................................................13

*Doe v. Brown Univ.*,
  166 F. Supp. 3d (D.R.I. 2016)..............................................................................................13

*Doe v. Salisbury Univ.*,
  123 F. Supp. 3d. 748 (D. Md. 2015).....................................................................................13

*EEOC v. Tandem Computers Inc.*,
  158 F.R.D. 224 (D. Mass. 1994)..........................................................................................20

*Lichtenstein v. Consol. Servs. Grp. Inc.*,
  173 F.3d 17 (1st Cir. 1999)......................................................................................14, 17, 20

*Rodick v. City of Schenectady*,
  1 F.3d 1341 (2d Cir. 1993)...................................................................................................11

*Safe-Strap Co., Inc. v. Koala Corp.*,
  270 F. Supp. 2d. 407 (S.D.N.Y. 2003).................................................................................19

*United States v. Weiner*,
  3 F.3d 17 (1st Cir. 1993)......................................................................................................13

*Xiao Wei Catering Linkage in Inner Mong. Co. v. Inner Mong. Xiao Wei Yang*
   *USA, Inc.*,
   2018 WL 1567604 (D. Mass. Mar. 30, 2018)............................................................1

## **Rules**

Fed. R. Civ. P. 8(a) ..................................................................................................14

Fed. R. Civ. P. 11 .............................................................1, 2, 10, 11, 13, 14, 17, 18, 19, 20

Fed. R. Civ. P. 11(b)(3)..............................................................................................13

Fed. R. Civ. P. 11(c)(2)..............................................................................................19

Fed. R. Civ. P. 56 .....................................................................................................19

## **Other Authorities**

Restatement (Third) of the Law Governing Lawyers § 35, cmt. f(ii) (2000) 15

Defendant and Counterclaim-Plaintiff Advent International, L.P. f/k/a Advent International Corporation ("AIC," together with its affiliates, "Advent") respectfully submits this opposition to Plaintiff and Counterclaim-Defendant Servicios Funerarios GG, S.A. de C.V.'s ("SF") motion for sanctions pursuant to Federal Rule of Civil Procedure 11 (the "Motion").

## INTRODUCTION

"[F]alsely accusing opposing counsel of misconduct is sanctionable under [Rule] 11." *Xiao Wei Catering Linkage in Inner Mong. Co. v. Inner Mong. Xiao Wei Yang USA, Inc.*, 2018 WL 1567604, at *6 (D. Mass. Mar. 30, 2018). Yet that is exactly what SF has done here. Though it ostensibly seeks to unmask AIC's Counterclaims as "baseless," the Motion reveals the opposite. SF spends half of its brief (and six of seven exhibits) detailing just some of the substantial evidence AIC has *already identified* to support its allegations that SF illegitimately procured extortionate criminal sanctions against AIC. SF asks the Court to simply ignore this evidence—to say nothing of what AIC may yet uncover in discovery—and instead accept at face value SF's contrived assertions that the allegations are false. What the evidence *already* shows is that SF hired criminal counsel notorious for using friendly judges to obtain extortionate arrest warrants and asset embargoes against its client's targets in civil disputes, incentivized that counsel to seek those exact measures against AIC's affiliates, and did so *knowing* AIC was innocent of the made-up fraud claims it has brought in Mexico and now in this Court. SF argues about how a factfinder might eventually weigh this evidence, but it falls woefully short of the extraordinary showing (*i.e.*, that AIC's allegations had *no hope of evidentiary support*) necessary to justify sanctions.

Unable to dispute the actual substance of AIC's Counterclaims, SF mischaracterizes AIC's allegations and shifts the goalposts, arguing that Rule 11 somehow required AIC to identify *each specific instance* in which SF took a "corrupt act." But AIC does not bear that burden even at trial, much less at the pleading stage. SF never specifies *what* sanctions it seeks—but its arguments that

AIC will never be able to support its Counterclaims implicitly request a *de facto* ruling that AIC's claims fail on the merits. The law is clear that such pseudo-dispositive relief is simply not available on a pre-judgment Rule 11 motion, and SF cannot cite a single case granting comparable relief.

Underscoring the futility of its Motion, SF raised identical arguments last year in a motion to compel a further response to interrogatories probing the evidentiary basis of AIC's counterclaims, threatening a Rule 11 motion on the same grounds. Judge Boal rejected those arguments, concluding that "[a]fter review of AIC's response [explaining the evidentiary basis for the Counterclaims], ***I find that it is sufficient at this time.***"  SF provides no reason that is not the case today. The Court should deny SF's Motion and grant AIC its fees and costs for opposing it.

## **BACKGROUND**

### A.   After SF and Fibra Uno Purchased Gayosso from Advent Affiliates, SF Initiated Civil and Criminal Proceedings

This action concerns SF's 2021 purchase of Mexican funeral services company Grupo Gayosso S.A. de C.V. ("Gayosso") from entities affiliated with private equity funds managed by AIC (the "Sellers"). In 2019, SF's principal Pablo Peña approached AIC's Mexican affiliate ("Advent Mexico") on behalf of the El-Mann family—wealthy real estate investors for whom Pablo Peña has long served as an investment banker and business representative—to explore a bid to purchase Gayosso. Doc. No. 14 ("Countercls.") & Doc. No 34 ("Ans.") ¶¶ 70, 72, 90. Shortly thereafter, SF was formed as an acquisition vehicle. *Id.* ¶¶ 70–72. At the time, Pablo Peña's brother Carlos worked for Advent Mexico and sat on Gayosso's board of directors (and its finance committee). Carlos Peña, who was by far the most knowledgeable Advent employee concerning Gayosso's finances, managed the day-to-day sale and diligence process from the Advent side.

Before signing a Stock Purchase Agreement ("SPA") with the Sellers, SF conducted seven months of due diligence, aided by sophisticated legal, accounting, and financial advisors—

including Gayosso's then-auditor Ernst & Young—who scoured Gayosso's accounting practices and financial condition. *Id.* ¶¶ 100–01. After signing the SPA, SF engaged in ten additional months of due diligence before closing, amending the terms of the sale three times. *Id.* ¶ 107. In the end, the El-Manns' investment trust Fibra Uno financed more than half of the transaction by purchasing Gayosso's real estate assets and leasing them back to SF. *Id.* ¶ 144. SF paid just under USD 51 million to Advent funds to acquire Gayosso's operations. *See id.* ¶ 143.

The transaction closed on January 28, 2021. Shortly after purchasing Gayosso, SF began a campaign to extort AIC based on false claims that AIC fraudulently inflated Gayosso's value during the sale process. In November 2021, SF sent a demand letter threatening criminal action if AIC did not pay SF approximately USD 116 million—an amount far in excess of the Sellers' contractual liability for false financial statements (and more than double the total amount SF paid to acquire Gayosso). *Id.* ¶¶ 126–32. The letter advertised that SF had retained García González y Barradas ("GGB"), a criminal law firm well known in Mexico (and to AIC's counsel) for leveraging connections with criminal prosecutors and judges to extort its clients' counterparties in civil litigation.[1] *Id.* ¶¶ 21–22. When AIC refused to succumb, SF commenced an escalating series of scorched-earth tactics—filing civil and criminal complaints in Mexico City courts; obtaining criminal arrest warrants and seeking Interpol Red Notices for Advent affiliates including James Westra, who was, at the time, AIC's Boston-based general counsel (the "Targeted Employees"); freezing hundreds of millions of dollars in assets owned by AIC-managed funds unrelated to the Gayosso transaction; and bringing this action in Massachusetts. But as SF knows, and AIC will prove at trial, SF's fraud allegations are false.

---

[1] GGB had previously represented members of the El-Mann family in a financial crime investigation by the Mexican Attorney General, and secured the El-Manns an unusually favorable resolution. Doc. No. 145 ("AIC R&Os") at 10–11.

### B.      AIC Challenged SF's Abusive Tactics In Its Counterclaims

By suing AIC in Massachusetts, SF voluntarily submitted to the jurisdiction of a U.S. court. AIC—which for good reason had not appeared in Mexican court—readily availed itself of the opportunity to hold SF accountable in an impartial forum, recover its damages, and clear its name. AIC alleged that SF's frivolous civil and criminal complaints against AIC and its affiliates give rise to tort and statutory liability under Massachusetts and Mexican law.  Countercls. ¶¶ 244–291. Based on a substantial body of evidence, much of it laid out in the Counterclaims themselves, AIC further alleged on information and belief that SF and its counsel influenced the Mexican prosecutors and judges—each of whom is reportedly part of an illicit network that includes SF's criminal counsel—to issue the unlawful arrest warrants and asset embargoes "by use of illegitimate means."  Countercls. & Ans. ¶¶ 181, 193, 195, 206, 214, 257.[2]  SF answered AIC's Counterclaims without moving to dismiss, admitting numerous key facts—including its direct responsibility for causing the Mexican prosecutor to initiate criminal proceedings against the Targeted Employees and to seek arrest warrants and asset embargos against AIC's affiliates.  Countercls. & Ans. ¶ 23.

### C.      AIC Rigorously Justified the Allegations in Its Counterclaims

AIC had overwhelming evidence for the challenged allegations in its Counterclaims. Among other detailed allegations: (i) SF's criminal law firm GGB is notorious for the exact type of abuse that occurred here; (ii) the Mexican criminal proceedings were rife with such significant irregularities that the outcomes could reasonably be explained only by malfeasance; and (iii) SF's

---

[2] SF makes a concerted effort to mischaracterize these and similar allegations—which it refers to as the "Corruption" allegations even though the Counterclaims never use that term—as an assertion that "SF's Mexican counsel could corruptly guarantee SF would prevail on its fraud claims in Mexican courts."  Mot. 1.  The Counterclaims detail SF's abuse of interim measures like arrest warrants and asset embargoes for settlement leverage (according to its counsel's established playbook) but never claim that SF's counsel could "corruptly guarantee" a final judgment.

conduct—including the inexplicable decision to hire Carlos Peña as Gayosso's CEO while pursuing criminal sanctions against the Targeted Employees—is incompatible with a good-faith belief that AIC or the Targeted Employees are guilty of the civil or criminal fraud SF has alleged.

### 1.     *SF's Counsel Is Notorious for the Precise Abuses AIC Suffered Here*

GGB's influence over the Mexican judiciary—and abuse of that influence for leverage in civil disputes—has been widely documented in the Mexican press.[3]  *See, e.g.*, Exs. A–F.  Indeed, the Mexican Attorney General is reportedly investigating GGB for extorting criminal defendants in exchange for dismissing the charges against them.  Ex. G.  That SF selected, advertised, and deployed GGB to secure coercive criminal measures against AIC's affiliates was itself indicative of impropriety, and subsequent evidence has bolstered those allegations.  *See infra* Background D.

### 2.     *The Criminal Proceedings Are Incompatible With Legitimate Process*

The criminal proceedings through which SF and GGB secured the arrest warrants and asset embargoes suffered from severe deficiencies inconsistent with impartial process.[4]  For instance:

- The criminal judge granted the prosecutor's request for an arrest warrant hearing within an hour and held the hearing the same day.  Countercls. ¶ 196.  The judge then issued the warrants without holding a charging hearing and opportunity for the Targeted Employees or their counsel to be heard, absent any of the exceptional circumstances necessary to justify such a measure under Mexican law.  *Id.* ¶¶ 202–03; *see* Doc. No. 145 ("AIC R&Os") at 12–15.

---

[3] As SF points out (Mot. 16–18), AIC's counsel has firsthand experience with GGB's underhanded tactics in other matters, underscoring the adequacy of AIC's pre-filing investigation.

[4] In addition to the stark parallels to other recent instances of abuse, *see* AIC R&Os at 8–10, SF and GGB's ability to influence the Mexican judiciary is consistent with reports by reputable institutions.  It is well documented that courts in Mexico are "susceptible to improper influence by both private and public entities, particularly at the state and local level," Ex. R (U.S. State Dep't Country Report), that "the Mexican judicial system is affected by persistent structural issues such as corruption," Ex. Q (OECD Policy Review), and that businesses in particular "face a high corruption risk when dealing with the judiciary in Mexico," Ex. P (Gan Integrity Report summarizing evidence from the World Economic Forum).  Mexico ranks 136 out of 142 in the World Justice Project's list of countries in which the criminal system is free of corruption.  Ex. S.

- The judge also issued the warrants with insufficient legal basis to determine that the Targeted Employees "probably" committed fraud, a violation of Mexican law. He also based his reasoning on evidence not presented orally by the prosecutor, another unambiguous violation. In a particularly egregious example, the judge issued an arrest warrant against Mr. Westra, AIC's longtime general counsel, on the basis that he had been hired specifically to "verify [Gayosso's] financial situation."—an indisputably false claim, never alleged by SF or the prosecutor. Countercls. ¶ 200; AIC R&Os at 14–15. It also defies common sense that Mr. Westra—a lawyer who does not speak Spanish—would be "hired to verify" the "financial situation" of a company that conducts its business in Spanish and has its financial statements prepared in Spanish

- The same judge granted the asset embargo later that day, again with no notice or opportunity to be heard, after a hearing that lasted less than 10 minutes. This extreme brevity was itself unusual because it is facially insufficient for the prosecutor to orally present all evidence necessary to justify the embargo, as Mexican law requires.[5] The result was further suspicious because a Mexican civil court had just denied SF's request for the same embargo on the same facts, and that denial was upheld on appeal. Countercls. & Ans. ¶ 174; AIC R&Os at 15–16. Only when GGB sought an identical embargo from a friendly prosecutor and judge was it granted. Countercls. ¶ 180.

- At the hearing, the prosecutor made material misrepresentations and omissions to inflate SF's potential damages. For example, the prosecutor falsely claimed that SF had funded the entire transaction and could recover the full USD 200 million purchase price—contradicting the plain terms of the SPA, which set the price for SF's portion of the transaction at around USD 50 million. The prosecutor also failed to inform the Court that AIC-managed investment partnerships had guaranteed the Sellers' indemnity obligations under the SPA, up to Gayosso's full enterprise value (four times what SF paid), obviating any need to secure further assets. Countercls. & Ans. ¶¶ 133–39; *see* AIC R&Os at 16–18.

- The embargoed assets belonged to AIC affiliates that (i) had no relation to the Gayosso transaction, Countercls. & Ans. ¶¶ 15, 171–72, and (ii) were not under investigation, in clear violation of Mexican law, *id.* ¶¶ 183–88.

- The judge, who typically grants hearings with defense counsel as a matter of course, refused all efforts to be heard in connection with the arrest warrants or asset embargoes. Countercls. ¶ 201.

The judge and prosecutor's rush to issue the extreme measures SF requested, no matter how flawed the basis, is strong circumstantial evidence of GGB's improper influence.

---

[5] A reporter familiar with the embargo hearing observed that the Court "seized Advent companies without . . . legal justification" and condemned the proceeding as "a judicial abomination." Ex. H; *see also* AIC R&Os at 18.

3.      *SF's Conduct Is Incompatible With Its Fraud Claims*

Finally, SF's actions are irreconcilable with a genuine belief that AIC committed fraud. Despite claiming in litigation that AIC misrepresented Gayosso's financial condition, SF did not pursue criminal claims against Carlos Peña—the Advent employee most heavily involved in both Gayosso's financial reporting and negotiations with SF—or even mention his name in any of its civil or criminal complaints.  *See* Countercls. & Ans. ¶ 164.  Instead, after the transaction closed, SF immediately *hired* Carlos Peña as Gayosso's CEO, keeping him in that position well after SF accused AIC of fraud.  Countercls. & Ans. ¶¶ 162–163; *see also* Ex. T (SF's June 5, 2023 R&Os) at 29 (confirming Peña has been either Gayosso's CEO or Executive President at all times since closing).  SF likewise kept Gayosso's CFO Octavio Trejo, who was responsible for the allegedly fraudulent financial statements, in his position for years after the transaction closed.  Countercls. & Ans. ¶¶ 162–163; *see also* Ex. T (SF's June 5, 2023 R&Os) at 31 (confirming Trejo remained Gayosso's CFO through February 2023).  It would have been impossible for AIC to defraud SF without Peña and Trejo's direct participation; that SF put and kept them *in charge of Gayosso* proves that SF knew its civil and criminal claims were meritless when filed.  That SF sought arrest warrants against *other* Advent personnel with *far less* involvement in the allegedly fraudulent financial statements demonstrates it did so only for leverage.

D.      **Subsequent Evidence Has Confirmed the Allegations in the Counterclaims**

The additional evidence that has come to light since AIC filed its Counterclaims further demonstrates that AIC's allegations were well-founded.  *First*, in June 2023, Mexican political analyst Hernán Gómez Bruera published a book documenting abuses of the Mexican justice system by an established network of lawyers, prosecutors, and judges in Mexico City, including GGB.  *See* Ex. L, Hernán Gómez Bruera, *Traicion En Palacio: El Negocio De La Justicia En La 4T* (Grijalbo 2023) (hereinafter, "*Treason in the Palace*" or *Gómez*).  The book confirms that using

7

arrest warrants and asset embargoes as leverage in commercial disputes is part of an established "modus operandi" that GGB has used repeatedly on behalf of its clients, relying on a consistent network of friendly Mexico City prosecutors and judges known to enable its illicit schemes. *See Gómez* 163–87; 220–39. In explaining the operation of this network, Gómez identifies *by name*:

- Andrés Maximino Pérez Hicks, the prosecutor who requested the arrest warrants and asset embargoes against AIC's affiliates, who has demonstrated a willingness to request similar warrants and embargoes based on demonstrably false information in past cases. *Gómez* 178–79 & Fig. 3, 222–23; *see* AIC R&Os at 7.

- Judge Júpiter López Ruíz, who issued the arrest warrants and asset embargoes, is named as one of the most "conspicuous" judges willing to rubber-stamp GGB's requests. Judge Héctor Fernando Rojas Pacheco, who extended the asset embargo, is also named. *Gómez* 128, 179 & Fig. 3, 185–86, 237; *see* AIC R&Os at 7.

- The court that issued the warrants and embargoes in this case, the *amparo* (federal constitutional) court that denied reconsideration of the asset embargo, and the appellate court that affirmed that denial. *Gómez* 184–87; *see* AIC R&Os at 7.

*Second*, SF's productions demonstrate that SF hired GGB precisely to take advantage of its influence and well-worn playbook. For instance, SF's engagement letter with GGB (belatedly produced in November 2023) expressly provides that GGB will ███████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████ *See* Doc. No. 209-1

(Engagement Letter); *see also* Doc. No. 209 (AIC brief discussing same). ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* SF even agreed to pay GGB

*a* █████████████ *success fee* ████████████████████████████████████

████████████████████████████████ *Id.*

Other produced documents similarly confirm SF's coercive intent. ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████  *See* Ex. W.

*Third*, discovery has confirmed AIC's allegations that SF, GGB, and the Mexican prosecutor sought arrest warrants on false pretenses. When asked in an interrogatory to provide "the complete factual and legal basis" for targeting AIC-affiliated employees, SF offered only two- or three-sentence responses reciting each individual's job title and a description of their purported duties—*with no specific allegations of wrongdoing*. *See* Doc. No. 188 at 7–9. For instance, SF's "complete factual and legal basis" for targeting Mr. Westra was that he "was a Managing Partner of AIC and the General Counsel of AIC. He was a lead negotiator on the sale of Gayosso's shares, including with respect to the false representations made in the SPA." Dkt. 76-4 at 3–4. Even these barebones responses had no support. Mr. Westra indisputably was not a "lead negotiator" in the Gayosso transaction, and SF *has not produced a single document* suggesting that he held such a role (or had any involvement whatsoever in preparing Gayosso's financial statements). Doc. No. 188 at 9. Nor has SF ever attempted to defend the judge's unmistakably false statement that Mr. Westra was hired to "verify [Gayosso's] financial situation." *See supra* Background C(2).

*Fourth*, the Mexican prosecutor's conduct *in this litigation* illustrates GGB's undue influence. While AIC has been unable to obtain an audience with the prosecutor's office, the prosecutor has provided letters *on a two-day turnaround* to support SF's efforts to avoid disclosing its copy of the Mexican criminal file. Doc. No. 168 at 1–2; *see* Doc. Nos. 148-1 & 195-3. The prosecutor went so far to conceal this evidence from AIC that even SF was forced to acknowledge before this Court that it "disagrees with the prosecutors' view of the law." Doc. No. 318-1 at 5.

### E.      The Court Affirmed the Sufficiency of AIC's Interrogatory Responses

In July 2023, SF served its Second Set of Interrogatories on AIC, seeking "the complete factual and legal basis . . . for the allegations in the Counterclaim that [SF] used 'illegitimate means' . . . in connection with the Mexican criminal justice system" as well as "each instance" in which SF did so.  AIC R&Os at 2–3, 19.  AIC responded by detailing nearly 20 pages of evidence in support of its Counterclaims.  *See generally* AIC R&Os.

Purportedly unsatisfied with this comprehensive recitation, SF moved to compel an even more detailed response.  Doc. No. 174.  SF's motion raised substantially all of the arguments it makes here—including that AIC "lacks any evidence that [SF] or its Mexican counsel engaged in corrupt practices," "regurgitat[es] unsourced accusations in a Mexican political muckraking book," and references the *Oro Negro* litigation in which a different client of Quinn Emanuel was the victim of similar misconduct by SF's criminal counsel.  Doc. No. 174 at 13–14.  At a subsequent hearing before Judge Boal, SF's counsel expressly threatened to seek Rule 11 sanctions if AIC could "come up with nothing" to support its Counterclaims, arguing that "[i]f the Court looks at [AIC's interrogatory responses], it will be clear there's no substance to it."  Ex. V (Nov. 6, 2023 Hr'g Tr.) at 21–22.  The Court disagreed.  Following extensive briefing and a further hearing on the adequacy of AIC's response, Judge Boal denied SF's motion in relevant part, ruling that "**[a]fter review of AIC's response, I find that it is sufficient at this time.**"  Doc. No. 232 (MTC Order) at 3 (emphasis added).  SF did not object to Judge Boal's Order.

### F.      SF's Frivolous Rule 11 Motion

After Judge Boal definitively rejected SF's challenge to AIC's interrogatory responses, SF made no further mention of Rule 11 sanctions for months—that is, until after AIC filed its own sanctions motion against SF on February 23.  *See* Doc. No. 274.  AIC brought that motion in response to SF's brazen lack of candor to AIC and the Court in attempting to avoid key discovery

into the abuses of process that gave rise to AIC's Counterclaims.  In opposing AIC's motion to compel production of the Mexican prosecutor's criminal investigative file, SF had repeatedly indicated that AIC was a third-party to the Mexican criminal action, rather than a defendant entitled to access the file.  Doc. No. 274 at 7–9.  This proved to be false—***SF itself*** had caused the prosecutor to add AIC as a defendant without ever informing AIC.  *Id.* at 10.  AIC's motion for sanctions remains pending.

SF now dusts off the same arguments Judge Boal rejected and repackages them into a Rule 11 motion—which it served mere hours after AIC filed its reply supporting its sanctions motion.  The timing reveals much.  There is no legitimate explanation for SF's decision to file such a patently frivolous motion now, in the middle of discovery, after taking no action for *four months* after the Court affirmed the sufficiency of AIC's interrogatory responses and *a year* after AIC filed its Counterclaims.

## LEGAL STANDARD

"Rule 11 sanctions [are] a remedy that should not be employed lightly."  *Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 495 F. Supp. 3d 47, 49–50 (D. Mass. 2020); *see Am. Modern Home Ins. Co. v. United Yacht Sales*, 2017 WL 5760914, at *7 (D. Mass. Sept. 7, 2017).  As movant, SF bears the heavy burden to prove a Rule 11 violation has occurred, *Anaqua, Inc. v. Schroeder*, 2014 WL 1795310, at *3 (D. Mass. May 5, 2014), and "district courts should resolve all doubts in favor of the signer," *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993).

To satisfy Rule 11, "[i]t is not necessary . . . that an investigation into the facts be carried to the point of absolute certainty.  Rather, it is sufficient if a factual contention will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  *CQ Int'l Co. v. Rochem Int'l, Inc., USA*, 659 F.3d 53, 63 (1st Cir. 2011) (citation omitted).  As the First Circuit has repeatedly affirmed, Rule 11 is not a "strict liability provision."  *Citibank Glob. Mkts.,*

*Inc. v. Rodriguez Santana*, 573 F.3d 17, 32 (1st Cir. 2009). Rather, "[a] showing of at least culpable carelessness is required before a violation of the Rule can be found." *Id.*

<u>**ARGUMENT**</u>

The Court should deny SF's frivolous Motion. Even a cursory reading of AIC's Counterclaims and interrogatory responses shows AIC's claims are based on extensive evidence. Nor can SF substantiate the absurd proposition that AIC pursued its Counterclaims, which were brought "in response to [SF's] flagrant abuse of the Mexican criminal justice system," Countercls. ¶ 1, for an improper purpose. Even beyond these substantive faults, the Motion also fails because, by attempting to litigate the validity of AIC's evidence, SF seeks what amounts to a merits ruling in the middle of discovery—an end-run around dispositive-motion practice that courts uniformly reject. The Court can deny SF's retributive Motion on any one of these grounds, but mere denial is an insufficient response to SF's vexatious conduct. SF's threadbare arguments (already rejected by the Court once) were doomed long before SF ever sought sanctions, and the Court should award AIC its fees and costs for having to oppose them.

I.      **AIC'S COUNTERCLAIMS ARE SUPPORTED BY EXTENSIVE EVIDENCE**

Contrary to SF's accusations, AIC's claims have always had extensive factual support. Subsequent revelations about SF and GGB's conduct have only bolstered those allegations. SF's insistence that AIC needed *even more* evidence before bringing claims is contrary to law, and its position rings particularly hollow because SF controls the direct evidence of its own misconduct.

A.      **AIC Had Ample Basis for the Allegations in its Counterclaims**

SF's assertion (Doc. No. 338 ("Mot.") at 10) that "[t]he Counterclaim fails to allege a single fact that supports AIC's . . . allegations of corruption by SF" is irreconcilable with the detailed allegations in AIC's pleadings. Though it would be impossible to replicate all of the nearly 50-page Counterclaims here (and AIC encourages the Court to read them), they set out detailed

evidence that SF knew AIC had not committed fraud, hired counsel notorious for extortionary tactics, and used that counsel to obtain extreme relief (that multiple civil judges had already denied) in criminal proceedings marred by procedural irregularities. *See supra* Background C. These unusual circumstances more than sufficiently support the conclusion that SF and GGB did not procure the arrest warrants and asset embargoes against AIC's affiliates legitimately.[6]

Though SF appears to dismiss anything less than a smoking gun as unfounded "speculation," Mot. 14, it is well established that the type of circumstantial evidence AIC *already has* is more than sufficient to support its claims. Indeed, *even at trial*, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Chadwick v. WellPoint, Inc.* 561 F.3d 38, 46 n.9 (1st Cir. 2009) (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)). The First Circuit's decision in *United States v. Weiner*, 3 F.3d 17, 21 (1st Cir. 1993), is particularly instructive. There, the Court held a defendant could be convicted of conspiracy to use "extortionate means" based "entirely on circumstantial evidence" concerning his decision to hire a debt collector who carried out extortive acts, even where the defendant offered a purportedly legitimate explanation for that evidence and denied knowledge of his agent's methods. *Id.* If that contested circumstantial evidence was enough to prove extortion

---

[6] Though it had ample basis to allege that SF and GGB procured arrest warrants and asset embargoes via illegitimate means, AIC still qualified such allegations as made "on information and belief" to reflect the difficulty of obtaining more direct evidence without discovery. *See Countercls.* ¶¶ 181, 193, 195, 206, 214, 257. Though SF claims (Mot. 13) that pleading "on information and belief" does not "specifically identify any factual contention [as one] for which it 'will likely' have support after discovery or further investigation," its own authority (Mot. 9) confirms otherwise. *See Doe v. Brown Univ.*, 166 F. Supp. 3d, 177, 190 (D.R.I. 2016) (pleading facts on information and belief "is a permissible way to indicate a factual connection that a plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis" (quoting *Doe v. Salisbury Univ.*, 123 F. Supp. 3d. 748, 768 (D. Md. 2015)); *see also* Rule 11 Advisory Committee Notes to 1993 Amendment (discussing Rule 11(b)(3)'s application to allegations "specifically identified as made on information and belief").

*beyond a reasonable doubt*, then AIC's evidence is *far beyond sufficient* to make allegations on information and belief at the pleading stage.

SF's only purported evidence that AIC lacked a reasonable basis for its allegations is that its interrogatory responses "failed to identify a single instance of illegal, improper, or illegitimate conduct by SF." Mot. 5, 8.  Setting aside that Judge Boal has already rejected that claim, *see supra* Background E, SF's contention is obviously false.  AIC's Counterclaims and interrogatory responses identified *numerous* instances in which SF acted improperly—including by bringing baseless fraud claims against AIC, authorizing its counsel to seek criminal arrest warrants, asset embargoes, and Interpol Red Notices against Advent affiliates, and providing inaccurate or incomplete information to the Mexican courts.  *See* Countercls. ¶¶ 147–219; AIC R&Os at 2–18, 20.  But in any event, AIC was not required to know *specific instances* in which SF acted unlawfully before filing its Counterclaims because direct evidence of individual acts is outside AIC's control.  *See infra* Argument I.C.  It would vitiate Rule 8(a)'s plausibility standard—and the fundamental principles underlying discovery—if Rule 11 required a plaintiff to have comprehensive proof of a defendant's secretive machinations before filing suit.  Of course, it does not.  *See CQ Int'l Co.*, 659 F.3d at 63 (affirming denial of Rule 11 sanctions where "obtaining further corroborating information may have been difficult"); *Lichtenstein v. Consol. Servs. Grp. Inc.*, 173 F.3d 17, 24 (1st Cir. 1999) (affirming denial of Rule 11 sanctions because "evidence of misconduct by [defendant], if it existed, would not necessarily have been known by [plaintiff].").

**B.      Subsequent Evidence Has Only Bolstered AIC's Claims**

Because AIC had ample grounds for its Counterclaims when it filed them, the Court need not reach SF's argument (Mot. 12–19) that AIC was unlikely to uncover further support after filing. If the Court does proceed to that question, though, the answer is plain: *AIC already has*.  Since AIC filed its Counterclaims: (i) discovery has uncovered still more evidence of SF's wrongdoing,

including an engagement letter authorizing and incentivizing GGB to use criminal measures as a lever for settlement; (ii) litigation has emphasized SF's unusually familiar relationship with the Mexican prosecutor; and (iii) *Treason in the Palace* has further connected SF and GGB's abuses in this case to a larger pattern of similar misconduct in which GGB has repeatedly engaged to obtain favorable commercial outcomes for its clients.  *See supra* Background D.

SF's responses to this evidence are plainly inadequate.  Addressing the engagement letter in which it offered GGB a ███████████ bounty ████████████████████████████████, SF weakly protests (Mot. 6 n.4) that success fees are not banned in Mexican criminal actions as they are in the United States.  But the mere fact that SF's conduct is not *per se illegal* does not change that SF incentivized GGB to use criminal process to obtain a settlement regardless of the merits—exactly AIC's allegations.  The concern about such perverse incentives is exactly why the U.S. uniformly prohibits such fees.[7]

SF also strains to discredit *Treason in the Palace*, but none of its arguments undermines the support the book lends to AIC's allegations, much less establishes that those allegations are *sanctionable*.  While SF blithely dismisses *Treason in the Palace* as a "muckraking book," its allegations have been taken seriously in Mexico.  Its descriptions of "extortion, influence peddling and depravity of justice" have been discussed in the news, *see* Ex. I, and journalists and politicians have cited *Treason in the Palace* by name in discussing corruption concerns in connection with the upcoming Mexican presidential election, s*ee, e.g.*, Exs. J–K.  Indeed, the president of the Mexican Federal Judiciary Council recently ordered a wide-ranging investigation into corruption in Mexico City Courts, Ex. O (investigation order), specifically including the *Cruz Azul* litigation

---

[7] *See* Restatement (Third) of the Law Governing Lawyers § 35, cmt. f(ii) (2000) ("Fees contingent on success in prosecuting a criminal case violate public policy.").

in which Gómez reports GGB "was in charge of promoting a series of selective accusations, in order to obtain various arrest warrants." Mot. 18 n.18.  This attention is unsurprising:  Gómez is a respected researcher, professor, and journalist with a Ph.D., whose analyses of Latin American law and politics have been published in other reputable outlets like the *New York Times*, *see* Ex M; the book itself was published by a reputable division of Penguin Random House, *Gómez* at PDF p. 8; and its analysis of the Mexican judicial system is based on *80 interviews with government officials and litigants*.[8]  *Id.* at 11.  SF may not like what *Treason in the Palace* has to say, but it has presented no basis to doubt the book's legitimacy.

SF's argument (Mot. 14) that Gómez does not specifically "mention SF, [its principal] Pablo Peña, [or] the Gayosso transaction" deliberately misses the point.  SF's tactics here *precisely mirror* those GGB has deployed in prior extortion schemes involving *the same prosecutor and judges*, raising a strong inference that it continued the pattern here.  (Indeed, Gómez reached the same conclusion when he wrote about the parallels between the Gayosso transaction and his prior reporting. Ex. N.)  What's more, the book specifically identifies SF's co-buyers in the Gayosso transaction (longtime associates of SF's principal) among GGB's former clients—suggesting at least one way SF may have known to retain them.

*Finally*, SF's stale speculation (Mot. 17) that Quinn Emanuel is the source of Mr. Gómez's reporting because another of its clients was subject to GGB's abusive conduct in the *Oro Negro* litigation is both false and irrelevant.  AIC and its counsel have *repeatedly* confirmed that they had no role in the book's authorship or publication.  *See* Doc. No. 188.  And, of course, the book's

---

[8] SF derides Gómez for keeping his sources confidential, Mot. 15, but that is common in journalism, particularly where publishing sources' names could endanger them.  *Cf. Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 596 (1st Cir. 1980) (noting in defamation context "that journalists have a federal common law privilege . . . to refuse to divulge . . . sources").

reporting on GGB's conduct extends to additional instances—like the Cruz Azul litigation presently under investigation by the Mexican authorities—in which Quinn Emanuel had no involvement whatsoever.  To be sure, it is unfortunate that multiple of Quinn Emanuel's clients are victims of GGB's abuse, but that common experience is evidence *supporting* AIC's allegations, not a basis to disregard them.

### C.     SF's Motion Is Further Meritless Because All Direct Evidence of SF's Abuse Is Within SF or GGB's Sole Possession

SF's mid-discovery attempt to discredit AIC's allegations fails for yet another reason: SF controls the remaining evidence of its misconduct.  Multiple motions to compel additional documents from SF remain pending, Doc. Nos. 173, 295, as does SF's objection to Judge Boal's order to produce the criminal file, Doc. No. 195, a key piece of evidence (highly relevant to the Counterclaims) that SF has continued to withhold.  Further, *since SF served the Motion*, it  has made multiple additional productions totaling over 8,000 documents and 36,000 pages.  It would be a perverse outcome if parties like SF could head off efforts to hold them accountable by concealing their abuses and brandishing Rule 11 to deter their victims from bringing claims.  *See Anderson v. Cryovac, Inc.*, 96 F.R.D. 431, 431 (D. Mass. 1983) ("Rule 11 should not be used [] to harass the serious litigant whose claim may depend upon circumstantial evidence and may not be fully developed at the time that the complaint is filed.").  That is precisely why the Rule 11 inquiry accounts for the "difficulty[] of access to the requisite information" and rejects sanctions where evidence "would not necessarily have been known," *Lichtenstein*, 173 F.3d at 23, or "obtaining further corroborating information may have been difficult," *CQ Int'l*, 659 F.3d at 63.

## II.     AIC BROUGHT ITS COUNTERCLAIMS FOR THE PROPER PURPOSE OF RECOVERING DAMAGES ARISING FROM SF'S EGREGIOUS MISCONDUCT

SF's two-paragraph accusation (Mot. 19–20) that AIC filed the Counterclaims "for an improper purpose" is nonsense.  As AIC long ago explained, it "br[ought] the[] counterclaims in

response to [SF's] flagrant abuse of the Mexican criminal justice system." Countercls. ¶ 1. SF's only argument otherwise is that "AIC never asserted in a court proceeding or publicly that [the arrest warrants and asset embargoes] were the result of corruption until it asserted the Counterclaim . . . after it was sued [in Massachusetts] by SF." Mot. 19–20. But it is hardly suspicious that AIC declined to allege impropriety *before the very Mexico City courts involved in SF's misconduct*. When SF voluntarily submitted to the jurisdiction of an impartial court in Massachusetts just six months later, AIC filed its claims at the first opportunity. SF's imagined motive for the Counterclaims—to "avoid litigating the merits of SF's fraud claims," Mot. 1—is even more puzzling. SF offers no explanation for how AIC's allegations affect SF's ability to pursue its claims, particularly since AIC *is already litigating them*, including by producing tens of thousands of pages of discovery from the Advent employees who oversaw the Gayosso transaction.

## III. THE COURT SHOULD REJECT SF'S ATTEMPT TO OBTAIN A MERITS RULING ON AN INCOMPLETE RECORD

SF's meritless motion should be denied for yet another reason. Though styled as a request for sanctions, SF's brief often reads like a dispositive motion. SF asks the Court to find that AIC will never have a factual basis for its Counterclaims, Mot. 8, and then—paradoxically—spends over half its pages trying to explain away the *specific factual allegations and evidence* that already support them. Even without naming the specific sanctions it seeks, SF effectively asks the Court to weigh the record evidence and rule that AIC's claims lack merit—all before discovery concludes. That improper request misunderstands both Rule 11 procedure and AIC's claims.

*First*, it is well established that a "Rule 11 motion is not a proper substitute for a dispositive motion and should not be employed . . . to test the sufficiency or efficacy of allegations in the pleading." *Allscripts*, 495 F. Supp. 3d at 51–52; *see United Yacht*, 2017 WL 5760914, at *7

(same); *Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d. 407, 416 (S.D.N.Y. 2003) (same).[9] Where, as here, a Rule 11 motion "simply illuminates areas in which the parties disagree on the strength of specific evidence, the inferences to be drawn from information produced or revealed during discovery, and the application of the law to various facts . . . the 'better course' [is] a motion for summary judgment, not a motion for Rule 11 sanctions." *Colella v. Androus*, 2024 WL 1239697, at *7 (D.D.C. Mar. 22, 2024); *accord Allscripts*, 495 F. Supp. 3d at 52.

*Second*, there are very good reasons SF has *not* brought these arguments in a summary judgment motion. To start, any such motion would be premature, as document discovery remains ongoing and neither fact depositions nor expert discovery has even begun. But more fundamentally, *even the present record* precludes SF from establishing that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56; *see supra* Section I. The core of AIC's abuse-of-process claim is that SF has improperly used civil and criminal proceedings—legally instituted or not—to damage AIC's business and reputation for leverage in a business dispute, despite knowing that AIC has committed no crime. *See* Countercls. ¶¶ 244–268. The allegations that SF achieved these ends through GGB's improper influence (which, in any event, are well founded) are merely cumulative support for AIC's claims. The Court should reject SF's attempt to obtain a *de facto* merits ruling without meeting its burden at summary judgment or trial.

## IV.    SF SHOULD BEAR AIC'S FEES FOR OPPOSING SF'S FRIVOLOUS MOTION

Filing a patently meritless motion, as SF has done here, is itself sanctionable under Rule 11. *See* Fed. R. Civ. P. 11(c)(2) ("[T]he court may award to the prevailing party the reasonable

---

[9] SF *does not cite a single case* in which a Court issued Rule 11 sanctions for an allegedly frivolous pleading before the contested claims could be finally adjudicated. And to the extent SF seeks dismissal as a sanction, such relief would be unprecedented. *See Allscripts*, 495 F. Supp. 3d at 51 ("[T]his court was unable to locate a single instance where a court in this Circuit ordered a dismissal solely on the basis of a Rule 11 motion.").

expenses, including attorney's fees, incurred for the motion."). The Court should award AIC its fees for having to oppose SF's vexatious motion.

*First*, the motion is facially meritless. ***Not one*** of SF's cited decisions sanctioned a party for a purportedly frivolous pleading prior to final adjudication. Instead, the caselaw is clear that Rule 11 sanctions are best considered *after* final judgment, *Allscripts*, 495 F. Supp. 3d at 52, particularly "where the thrust of the sanctions motion is that institution of the case itself was improper," *Lichtenstein*, 173 F.3d at 23. But even on the merits, SF fails to substantiate its tired refrain that the Counterclaims have no basis in fact. *Supra* Background C, D & Argument I. To the contrary, the Motion cites, quotes, and even attaches volumes of evidence on AIC's behalf. *See, e.g.*, Mot. 18 nn. 18–19 (quoting report that SF's counsel "has a history of being an attorney for special cases where his clients . . . make the situation one where victims are harmed by abuse of power"). Based only on the evidence *it cited*, SF must have known it could not meet the extraordinary bar to justify sanctions—but it chose to waste the Court's time anyway.

*Second*, it is SF—not AIC—that filed its Motion for an improper purpose. AIC filed its Counterclaims more than a year ago, but SF has never moved for dismissal or judgment on the pleadings. AIC served its interrogatory responses justifying those claims *seven* months ago (and the Court confirmed their sufficiency two months later), but SF still did not serve its Rule 11 motion until late March, *right after AIC requested sanctions against SF* for its lack of candor. SF's only plausible motivations are retaliation, harassment, and intimidation (including an opportunity to further attack AIC in the press). That ill motive alone is sanctionable. *EEOC v. Tandem Computers Inc.*, 158 F.R.D. 224, 229 (D. Mass. 1994) (Rule 11 sanctions warranted for motion filed "to harass the [party] and its attorneys and/or to increase the cost of the litigation needlessly").

## CONCLUSION

The Court should deny SF's Motion and award AIC its fees and costs for opposing it.

Dated: May 6, 2024

Respectfully submitted,

/s/ Andrew J. Rossman

Andrew J. Rossman*
Nicholas A. S. Hoy*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
andrewrossman@quinnemanuel.com
nicholashoy@quinnemanuel.com

Gabriel F. Soledad*
Valerie Ramos*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW
Washington, D.C. 20005
(202) 538-8000
gabrielsoledad@quinnemanuel.com
valerieramos@quinnemanuel.com

Joseph H. Margolies*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400
josephmargolies@quinnemanuel.com

Peter L. Welsh (No. 643261)
Daniel V. Ward (No. 667158)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7050
Peter.Welsh@ropesgray.com
Daniel.Ward@ropesgray.com

*Admitted Pro Hac Vice*

*Counsel for Defendant and Counterclaim-Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2024, I served a copy of the foregoing document via ECF to all counsel of record.

/s/ Andrew J. Rossman

Andrew J. Rossman
*Counsel for Defendant and*
*Counterclaim-Plaintiff AIC*